**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

**-against-**                                    **04-CR-402**

**YASSIN MUHIDDIN AREF**
**and MOHAMMED MOSHARREF HOSSAIN**,

                                    **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**MEMORANDUM**
**DECISION & ORDER**

## I.  INTRODUCTION

Defendants YASSIN MUHIDDIN AREF ("Aref") and MOHAMMED MOSHARREF

HOSSAIN ("Hossain") were charged in a thirty (30) count superseding indictment with

various violations of 18 U.S.C. §§ 1956(a)(3), 2339A, 2339B, 1546, 1001 & 2.  Following a

four-week jury trial, Hossain was convicted of each of the twenty-seven (27) counts with

which he was charged.  Aref was convicted of ten (10) of the thirty (30) counts with which

he was charged.  Both defendants now move to vacate their convictions pursuant to Rule

29 of the Federal Rules of Criminal Procedure, or, in the alternative, for a new trial

pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  The government has

opposed the motions.

1

## II. STANDARD OF REVIEW

### a. Rule 29

Both defendants move for judgments of acquittal pursuant to Fed. R. Crim. P. 29 asserting that the trial evidence was insufficient as a matter of law to support the jury's guilty verdicts.  See Fed. R. Crim. P. 29(c).  On such motions, the Court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004)(quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

"[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003).  In this regard, the Court must avoid substituting its own determination of the weight of the evidence presented and the reasonable inferences that may be drawn from that evidence. Id.  "Indeed, it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." Id.  The Court must "credit[] every inference that the jury might have drawn in favor of the government," United States v. Temple, 447 F.3d 130, 136-37 (2d Cir. 2006), and resolve "all issues of credibility in favor of the jury's verdict." United States v. Desena, 260 F.3d 150, 154 (2d Cir. 2001); see also United States v. Florez, 447 F.3d 145, 154-155 (2d Cir. 2006)("In assessing  sufficiency, we are obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court.").

"The traditional deference accorded to a jury's verdict is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." United States v. Jackson, 335 F.3d at 180 (internal quotation marks and citation omitted).  Further, the Court must "bear in mind that the jury's verdict may rest entirely on circumstantial evidence." Id.

Although a defendant's burden on such a motion is not insurmountable, a judgment of acquittal will only be granted if "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  United States v. Cassese, 428 F.3d 92, 98 (2d Cir. 2005).  Put another way, a Rule 29 motion must be denied if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Temple, 447 F.3d at 136 (emphasis in original).

**b.  Rule 33**

Rule 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  This rule

> by its terms gives the trial court broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.  The district court must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury.  Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.  An example of exceptional circumstances is where testimony is patently incredible or defies physical realities, although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief.

3

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.  The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict.  The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.  There must be a real concern that an innocent person may have been convicted.  Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir. 2001)(internal quotation marks and citations omitted).

## III. BACKGROUND

### a.  The Sting and the Charges

The first twenty-seven (27) counts of the superseding indictment arose out of a sting operation in a which a government cooperating witness ("CW") claimed that he was importing a Surface-to-Air Missile ("SAM") into the United States.  The CW proposed a scheme to provide the $50,000 cash proceeds from the importation of the SAM to Hossain who would, in turn, provide monthly checks written to the CW's business, Hay's Distributors, in the total amount of $45,000.00.  See Trial Trans. pp. 299-318, 364-406.  Hossain would keep the remaining $5,000.00.  Id.  In keeping with the Islamic faith that both the CW and Hossain observed, Hossain requested that Aref, the Imam at the local Islamic mosque, serve as the witness to the financial transactions of this plan.  Id.  Aref agreed.  Id.  In January and February of 2004, the CW told Hossain and Aref that the SAM was going to be used in an attack on the Ambassador of Pakistan in New York City in order to teach the President of Pakistan a lesson.  See Govt. Ex. 2 L-T; Govt. Ex. 2 N-T; Trial Trans. pp. 327-28.  The CW further advised that the attack would be carried out by

4

Jaish-e-Mohammed, or JEM, an Islamic extremist group based in Pakistan that is on the United States State Department's list of designated foreign terrorist organizations. See Govt. Ex. 2 L-T; Govt. Ex. 2 N-T.

On the following five dates, the CW provided cash payments to Hossain pursuant to this plan: January 2, 2004 ($5,000.00); January 21, 2004 ($10,000.00); February 12, 2004 ($10,000.00); April 15, 2000 ($10,000.00), and June 9, 2004 ($5,000.00).  Trial Trans. pp 299-318, 364-406.[1]  Each time, Aref received and counted the cash and then gave it to Hossain. Id.  Aref provided receipts to the CW for the cash (although the receipts were not always provided to the CW on the same day that the cash was provided).  Id.  On the following ten dates, Hossain provided a check to the CW made payable to the CW's business: January 2, 2004 ($2,000.00); January 21, 2004 ($2,000.00); February 12, 2004 ($2,000.00);  February 13, 2004 ($6,000.00); March 31, 2004 ($2,000); April 16, 2000 ($5,000.00); May 4, 2004 ($2,000.00); June 1, 2004  ($2,000.00);  July 1, 2004 ($2,000.00); and August 3, 2004 ($2,000.00).  Id.  Aref was present for and witnessed each payment.  Id.

Counts 1-27 charge both Aref and Hossain as follows:

(a) one count of conspiracy to conceal or disguise the nature, location, source, ownership or control of property believed to be the proceeds of violations of 18 U.S.C. §§ 922(a)(1), 2339A and 2339B, in violation of the money laundering sting statute, 18 U.S.C. § 1956(a)(3)(B) & (h) (Count 1);

(b) ten counts, based on ten financial transactions (January 2, January 21, February 12, February 13, March 31, April 16, May 4, June 1, July 1 and August 3, 2004), of attempting, or aiding and abetting an attempt, to conceal or disguise the nature, location, source, ownership or control of property

---

[1] The total amount paid by the CW to Hossain before the defendants were arrested amounted to $40,000.00.

believed to be the proceeds of violations of 18 U.S.C. §§ 922(a)(1), 2339A and 2339B, in violation of the money laundering sting statute, 18 U.S.C. § 1956(a)(3)(B), and 18 U.S.C. § 2 (Counts 2-11);

(c) one count of conspiracy to conceal or disguise the nature, location source or ownership of material support or resources in connection with an attack with a weapon of mass destruction on a person or property within the United States, in violation of 18 U.S.C. § 2339A (Count 12);

(d) seven counts, based on seven financial transactions (on February 13, March 31, April 16, May 4, June 1, July 1 and August 3, 2004), of attempting, or aiding and abetting an attempt, to conceal or disguise the nature, location source or ownership of material support or resources in connection with an attack with a weapon of mass destruction on a person or property within the United States, in violation of 18 U.S.C. §§ 2339A & 2 (counts 13-19);

(e) one count of conspiring to provide material support to a designated terrorist organization (JEM), in violation of 18 U.S.C. § 2339B (Count 20); and

(f) seven counts, based on seven financial transactions (on February 13, March 31, April 16, May 4, June 1, July 1 and August 3, 2004), of attempting, or aiding and abetting an attempt, to provide material support to a designated terrorist organization (JEM), in violation of 18 U.S.C. §§ 2339B & 2 (Counts 21-27).

Three counts charged only Aref with the following offenses:

(a) one count of making a false statement on February 13, 2002 on INS Form I-485 Application to Register Permanent Resident or Adjust Status (answering "none" when directed to list political organizations of which he had been a member or with which he had been affiliated since his 16th birthday), in violation of 18 U.S.C. § 1546 (Count 28); and

(b) two counts of making false statements to the FBI on August 5, 2004 by denying that he had been a member or part of the Islamic Movement in Kurdistan ("IMK"),  and denying that he personally knew an IMK leader, Mullah Krekar, in violation of 18 U.S.C. § 1001 (Counts 29 & 30).

At the conclusion of the trial, the jury convicted Hossain of every count with which

he was charged (i.e Counts 1-27).  Aref was convicted of ten (10) counts as follows: (a)

conspiracy to engage in money laundering (Count 1); (b) two substantive acts of money

laundering, on July 1 and August 3, 2004 (Counts 10-11); (c) conspiracy to provide

material support in connection with an attack with a weapon of mass destruction (Count

12); (d) two substantive acts of material support in connection with an attack with a

weapon of mass destruction, on July 1 and August 3, 2004 (Counts 18-19); (e) conspiracy

to provide material support to a designated terrorist organization (Count 20); (f) two

substantive acts of material support to a designated terrorist organization, on July 1 and

August 3, 2004 (Counts 26-27); and (g) one count of making a false statement to the FBI

(denying that he knew Mullah Krekar) (Count 30).

### b.  Defendants' Arguments

On the instant motion, Hossain contends that:

(a) there was insufficient evidence

      (i) that the SAM was to be used against any person in the United States, and

      (ii) that Hossain knew that JEM engaged in terrorist activities;

(b) the testimony of the government's expert on Islamic fundamentalist groups, Evan Kohlmann, was improperly admitted, without which there was insufficient evidence that Hossain was predisposed to commit the crimes with which he was charged;

(c) the government did not prove that Hossain was predisposed

      (i)  to commit the crimes involving terrorism as charged at Counts 12 through 27; and

      (ii) to engage in money laundering as charged in Counts 1 through 27,

and therefore he is entitled to a finding of entrapment as a matter of law.

Aref contends that his convictions on Counts 1, 10, 11, 12, 18, 19,  20, 26 and 27[2]

---

[2]Aref has not presented any argument challenging his conviction on Count 30.  He contends in his

(continued...)

should be reversed because there was insufficient evidence that:

(a) he supported JEM;

(b) he understood

(i) that the CW imported SAMs,

(ii) that the SAM was to be used in an attack,

(iii) that by witnessing the loan, he was helping to launder the money;

(iv) what the phrase "to legalize the money" meant,

(v) what a missile or chaudry[3] was, and

(vi) that the item that the CW imported was connected to an attack in New York City;

(c) he intended to violate or believed he was violating the law by witnessing the financial transactions between Hossain and the CW.

### c.  The Government's Evidence

The Government contends that the following evidence presented at trial supports

both defendants' convictions on the challenged counts.

### 1.  November 20, 2003 - Display of the SAM to Hossain

On November 20, 2003, prior to any money laundering proposal, the CW and

---

[2](...continued)
Amended Reply Memorandum of Law that "the only reason he did not mention the false statement conviction (Count 30) in the Rule 29/33 memorandum was due to space considerations, and that he does strongly challenge that conviction as well, and will discuss that count in his appeal." Aref Amend. Reply Mem. Law [dkt. # 399], p. 1.  It should be noted that (a) Aref was granted permission to file a fifty (50) page memorandum of law which is twice the length ordinarily allowed under the Local Rules, (b) the page length of the memorandum of law does not restrict the length of exhibits that may be submitted on a motion, (c) Co-Defendant Hossain addressed each of the twenty-seven (27) counts with which he was convicted in a thirty-one (31) page memorandum of law, and (d) Aref offers no argument addressed to Count 30 in his Amended Reply Memorandum of Law.  Because Aref failed to present any arguments, either in his original moving papers or in reply, challenging his conviction on Count 30, the Court will not address that count.

[3]As discussed in the text *infra*, "chaudry" was a code word that the CW used when referring to the Surface to Air Missile.

Hossain had the following conversation about the items that the CW imported from China:

CW:[4]   And we also import weapons from China.

MH:[5]   What is that?

CW:   Ammunition.

MH:   I see, I see.

CW:   We import that too. So, we have two, three contacts in New
         York whose name we import in. They're our brothers, our
         Muslim brothers who live there. You understand, right?

Govt. Ex. 2 D-T 4:2-8.

The CW then showed Hossain a SAM, telling Hossain:

CW:   This - look at this. This came from China, right? Do you know what this is?

MH:   No.

CW:   This is for destroying airplanes. This is heat sensor, you know.

MH:   Yes, Holy is Allah.

CW:   This comes from there, from China.

MH:   Mmmmm.

CW:   It saves us 50,000 rupees. We get 50,000 dollars in this. This comes
         for our Mujahid brothers. I have been doing this work for about five
         years.

MH:   I see.

CW:   This is Muslim work, understand?

MH:   Yes, yes.

---

[4] "CW" identifies the speaker as the confidential witness.

[5] "MH" identifies the speaker as Mohammed Hossain.

CW:     For all these Muslim countries. Today it's going to New York. Today, it came. This comes in our packing, in our containers, see?

MH:     I see, I see.

CW:     From China. This will go straight to New York, it will be shipped.

MH:     I see, I see.

CW:     So yes, I was thinking I'll show this to my brother as well that I also do this business for my brothers, my Muslim brothers. I - It's been about five years. I had a friend who used to do this, but he gave me this work to me to do.

MH:     I see, I see.

CW:     This is easily about four, five thousand worth of merchandise.

MH:     Hmmm.

CW:     Easily.

MH:     Then from New York, it'll be transferred to another place?

CW:     I don't have anything to do with that. My job is to get it to New York. You've heard the term "stinger," right? This is a SAM right? This hits planes.

MH:     Yes, yes.

CW:     It's used for hitting the planes. All the Mujahideen brothers, right?

MH:     I've seen it on television.

CW:     What?

MH:     I had never seen it. I have, but on television.

CW:     On television. Did you like this business? So this is one of my other businesses.

MH:     Good money can be made from this-

CW:     A lot

10

MH:    -but it's not legal.

CW:    What is legal in this world? [laughs loudly] What is legal in this world?
       What is legal is legal?  Huh?  Tell me what is legal in the world? Huh?

MH:    Nothing.

Id. 4:8-5:23.

## 2.  December 2, 2003 - Hossain Demands Money

On December 2, 2003, still prior to any money laundering proposal, and after he

had been shown the SAM, Hossain demanded money from the CW in the following

exchanges:

MH:    No sir. I asked you to give me some money, but you showed me such
       an aspect that-

CW:    When did I? When did I show that? When did you ask me? I asked
       you. You said, "It's this much." So I said, "No problem. Whenever you
       say the word." When do you need this?

MH:    I needed two - three thousand the next day.

Govt. Ex. 2 E-T, 7:2-5.[6]

Later in the conversation, Hossain brought up money once again:

MH:    Okay, now let's not talk about philosophy. I need money.

CW:    How much do you need?

MH:    As much as you can give. Four - three or four months. You'll give it to
       me, and the day you ask for it to be returned, I'll return it to you on
       that day, Inshallah. As much as you can give.

CW:    Okay.

MH:    According to your resources. It's not that - Because I have -

---

[6] Previously, on October 20, 2003, Hossain had told the CW he needed between two and five
thousand dollars.

CW:   I have a lot of resources. My -

MH:   No - [Laughs]. If you have more money, then I'll build another house - that one, that I'm fixing up.

Id. 13:2-11.

### 3.  December 3, 2003 - the CW Proposes the Money Laundering Transaction

The next day, December 3, 2003, the CW responded to Hossain's requests for

money by reiterating that he made money from the "ammunitions" he imported from

China:

CW:   Okay, - ah - yesterday, you - you asked me for some money, right? Five thousand Rupees.

MH:   Whatever you can afford.

CW:   You know, I may - I may - I get some of the ammunition out of China, okay? That's what I do, okay? I make a lot of money, okay? I do it for - in the name of Allah and I do it in the name of Islam to satisfy my inner soul, therefore I do it. That's the only reason to satisfy my inner soul, and I make a lot of money. . . . .

Govt. Ex. 2 F-T, 6:7-12.

After some discussion, the CW summarized a proposed transaction as follows:

CW:   You - fifty thousand Rupees, right? I - I will give you fifty thousand, right? You do this – give me a check of $2,000.00 every month. Forty five thousand - forty five thousand dollars. Five thousand is yours, give me checks for $2,000.00. In two years, I'll get the money in the form of checks. What do you think?

MH:   It sounds very good, but you are making such a big sacrifice? You'll give me so much money, and then afterwards -

Id. 7:1-6.

After Hossain insisted that the transaction be documented in front of a witness, the

12

CW reiterated to whom the missiles were sent:

> CW: I have - we - I do - look - listen. All the missiles which come go for the Jihadis, okay? They all go for Jihadis, okay? What they want to do it, it's up to them - they don't tell me, okay? They don't - I don't want to know that. What's their program, I don't even know that. They come for Jihad, okay? I'm doing it for Jihad too. Making money is - it's - it's - it's a business too.

> MH: Sir, I actually - from my heart, I'm surprised that you opened yourself to me.

Id. at 9:20–25.

### 4.  December 2 and 5, 2003 - "The Walls Have Ears"

The Government asserts that on December 3, 2003 and again on December 5, 2003, Hossain demonstrated his understanding of the illegality involved in the transaction by warning the CW that "the walls have ears," Govt. Ex. 2 E-T, 7:20-21 (December 2); Govt. Ex. 2 G-T, 4:15 (December 5), and specifically cautioning the CW to be wary of FBI Special Agent Timothy Coll.  Also on December 5, Hossain professed his willingness to assist the CW and to lie for him if necessary when he promised: "If you say a cat is a dog, I will say a cat is a dog." Govt. Ex. 2 G-T, 7:5-6.

### 5.  December 10, 2003  - Aref and Hossain Are Told the CW Brings "Ammunitions" From China

The first meeting attended by Aref occurred on December 10, 2003.  At the meeting, the CW reiterated the source of the money, telling Aref and Hossain about "another business" that "I do in the name of Allah . . . I mostly deal with ammunitions too, I bring ammunitions from China and selling it to my brother (UI) back there."  Govt. Ex. 2 I-T, 3:25-4:11.  After summarizing the proposed transaction - i.e. that the CW would give Hossain $50,000, and Hossain would return $45,000 at $2,000 per month - the CW posed

this question to Aref: "I asked him the other day, if the America, we live in this country, if the law says don't do it, but my Allah say to do it, what should I do . . . ."  <u>Id.</u>  at 4:22-25. Although Aref initially stated "I don't believe it is against the law," the CW further explained, "I don't pay taxes, I don't keep in the bank, I don't show it in that, it's the money which I make it with my brother Mujahideen and uh that's how I, I do it." <u>Id.</u> at 5:5-11.

### 6.  January 2, 2004  - the CW Tenders $5,000, Displays the Trigger Mechanism ("This is the Part of the Missile That I Showed You"), and Explains That $45,000 Will Be Coming in the Next Couple of Weeks, After the CW Sends "This Part"

At a meeting on January 2, 2004 attended by both Aref and Hossain, the CW tendered $5,000 of the $50,000 and, while displaying the trigger mechanism for the SAM, explained that he would receive $45,000 in a couple of weeks after sending "this part" to "them:"

CW:   Okay, let's do, do some business, okay, let's make some money, okay, okay. Uh this is $5,000, okay I want you to count it okay, here, Bismillah.

MH:   Bismillah.

CW:   Okay, and the $45,000 will be coming, like I have to give them something, you know the instrument, and that will be coming like, in a, I would say probably couple of weeks from now, okay, cause you needed money, then I have

MH:   yeah.

CW:   to get that, you know.

MH:   Inshallah.

CW:   Because though, uh, because the last time I showed you, you know when I have to send this in, then they will give me $45,000, $50,000,

14

okay. This is the part of the missile that I showed you.[7]

MH:   Oh yeah. [simultaneously with above].

CW:   So as soon as it come, I'll give you, this is $5,000, so next couple of
weeks, or less, I'll get you more money.

Govt. Ex. 2 J-T, 6:5-19.

### 7.  January 2, 2004 - Second Meeting

At a second meeting on January 2, 2004 attended only by Aref, the CW told Aref

that "this money is made in, in a form, I have to legalize the money, you know, I show the

money came from some business, from where. I cannot show, I cannot, the money came

uh, on the black market, you know."  Govt. Ex. 2 K-T, 4:3-6.

### 8.  January 14, 2004 - CW Tells Aref (1) That He Is Working With JEM, and (2) They Sent the Missile to New York City to Teach President Musharreff a Lesson

On January 14, 2004, the CW met with Aref alone. During the conversation the CW

told Aref:

> And uh, the second thing that, uh, as I told you that, uh, the other day and,
> uh, I showed you also, that, uh, I help my, my brother Mujahideen with
> ammunition and stuff like that to fight the wars, Holy Wars. And I don't know
> if I break American laws, but I do not break Allah's laws, Islamic laws, to help
> our brother Mujahideen. And one of the groups I am working with is Jaish-e-
> Mohammed, JEM, Mulana, Azar Mohammad.

Govt. Ex. 2 L-T, 14:14-23.  After Aref indicated that he recognized JEM, the CW

explained:

> He's in Pakistan right now, and he's trying to liberate Kashmir from India.
> And, uh, he's been fighting the holy war for almost now, so many years and

---

[7]Aref claims that he never saw the  trigger mechanism, while FBI Agent Coll testified that he
perceived Aref glancing up when the CW displayed it. There is no dispute, however, that the CW said: "This
is the part of the missile that I showed you."

we're, we are trying to help him in that war. And this President Musharreff,
the President of Pakistan, is against him, and against the Holy War because
he's helping the Mushriq,[8] uh, and uh, we are fighting him too. And that's
why, the missile, that we sent it to New York City to teach Mu, uh, President
Mushareff, the lesson to not to fight with us.

Id. at 15:1-14.

The government contends that Aref recognized JEM as a designated terrorist

organization, commenting that they "classificate that organization with the group which is

they call terrorist group."  Id. at 17:12-13.  Aref warned the CW about the danger of

associating with JEM, stating: "And now if they know any person, he have link with those

people by giving them the money especial, cause now it is the best thing they do in Saudi

Arabia, in Kuwait, and you've got all that, Gulf, and Arab country, it is that, to find out

those people, even if they give the zakat for these organization, they take them to the jail

and they say they support the what, the terrorism."  Id. at 17:14-22.  Aref also advised the

CW "if you know them, you trust them and you believe they are doing right, and you

believe they are fearing Allah, and you believe they are working for Allah, I believe it is

wise for you to help if you can."  Id. at 19:11-15.  But again Aref warned that "if they find

---

[8]The government's Urdu translator testified as follows regarding the word "Mushriq:"

Q.    Just one question about that transcript. The word "Mushriq," can you give us
      the basic definition of the word Mushriq?

A.    Yes. It's a religious Arabic word, which is now part of all non-Arabic speaking
      Muslims' languages. I'm afraid I have to give a bit of a background.

Q.    Sure.

A.    This word was originally applied by the Muslims in the 6th Century to their
      Pagan idolatrist adversaries in the Arabian Peninsula, where Islam arose.
      However, very puritanical Muslims today and extremist radical Muslims now
      use this term to denote, primarily, Christians, Jews and Muslims who do not
      agree with them. So, it is a very pejorative term.

Trial Trans. p. 203.

any link between you and that group, you should to know, you are going to be in the trouble." Id. at 58:3-5.

### 9. February 3, 2004 - Code Word for Missile is Chaudry; Chaudry Will Be Given to the Pakistani Ambassador in New York to Teach Him a Lesson; JEM

On February 3, 2004, the CW met with Hossain, telling him: "Those missiles and stuff, there is a code word for that. The missiles and stuff, right? We have a code word for it. We call it Chaudry. Chaudry. You understand?" Govt. Ex. 2 N-T, 12:15-17.  After explaining that President Musharraf of Pakistan had ruined Qadir Khan, who had built the atom bomb, the CW told Hossain: "So, next week, Inshallah, see. I want to teach him a lesson; to the Ambassador of Pakistan in New York City. We're going to teach him fucking lesson, okay? . . . " Id. at 13:1-3.  The CW continued:  "So next week I have to give Mr . Chaudry to him, to the Ambassador [unintelligible phrase]. I have to give it to the Ambassador." Id. at 13:20-21.   The CW proceeded to ask Hossain if he had heard of Jaish-e-Mohammad (JEM), but Hossain clearly did not know who JEM was. The CW explained that JEM is the organization that fights in Kashmir, and that Azhar Mahmood "was our leader," and that JEM "does it all for us." Id. at 14:1-20.  The CW continued to rail against President Musharraf.

### 10. February 12, 2004 - A Missile Attack Is Coming to New York

On February 12, 2004 there was a meeting between the CW, Aref and Hossain. Also present was a third party, Kassim Shaar.  Shaar testified that at the February 12 meeting, the CW warned Aref and Hossain "there was an attack coming to New York City,

17

a missile attack coming there." See Trial Trans. pp. 327-328.[9]   Shaar reported that Aref

reacted by accusing the CW of taping him, and that Aref searched the CW for a body

recorder. Id. at 328-329.[10]   The CW's warning initially "scared" Kassim Shaar, until Shaar

was told by Aref that the CW was joking. Id. at 329, 356-57.

### 11.  March 2, 2004  - The Suicide Bomber Story

On March 2, 2004 the CW met with Aref and brought up the February 12 meeting,

reiterating his warning of that day not to go to New York because of something happening

to the Consulate:

> CW:   Well, I'm, because the, the other day because I told you something,
> brother, in front of Kassim. I should not say you that do not go to New
> York City because of uh, of something happening to the Consulate
> you know.
>
> YA:[11]   Yeah, that's very dangerous.
>
> CW:   I told you and uh because then we, we have to change it because the
> Consulate didn't show up but that's another story.

Govt. Ex. 2 P-T, 9:4-10.

---

[9]  There is no transcript of this meeting because the body recorder purportedly fell off of the CW on his way to the meeting. The substance of conversations during the meeting were testified to by Kassim Shaar, and by FBI Agent Coll who was monitoring the meeting over a kel transmitter.  Because the conversation was not in a language that Coll understood, he was only able to testify to hearing certain words that he did understand, such as "chaudry."  Shaar testified as follows about the conversation:

> Q.     Did [the CW] say anything about New York City that night?
>
> A.     Actually, he said that -- we are talking about like business and what he does
> and he bring merchandise from New York City; and he, he say that there
> was an attack coming to New York City, a missile attack coming there.

[10]  On cross-examination Aref admitted that on February 12 the CW warned there would be an attack in New York City the next week. Trial Trans. pp. 1600. Aref testified that he didn't hear the word "missile," but he understood attack to mean to "bomb somewhere or fight something." Id.  at 1600-01. Aref did not report the warning to the FBI or other authorities because he was "hundred percent sure that's lie, that's not true." Trial Trans. pp. 1602.  Aref denied patting the CW down in a search of a recording device. Id. at 1602-03.

[11]  "YA" identifies the speaker as Yassin Aref.

The government contends that Aref demonstrated his understanding of the illegality involved by warning the CW not to discuss such things and providing the following example of the suicide bomber who does not even tell his own mother when he is leaving for a suicide mission:

> YA:    No, no, not point here. Maybe not right now. Maybe around ten thousand people they catch. How they get crazy. They catch this person. Maybe they try, how much they try with, with him. How much they give, how much they give him, maybe to take something out after this, when he go in the coma, to treat him, sometime they talk about to control their mind. They cannot bring out any information. Why? Because even that person, he don't know maybe his neighbor declined to, to do something that he don't know. Maybe his brother who use the phone, they live, they live together.  His brother, he is planning to do something. We don't know. In Palestine, a couple of time happen, there's a person he society says he bomb somebody. After that, this person, he just cry. His mom came out, she come, she say this morning, he told me my mom I'm going to my coach and I am going today to get my degree. He mean degree, something else, he mean he became martyr. Allah will give him the degree, but his mom, he don't understand. He say she believe really he is going to his normal

> CW:    Uh huh

> YA:    college and he bring the degree.

Id. at 11:4-23.

Aref also warned the CW that "the person to, today he want to work. I believe he should to work very hiddenly, very secretly, without anybody know." Id. at 12:22-24.

### 12.  June 9 and June 10, 2004 - Aref Invites the CW to Invest His Money By Becoming a Partner in the Purchase of Hossain's Pizzeria

On June 9, 2004, Aref invited the CW to be his partner (supplying money) in the purchase of Hossain's pizzeria in the following exchange:

YA:     Do you want to come in with us?

CW:     Where yours partner, in the pizza?

YA:     Yeah

CW:     Anytime Brother

YA:     Hamdullah

CW:     You need money, I am here brother.

Govt. Ex. 2 R-T, 19:12-17.

In response, on June 10, 2004, the CW explained once again the source from

which the money came as follows:

CW:     Okay. I have money, but I have money in a different forms,
        okay?

YA:     Mmm.

CW:     It's not, uh, I cannot, uh, wake up and say, here is twenty, thirty
        thousand dollars, here.

YA:     Uh-huh.

CW:     I don't have that much, okay? I have it through my business, okay, uh,
        through the business work I do. If I could give Mosharref fifty
        thousand, I can certainly give you fifty thousand dollars, too, you
        know? I can, that is, that's not even a problem. Because my business
        comes from selling ammunitions, you know?

YA:     Mm-hmm

CW:     Chaudrys, we do that, that's where the business money comes from.
        I, I import them, I sell them, and they give me money. We I, I was
        expecting some money to come, but it has gone to the next week, uh,
        next month.

Govt. Ex. 2 S-T, 28:17 - 28:11.

The CW also reminded Aref about the still impending attack, and that after the

20

attack the CW would have to leave the country for two months:

> CW: Remember that, uh, you remember that, uh, it was a month ago we wanted to, that chaudry was going to New York to make that money, but it didn't use. So I, I, I, this, when it happens, I have to leave this country for two months, and then, you know, I'll just go away.

> YA: No problem, no problem, that's no problem.

> CW: So, and then, two month I, I have to go, because if they use the Chaudry on 142, then I have got a problem.[12]

Id. at 34:12-21.

### 13. August 3 & 4, 2004 - Hossain Continues to Worry About the Chaudry

Hossain's concern about the impending missile attack continued. On August 3, 2004, Hossain told the CW:

> MH: Regarding that CHAUDHRY- WODHRY, you worried me very much. You were going to come on Sunday. I kept calling and all that – nothing. No news at all. I thought God forbid if something has happened?

Govt. Ex. 2 T-T, 3:5-7.

Following his arrest on August 4, 2004, Hossain acknowledged hearing the warning about a missile attack, but claimed he thought the CW was joking.  Hossain also claimed that he thought the SAM he had seen was a "plumbing supply."  Trial Trans. p. 410.

## IV. DISCUSSION

### a. Hossain's Arguments

#### 1. Sufficiency of Evidence - Counts 12 - 19

---

[12] The location of the purported attack was supposed to be at First Avenue and 44th Street in New York City, the location of the United Nations's building. See Tr. Trans. 383.  From the context of the June 10, 2004 conversation, it could reasonably be inferred that the CW was referring to this attack although he mis-identified the location as First Avenue and 42nd Street.

Hossain first argues that the evidence was insufficient to support a conviction on Counts 12 through 19 because the government failed to adduced evidence that he knew that the money provided by the CW was the proceeds of a SAM that was intended to be used "against any person or property in the United States" as required by 18 U.S.C. § 2332a. The Court disagrees.

The defendants were charged in Count 12 with a conspiracy to provide material support in connection with an attack on a person within the United States with a weapon of mass destruction in violation of 18 U.S.C. § 2339A. Section 2339A provides in applicable part:

> Whoever provides material support or resources or conceals or disguises the nature, location, source or ownership of material support or resources, knowing or intending they are to be used in preparation for or carrying out a violation of . . . Section 2332a [is guilty of a crime].

18 U.S.C. § 2339A(a).

Section 2332a provides in applicable part:

> **(a) Offense against a national of the United States or within the United States.–** A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction–
>
> > * * *
>
> > **(2)** against any person or property within the United States, and
>
> > > * * *
>
> > > **(D)** the offense, or the results of the offense, affect interstate or foreign commerce, or, in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce;
>
> shall be imprisoned for any term of years or for life, and if death results, shall be punished by death or imprisoned for any term of years or for life.

22

18 U.S.C. § 2332a(a)(2)(D).

The term "weapon of mass destruction" includes any destructive device, such as any explosive, incendiary or poisonous gas missile having an explosive or incendiary charge of more than one quarter ounce.  18 U.S.C. § 2332a(c)(2)(A); 18 U.S.C. § 921(a)(4)(A)(iv).  The alleged material support or resources was the act of money laundering to facilitate the covert importation of the SAM that, in turn, was to be used for an attack on the Ambassador of Pakistan in New York City. See 18 U.S.C. § 2339A(b)(1) ("[T]he term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services . . . .").  Counts 13 through 19 charged Hossain both as a principal and an aider and abettor of seven substantive acts of providing material support in connection with such an attack.  These counts are based upon seven financial transactions occurring on February 13, March 31, April 16, May 4, June 1, July 1 and August 3, 2004.  On each of these dates, Hossain provided to the CW a check written to Hayes Distributors.

There was sufficient evidence from which the jury could reasonably have concluded that, at some point before any of these seven financial transactions occurred, Hossain understood that he was laundering money to support the secret importation of a SAM that would be used in an attack in New York City.  By November 20, 2003, Hossain was aware that the CW was importing a SAM, a weapon that could be used to shoot down an airplane, and that the SAM would be shipped to New York City so that it could be used by "our Muslim brothers," "our Mujahideen brothers."  Hossain's understanding of the illegality of the importation of this weapon was supported by the conversations between the CW and Hossain.  During the November 20, 2003 conversation, Hossain told the CW that the

23

importation of the SAM was "not legal" to which the CW retorted: "What is legal in this world? [Laughs loudly] What is legal in this world?  What is legal is legal?  Huh?  Tell me what is legal in the world? Huh?"  <u>See</u> Govt. Ex. 2D-T, 5:21-23.   Hossain replied: "Nothing."  <u>Id.</u>

On December 3, 2003, the CW told Hossain that the SAM was for Jihad.  Although the word Jihad has varying meanings, both violent and non-violent, the term is often associated with a violent religious war against non-Muslims.  The word Jihad was defined for the jury, <u>see</u> trial trans. pp. 194-195,[13] and the jury could reasonably have concluded

---

[13]The government's Urdu translator testified as follows:

Q.     Thank you. Now, yesterday, we looked at a transcript from September the 30th that had the word "Jihad" in it, do you recall that?

A.     Correct, yes.

Q.     And I believe you indicated that that word, the translation, there were many complexities to that word?

A.     Correct.

Q.     And would you briefly describe to us the complexities of that word in the context of what we're discussing here?

A.     Very well. When I said holy war was the simplest rendition, it really is too simple, because the root word for Jihad, in Arabic, means struggle, striving, and it can mean a simple struggle, like struggling to overcome financial difficulties. It can also mean a struggle of people who you believe are aggressive and preventing you perhaps from following your religion.

        The reason it's called holy is if anything is done in God's name, or Allah's name, it's considered to be holy. For example, historically speaking, a Jihad could mean a struggle against the evil within you, your evil impulses, temptation, something that is wrong.

        There could also be a Jihad against poverty, that means you want to do your best in God's name to eliminate poverty. It could also mean, and very often historically and commonly in the war sense, it used to mean a defense against people who are preventing you or your society from practicing Islam.

        These days, in extremist rhetoric, it means a war against anyone who you do not approve of as being Muslim or as being in favor of Muslims.

(continued...)

that it was used in this context by the CW and understood in this sense by Hossain.  <u>See</u> Hossain Ex. 3 (October 20, 2003 conversation between the CW and Hossain in which the two discuss each other's view of Jihad).  Viewing the evidence in the light most favorable to the government, a reasonable jury could have concluded that on December 3, 2003, Hossain had reason to suspect that the SAM, a weapon of mass destruction, would be used by Muslim brothers from New York City to shoot down airplanes as part of a violent Jihad.

On December 5, 2003, the following conversation occurred between the CW and Hossain that lends further support to the proposition that Hossain was aware that the SAM would be used as part of a religious Jihad:

> CW:   Yes, what is happening now is wrong.  What is happening now is wrong. Whatever I do, I do because, as the Prophet has said, "When your dogma, faith, and Islam are in danger, sacrifice your wealth, wife, children and everything." I have made the sacrifice.  Now I will face whatever is to happen to me.  This is my sacrifice.  Whatever I'm doing, I'm not doing anything wrong, nor am I breaking any law.  I'm smuggling from there and giving to my brothers.   As for the payment I get - I get good payment.  But if I don't, who will?  This is the question that arises.  I don't want to see one non-believer killing a hundred people on TV, doing it to our Muslims, because when I die tomorrow, God will ask me: "what did you do?"  In answer to this question, I can say, "O God, I tried to stop them."

> MH:   Everyone's safety is in God's hands.

---

[13](...continued)

Q.     So, is it fair to say the meaning of the word Jihad depends on the context in which it's used?

A.     It very much depends on the context. The main thing is you call it a Jihad when you do it for God, whatever you are calling a Jihad.

Trial trans. pp. 194-195.

CW:   Whatever happens to me tomorrow, whether I go to jail or am
hanged, God only knows.  I don't know this.  No one knows
about tomorrow.  I am not selling any kind of drug, nor am I
selling any kind of weapon that can cause a man to be killed.  I
am just delivering all this so that the Muslims can protect
themselves, from non-believers.  If this is sin, I'm doing it
hundreds of times. Not once, but hundreds of times.

MH:   No, no, this is good.  What you are saying now - this is good.

Govt. Ex. 2 G-T, 10:23- 11:13.

Further, the evidence supported the proposition that the CW wanted Hossain to

launder the money gained from this illegal importation so that government authorities

could not trace it to its source.  The CW told Hossain on December 5, 2003: "The money

that comes to me has to be dissolved somewhere, I have to show it somewhere.  I can't

put it in a box and keep it hidden behind a door."  Id. 11:15-17.  The agreement that the

CW would give Hossain $50,000 to be repaid, in the amount of $45,000, by checks from

Hossain to the CW's company, Hays Distributors, supports the conclusion that the

scheme was intended to make it appear as though the CW's company had earned the

money through legitimate business with Hossain when in fact it had not.  Based on

Hossain's nearly contemporaneous warning to the CW that "the walls have ears" and his

assurance that he would lie if necessary to assist the CW, there was ample evidence from

which the jury could have inferred that Hossain entered into the money laundering scheme

with full awareness of its illegality and the need for secrecy to allow the scheme to

continue.

The nature of the monetary transactions also render hollow any argument that the

money exchanged between the CW and Hossain was simply a legitimate business loan.

See United States v. Gotti, 459 F.3d 296, 337 (2d Cir. 2006)("[W]e believe that there was

26

ample evidence upon which a jury could conclude that the defendants-appellants participated in concealment money laundering, i.e., that they participated in a transaction (delivery of the cash) that was designed at least in part to conceal the source of these moneys."). Indeed, on January 12, 2004, amid the conversations of the impending missile attack in New York City, the CW gave to Hossain via Aref $10,000.00 in cash and Hossain gave back a check, made out to Hays Distributors, in the amount of $2,000.00. This check was followed the next day by a similar check in the amount of $6,000.00. The jury could well have concluded that Hossain knew that the transactions were intended to conceal the source of the proceeds from the CW's illegal importation of the SAM and to allow the money to enter the stream of commerce from what would appear to be legitimate business dealings.

There was also ample evidence from which the jury could reasonably have concluded that, by February 13, 2004, Hossain knew that the SAM he had been shown would be used in an attack in New York City. On February 3, 2004, the CW told Hossain that the SAM, which the CW had been referring to by the code word "Chaudry," would be "given" to the Ambassador of Pakistan in New York City to teach the President of Pakistan a "fucking lesson." Certainly, in the context of the conversation that the comment was made, the jury could reasonably have concluded that the CW was implying that the SAM would be "given" to the Ambassador in the sense that it would employed against him in order to kill him, not presented as a gift.

On February 12, 2004, the day before the first substantive § 2339A offense, the CW provided clear indication to Hossain that the SAM would be used against a person within the United States. In the presence of Hossain, Aref and Kassim Shaar, the CW

warned about an impending missile attack in New York City.  <u>See</u> Trial Trans. pp. 327-
328.  Although the SAM was not specifically referenced and although Aref told Sheer that
it was a joke, the jury could reasonably have concluded that, based upon the totality of the
circumstances, Hossain understood that the missile referred to in this conversation was
the SAM and that the purported attack was no joke.

From all of this, the jury could reasonably have concluded that, as of February 13,
2004, Hossain knew that he was engaged in a money laundering scheme supporting the
importation of the SAM, a weapon of mass destruction, and that the SAM was going to be
used by Muslim Mujahideen brothers against the Ambassador of Pakistan in New York
City.   Put another way, a jury could reasonably have concluded from the conversations
with the CW and the circumstances as a whole that Hossain knew by February 13, 2004
that the money he was laundering supported the importation of a SAM that was to be
used in an attack in New York City, but that he nonetheless proceeded with the money
laundering scheme on and after February 13, 2004.  Thus, on Hossain's sufficiency of
evidence challenge on Counts 12 through 19, the motion is denied.

Under Rule 33, the Court must review the entire record.  Doing so does not yield
the conclusion that Hossain is innocent of the charges contained in Counts 12 through 19.
While there is evidence that, in conversations prior to February 12, 2004, the CW
indicated that he did not know where the SAM would be sent after being sent to New York
City; that the SAM might be sent "back there;" and that the SAM might be used to protect
Muslims fighting in another country, the evidence as a whole overwhelmingly supports the
conclusion that by February 12, 2004, before any of the acts underlying the Section
2339A counts, it was known to Hossain that the SAM was purportedly to be used against

the Ambassador of Pakistan in New York City.  Thus there was sufficient evidence for the

jury to conclude that, by this date, Hossain knew, or should have known, that any further

attempts he made to hide the proceeds of the illegal importation of the SAM served to

provide material support for the use of a weapon of mass destruction against a person

within the United States and that, despite this knowledge, he willingly continued with the

money laundering scheme. Therefore, the Court does not find that Hossain's convictions

on Counts 12 through 19 constitute a manifest injustice and his Rule 33 motion in this

regard is denied.

### 2.  Sufficiency of Evidence -  Counts 20 - 27

Next, Hossain contends that the evidence was insufficient to support convictions on

Counts 20 through 27.  In this regard Hossain argues:

> Even looking at the evidence in the light most favorable to the government, .
> . . there is no evidence that defendant Hossain "knew" that JEM was a
> foreign terrorist organization. The government did not meet its burden of
> proof against defendant Hossain with respect to Counts 20 through 27
> sufficient for a conviction of guilty.

Def. Hossain Mem. L. p. 15.   The Court disagrees.

Count 20 charged Aref and Hossain with a conspiracy to provide material

resources and support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B.

Counts 21 through 27 charged Aref and Hossain with seven counts of knowingly

attempting to provide, and aiding and abetting the provision of, material resources and

support to a foreign terrorist organization in violation of Section 2339B.

Section 2339B provides:

> Whoever knowingly provides material support or resources to a foreign
> terrorist organization, or attempts or conspires to do so, shall be fined under
> this title or imprisoned not more than 15 years, or both, and, if the death of

any person results, shall be imprisoned for any term of years or for life.  To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d) (2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

18 U.S.C. § 2339B(a)(1).

The term "material support or resources" used in this Section means any property, tangible or intangible, or service, including financial services. 18 U.S.C. § 2339B(g)(4).  A "designated terrorist organization" is one so designated by the Secretary of State through Section 219 of the Immigration and Nationality Act.  18 U.S.C. § 2339B(g)(6).  The term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed and which involves an assassination or the use of any explosive, firearm, or other weapon or dangerous device with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property, or a threat, attempt, or conspiracy to do any of the foregoing. 8 U.S.C. § 1182(a)(3)(B)(iii)(IV), (V)(b), (VI).[14]  The term "terrorism" is defined to mean premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents. 22 U.S.C. § 2656f(d)(2).

The sole mention of JEM to Hossain occurred on February 3, 2004.  <u>See</u> Govt. Ex. 2N-T.  During this conversation, after telling Hossain that the code word for "the missiles and stuff" is "chaudhry," the CW told Hossain that he wanted to teach President Musharref

---

[14]The jury was instructed that it was unlawful to discharge a Surface-to-Air Missile aimed at a person or property in New York City.

30

of Pakistan a lesson so, the following week, he would "give Mr. Chaudhry to him, to the

Ambassador." Id. at 12:5 - 13:23.  Immediately after making this threat, the CW asked

Hossain if he had "heard of - have you heard the name of Jaish-e-Mohammad, the

organization? Of Azhar Mahmood?"  Id. at 14:1-4.  Hossain replied that he thought JEM

was a singing group and that he had not heard of Azhar Mahmood. Id. at 14:7, 14:14-17.

The CW explained that JEM is the organization that "fights in Kashmir," and that Azhar

Mahmood "was our leader," and that JEM "does it all for us." Id. at 14:8-14.  Then,

immediately after telling Hossain that "[w]hatever we need, [JEM does] it for us," the CW

stated: "The bastard, Musharraf, the sister fucker.  Musharraf is such a bastard." Id. at

14:21-23. The following exchange then occurred between the CW and Hossain:

> MH:   Still sir, I will only say this from the bottom of my heart.  See,
>       initially, we exchanged greetings only.  Then when -
>
> CW:   Now you -
>
> MH:   Then, when ties grew stronger - as they grow stronger, then
>       there should be concern for one another.
>
> CW:   Yes.
>
> MH:   That is the reality of Muslims and human beings.  This is also
>       true for Mushriqs.  That, when they start to become better
>       friends with each other, they start to love each other, they take
>       care of each other, making sure that nothing happens to our
>       friend, and they also take care that nothing should happen to
>       our brother.
>
> CW:   That's why we are so careful, see.  That's why I'm very, very
>       careful that only two people are aware of this.  You, me, and -
>
> MH:   Brother Yassin.
>
> CW:   Brother Yassin, and no one else.
>
> MH:   Brother Yassin won't tell anyone.

CW: Do you understand?  If anyone has to leak out, is you people, two people, okay?

MH: No, you don't understand Brother Yassin.  Not till today.

CW: No, he knows.  I have talked to him.

MH: You have talked to him?

CW: Yes.  He knows.

MH: Maybe he is not telling me.  I did not tell him either.

CW: [CW laughs loudly].

MH: From now on, it's in your trust.

Govt. Ex. 2 N-T, 14:21 - 15:21.

The jury could have reasonably concluded from this conversation, during which Hossain acknowledges both the necessity for a veil of secrecy over their dealings and the need for Muslims to protect each other, that Hossain understood that it was JEM that would carry out the use of the SAM on the Ambassador in order to teach the President of Pakistan a lesson for his actions against Muslim interests in Pakistan.  As indicated above, the evidence was sufficient for the jury to conclude that, by February 13, 2004 (the day of the first substantive Section 2339B count), Hossain knew that the SAM was transported to Muslim brothers in New York City to be used there for an attack on the Ambassador of Pakistan.   By simple deductive reasoning, the jury could reasonably have concluded that, despite Hossain's lack of prior familiarity with JEM, he knew that members of this Muslim organization were intending to engage in terrorist activity by attempting to assassinate the Ambassador of Pakistan via the use of a the SAM, an explosive, firearm, or other weapon or dangerous device. Further, the jury could have concluded that despite

32

this knowledge, Hossain engaged in financial transactions intended to hide the source of the funds from the importation of the SAM for this organization and thereby knowingly provided support to an organization that engages in terrorist activities.

Thus, the evidence was sufficient for a reasonable jury to conclude that Hossain knowingly provided material support or resources to a foreign terrorist organization knowing that the organization engages in terrorist activity in violation of 18 U.S.C. § 2339B(a)(1). Accordingly, Hossain's Rule 29 motion addressed to the convictions on Counts 20 through 27 is denied.

Based upon the totality of the evidence presented in this case, the Court does not find that Hossain's convictions on Counts 20 through 27 constitute a manifest injustice. Consequently, Hossain's Rule 33 motion in this regard is also denied.

### 3. Entrapment

### A. Admission of Expert Testimony

_____With regard to the entrapment defense, Hossain first argues that the Court erred by allowing Evan Kohlmann to testify as an expert on political groups in Bangladesh, and contends that, without Kohlmann's testimony, the government would not have been able to establish Hossain's predisposition to commit the crimes charged. The argument is unpersuasive. The present challenge to the admissibility of Kohlmann's testimony on this subject matter was raised and rejected at trial. See dkt. # 329; dkt. # 336; trial trans. pp. 1166-1173, 1193. The Court adheres to it previous ruling. The basis of Kohlmann's knowledge regarding the various political parties in Bangladesh, and their ideologies, was gained in a manner similar to that employed in other federal courts involving terrorist

organizations.  See United States v. Paracha, 2006 WL 12768, at * 20-*21 (S.D.N.Y. Jan.

3, 2006) ("Kohlmann also necessarily relies on secondary sources to form his opinions

about secretive terrorist organizations. His use of such sources is permissible.").  The

basis of Kohlmann's knowledge affected the weight of his testimony, and counsel was free

to, and in fact did, address that basis on *voir dire* and cross-examination. See Trial Trans.

p. 1189-1193, 1216-1223.  Further, for the reasons discussed below, there existed

sufficient evidence of Hossain's predisposition apart from Kohlmann's testimony.

Therefore, the admission of Kohlmann's testimony does not warrant a judgment of

acquittal or a new trial.

## B.  Entrapment as a Matter of Law

Hossain next argues that he is entitled to the entrapment defense as a matter of

law because the government did not prove that he was disposed to commit money

laundering or acts of terrorism prior to meeting the CW.   In this regard, Hossain argues

that the transcripts of conversations between Hossain and the CW establish that, before

the CW proposed the money laundering scheme, Hossain professed both his intention to

follow American law and a view critical of acts of terrorism or violent Jihad.   Hossain

contends that since the Supreme Court has held that a person's disposition must be

judged from a point in time before contact with law enforcement officers, see Jacobson v.

U.S., 503 U.S. 540, 549 (1992), and since he expressed views antithetical to money

laundering and terrorism crimes after meeting the CW but before the government's agent

induced these crimes, he is necessarily entitled to a finding of entrapment as a matter of

law.  The Court disagrees.

34

First, Hossain bases his argument on an overly restrictive view of the law of entrapment. "The entrapment defense exonerates a defendant who engages in criminal behavior when the activity of government agents implants in the mind of an innocent person the disposition to commit the alleged offense and induces its commission." United States v. Myers, 692 F. 2d 823, 835 (2d Cir. 1982)(interior quotation marks and citation omitted).  This "affirmative defense [first] requires a defendant to prove by a preponderance of the evidence the government's inducement to commit the crime." United States v. Brand, 467 F.3d 179, 189 (2d Cir. 2006).  If, as was the situation in this case, the government concedes inducement, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime.  Id. This is so because the entrapment defense arises only when "the criminal conduct was the product of the creative activity of law enforcement officials." United States v. Siraj, — F. Supp. 2d —, 2007 WL 29398, at * 2 (Jan. 4, 2007 E.D.N.Y.)(citing Sherman, 356 U.S. at 372).

> But the defense of entrapment is not established simply because government agents afford opportunities or facilities for the commission of the offense.  The legal defense of entrapment is not established whenever a defendant is caught by a ruse.

United States v. Myers, 692 F. 2d at 835.  As the Supreme Court has held, the entrapment doctrine draws a line "between the trap for the unwary innocent and the trap for the unwary criminal." Sherman, 356 U.S. at 372.

> That government agents merely afford opportunities or facilities for the commission of the offense does not constitute entrapment . . . . [Sherman, 356 U.S. at 372]. Likewise, the mere fact of deceit will not defeat a prosecution; it is only when the government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play. United States v. Russell, 411 U.S. 423, 436, 93 S.Ct. 1637,

36 L.Ed.2d 366 (1973).

United States v. Siraj, 2007 WL 29398, at * 2.

It is true that, to prove that the defendant is an unwary criminal and not an unwary innocent who has been duped or cajoled into committing a crime, the government must prove that the defendant was disposed to commit the crime prior to government involvement with the defendant. Jacobson, 503 U.S. at 549; see Brand, 467 F.3d at 192.[15] But the government is not limited to proving predisposition solely by evidence of the defendant's conduct prior to the commencement of the government's investigation. Rather, "predisposition may be shown by evidence of: (1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." Brand, 467 F.3d at 191 (internal quotation marks and citation omitted). The third of these three ways for proving predisposition relies upon the defendant's conduct after contact with the government agent, and the holding of Jacobson does not extinguish this avenue. See Brand, 467 F.3d at 192 ("[E]ven under Jacobson, the Government can still establish predisposition based on the accused's ready response to the inducement."). Thus, to the extent that Hossain now argues that predisposition may

---

[15] In Brand, the Second Circuit wrote:

Because we are bound by the Court's holding in Jacobson, Brand is correct in pointing out that the government's reliance on certain evidence of acts that occurred *after* Brand's initial contact with government agents is misplaced.  This evidence would not be probative of "petitioner's state of mind *prior* to the commencement of the Government's investigation."

Brand, 467 F.3d  at 192 (quoting Jacobson, 503 U.S. at 549 n. 2)(emphasis in original).

not be established by proof of a defendant's ready and willing response to an inducement

to commit a crime, the motion must be denied because the Second Circuit has clearly

rejected such an argument.  See Brand, 467 F.3d at 192.

Second, the evidence in the case, when viewed in the light most favorable to the

government, see Brand, 467 F.3d at 191 (since the argument is "in substance an attack

on the sufficiency of the government's evidence of predisposition, that evidence must be

viewed in the light most favorable to the government, and all reasonable inferences must

be drawn in the government's favor")(citations omitted), does not establish that Hossain is

entitled to the entrapment defense as a matter of law.  A defendant is entitled to the

entrapment defense as a matter of law if, viewing the uncontradicted evidence, the jury

could have reached only one conclusion on the defense.  Sherman v. United States, 356

U.S. 369, 373 (1958); see United States v. Nguyen, 413 F. 3d 1170, 1177 (10th Cir. 2005)

("Entrapment exists as a matter of law only if the evidence of entrapment is

uncontradicted.")(citation omitted).  "In other words, entrapment as a matter of law exists

only when there is undisputed testimony which shows *conclusively* and *unmistakably* that

an otherwise innocent person was induced to commit the criminal act." Nguyen, 413 F. 3d

at 1178 (citations and interior quotation marks omitted, emphasis in Nguyen).

While Hossain points to some of his statements that, in isolation, seem to express

a lawful and pacifistic attitude, when read in context and in the light most favorable to the

government, they lend themselves to a diametrically different interpretation.  For instance,

Hossain points to the August 7, 2003 transcript in which he professes, *inter alia*:

> MH:   I am a true citizen of this country. I am one of the best citizen in
> this country. I am teaching my children behave. I am a
> businessman. I am a house owner. I have nothing to do with

anything else. This is my country.

Govt. Ex. 2A-T at 25:21-26:1.

When read in context, however, the statement is susceptible to a decidedly different connotation.  The above-quoted statement was given in response to the CW's question of whether the 9/11 attacks gave a "bad name for the whole of Muslim society." Id. at 25:20, Hossain responded: "Indeed, indeed. Certainly it did, it took me/him two hours to - Osama Bin Laden" and then made the above quoted-statement.  During the conversation, however, Hossain questions whether the 9/11 attacks were carried out by Osama Bin Laden or some other group, id. at 24:20-21 (MH: "Now I don't rightly know whether Bin Laden did this or someone else did it, for whatever reason. God the Master knows this."), and states his view that simply because Muslims were on the planes that flew into the World Trade Center buildings does not necessarily mean that Muslims carried out the attacks. Id. at 25:6–12.  In addition, after the above-quoted passage, Hossain makes the following statements:

> CW:  True.  But - er - wrong publicity doesn't it create - er - wrong atmosphere?
>
> MH:  You know, satanic influence, when it comes - Satan does so many way. Now, Allah Wa'Alam, I don't know.  That day, there is  - I heard that so many Jews supposed to go to the World Trade Center, but none of them showed up.  One word, and then they didn't protest that word. They didn't say, "No there was some Jew die."  None.  And there is so many newspaper. And they didn't say anything.  They didn't protect themselves and go, "No!  You're lying!  Who says?" They didn't say anything.
>
> CW:  But, so you think that all the Islamic - er -er - enemies against Islam?
>
> MH:  Against Islam - this - this most likely, my heart says.

38

> Otherwise, my brother, let me tell you, this like Osama Bin Laden, like that kind of guy, who know the Koran, who know the Hedeeth - the Prophet, may God's peace and blessing be upon him, repeatedly says, "If some one person kill one human being, as he kill whole mankind. If he who save one mankind save whole world."

CW:   But does, here - Bin Laden killed three thousand people.

MH:   That's - that's of course, kill and be killed, [followed by a unintelligible and garbled Arabic saying]

CW:   Islamic - that's against Islamic - er - Islamic version.

MH:   No, no, no this is - let me tell you.  Under - under such circumstances: if you try to kill me, I have the right to protect myself.  By protecting me, if you get killed, I don't know, - I mean, see if you - when you declare, you know, the fight against me, I have to - I have nothing any other choice but fight against you, you know.  Under that circumstances.

Id. at 26:1-21.

While the meaning of Hossain's statements during this conversation are open to varying interpretations, a reasonable jury could have concluded that Hossain was not professing his disposition to abide by the laws of this country, but rather his religious or philosophical right to fight back against those who he perceives have declared a fight against him or the Islamic faith - or who have made his life as a Muslim more difficult.

Other statements offered by Hossain to show his lack of predisposition also lend themselves to the opposite conclusion when reviewed in the context of the conversation with which they were spoken and viewed in the light most favorable to the prosecution.  At page 25 of his Memorandum of Law, Hossain cites to the November 20, 2003 transcript and argues that on this date "Defendant Hossain directed Malik to his faith instead of violence."  Def. Hossain Mem. L. p, 25 (citing Govt. Ex. 2D-T at 7:8-11).  The quoted passage of this transcript does indicate, in isolation, that Hossain is extolling the pacifistic

39

virtues of Islam:

> MH:   So, that - that things is - is clear indication even though enemy, we
> cannot kill them like a coward. We have to let them elect their fight.
> As you see, in Badr and all of those battles, we had faith. If they have
> more soldiers, they have less, it doesn't matter, **have more power in
> your faith.**

Govt. Ex. 2D-T at 7:8-11(emphasis added by Hossain).  But immediately after making this

statement, Hossain states:

> MH:   Allah will support, and therefore but still we're gonna fight, face
> to face - rather, until death, it doesn't matter.

Id. at  7:13-14.  While Hossain may not have been advocating violence in this

conversation, the jury could well have interpreted it as Hossain's view that violence in this

world is inevitable and, therefore, everyone must be prepared to engage in it when so

confronted.

In addition, many of the statements offered by Hossain to demonstrate his lack of

predisposition were made before the CW showed Hossain the SAM on November 20,

2003, see Plf. Mem. L. pp. 24-30 (citing, *inter alia,* statements made on August 7, 2003

[Govt. Ex. 2A-T]; October 20, 2003 [Hossain Ex. 3]; November 11, 2003 [Govt. Ex. 2D-T]),

before the CW proposed the money laundering scheme on December 3, 2003, see id.

(citing, *inter alia*, statements made on November 20, 2003 [Govt. Ex. 2D-T]; December 3,

2003 [Govt. Ex. 2F-T]), or before the CW indicated that the SAM would be used for an

attack within this country by JEM.  See Id.  pp. 29-30  (citing, *inter alia*, statements made

on January 2, 2004 [Govt. Ex. 2J-T[16]].  While these statements might have reflected a

---

[16]Hossain cites to Government Exhibit 2K-T, but the quoted statements appear in the transcript which is marked as Government Exhibit 2J-T.

general philosophical disposition contrary to crime or violence, the jury could reasonably have concluded that they did not represent an aversion to the specific criminal conduct that the CW eventually induced.  See Brand, 467 F.3d at 190 (inducement for purposes of the entrapment defense includes "soliciting, proposing, initiating, broaching or suggesting the commission of the offense charged.")(citation omitted ).

Further, there was sufficient evidence to support the conclusion that Hossain readily and willingly went along with the various criminal transactions without persuasion by the CW.  As indicated above, when the CW showed Hossain the SAM on November 20, 2003 and explained that he had imported it from China, Hossain immediately recognized that "a lot of money can be made from this" but also recognized that "it is not legal."  The CW retorted: "What is legal in this world? [Laughs loudly] What is legal in this world?  What is legal is legal?  Huh?  Tell me what is legal in the world? Huh?"  See Govt. Ex. 2D-T, 5:21-23.  Hossain replied: "Nothing."  Id.  Yet, on December 3, 2003, Hossain pursued the CW looking for money, and when the CW explained on December 5, 2003 that he made his money by selling the SAM to the Muslims so they could protect themselves from non-believers, Hossain replied: "No, no, this is good.  What you are saying now - this is good."  Govt. Ex. 2 G-T, 11:13.  The jury could reasonably have concluded from these conversations that Hossain entered the money laundering scheme without persuasion and with a full awareness of its illegality.  Similarly, in February 2004, when the CW advised that a missile attack was coming to New York and provided another $10,000 toward the money laundering scheme, see Trial Trans. pp. 327-328; 380-381, 384-385, Hossain did not protest, seek to withdraw, or indicate his aversion to the underlying conduct, but readily and willingly went along with the plan and pledged his

41

loyalty to the CW's need for secrecy.

Hossain's arguments that the CW tricked him about the legality of the transactions are unpersuasive because he relies on statements that, when taken in the context of which they spoken, reasonably support the opposite proposition.  For example, on November 20, 2003, when the CW showed Hossain the SAM and told him that it was imported for "our Mujahideen brothers," Hossain immediately recognized the illegality of importing the weapon to which the CW only laughed and asked repeatedly: "What is legal in this world."  The CW does not state that his conduct is legal, and given the totality of the circumstances and conversations between Hossain and the CW about Jihad and Muslim strife, the jury could reasonably have concluded that Hossain understood the rhetorical question to be directed to what was legal within the philosophical or religious context - not within the context of American law.

A similar interpretation could reasonably have been reached with regard to the December 5, 2003 conversation in which the CW stated: "Whatever I'm doing, I'm not doing anything wrong, nor am I breaking any law" and  "I am not selling any kind of drug, nor am I selling any kind of weapon that can cause a man to be killed."  See Govt. Ex. 2 G-T, 10:23-11:13.  As the full context of this conversation reveals, the statements were made as part of a discussion in which the CW told Hossain that he smuggled the SAM for his Muslim brothers so they could "protect themselves from non-believers," id.  and told Hossain:

> What is happening now is wrong.  What is happening now is wrong.
> Whatever I do, I do because, as the Prophet has said, "When your dogma,
> faith, and Islam are in danger, sacrifice your wealth, wife, children and
> everything." I have made the sacrifice.  Now I will face whatever is to happen
> to me.  This is my sacrifice.

42

Id.

_____Certainly, a jury could have reasonably concluded that the CW was telling Hossain that his conduct, while perhaps justified under religious law, was illegal under American law and subject to severe consequences if divulged.   The jury could have concluded that the CW would not have had to face any consequences or make any sacrifice if his conduct was legally proper under American law.   Accordingly, the evidence does not support the contention that Hossain was duped into the illegal scheme by the misrepresentation that the CW's conduct was in accordance with American law.

The Court concludes that, to the extent that Hossain argues that the evidence was insufficient to establish his ready and willing response to the inducement to commit the crimes charged, the motion must be denied.  There was a wealth of evidence from which a jury could reasonably have concluded that Hossain readily and willingly went along with the proposed crimes with full awareness of their illegality and without persuasion or trickery by the CW.  The Court also finds that, viewing the evidence in its totality, there is no basis for a new trial arising from Hossain's invocation of the entrapment defense. Therefore, the Rule 29 and 33 motions in this regard are denied.

### b.  Aref's Arguments

_____Aref contends that his convictions on Counts 1, 10, 11, 12, 18, 19,  20, 26 and 27 should be vacated under Rule 29 because of insufficient evidence that supports each of the essential elements of each crime of conviction.  In the alternative, he argues that he should be granted a new trial under Rule 33.  The Court disagrees.

### _____1.  Counts 20, 26, and 27 - Support for JEM

_____Aref first argues that his convictions on Counts 20 (conspiracy to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B ), 26 (attempting, or aiding and abetting the attempt, to provide material support to a foreign terrorist organization on July 1, 2004 in violation of 18 U.S.C. §§ 2339B & 2) , and 27 (attempting, or aiding and abetting the attempt, to provide material support to a foreign terrorist organization on August 3, 2004 in violation of 18 U.S.C. §§ 2339B & 2) must be vacated because there was insufficient evidence of his criminal intent.  In this regard he asserts that the evidence does not establish that he believed (a) he was violating any law or, (b) that he was helping JEM.  Rather, he contends that on January 14, 2004, the only date that JEM was mentioned by name, he disavowed that he would provide any support for JEM and, therefore, contends that the evidence was insufficient to support a finding of intent to commit the crimes charged in Counts 20, 26, and 27.  He also argues that his acquittals on Counts 21 through 25 (§ 2339B counts based on transactions occurring prior to July 1, 2004) necessarily mean that the evidence of his guilt on the later charges was unsupported.  Lastly, he argues that his convictions on Counts 20, 26, and 27 must be vacated because he did not understand that the monetary exchanges between the CW and Hossain was not a legitimate "loan" and that, therefore, there was no nexus between his acts of witnessing the monetary transactions and the CW's discussions of helping JEM.  The Court finds each argument to be unpersuasive.

Count 20 charged Aref with conspiring to provide material support to a foreign terrorist organization in violation of  18 U.S.C. § 2339B.  As indicated above, the designated terrorist organization was JEM.  In order to convict Aref of this count, the jury necessarily had to find that Aref positively or tacitly came to an understanding with his co-

defendant to accomplish the unlawful objective alleged in the indictment, that is, to provide material support or resources to a foreign terrorist organization. See United States v. LaSpina, 299 F.3d 165, 174 (2d Cir. 2002) ("A conspiracy involves an agreement by at least two parties to achieve a particular illegal end."); United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001)("[C]o-conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.")(internal quotations omitted); United States v. Gore, 154 F.3d 34, 40 (2d Cir. 1998)(It is the agreement, not the commission of the substantive crime, that is the essence of a conspiracy charge.).

Counts 26 and 27 charged Aref with attempting, or aiding and abetting an attempt, to provide material support to the same foreign terrorist organization on July 1, 2004 and August 3, 2004 in violation of 18 U.S.C. §§ 2339B & 2.   In order to convict Aref of these two counts, the jury necessarily had to find that, on July 1, 2004 and August 3, 2004, Aref either intended to commit the underlying crime of attempting to provide material support or resources to a foreign terrorist organization, or knowingly and deliberately associated himself in some way with the crime and participated in it with the intent to aid the commission of the crime.  See United States v. Best, 219 F.3d 192, 199-200 (2d Cir. 2000);[17] Def. Mem. L. p. 11 ("Thus in order to uphold the convictions on Counts 26 and

---

[17]As the Second Circuit noted in Best:

To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted-or failed to act in a way that the law required him to act-with the specific purpose of bringing about the underlying crime.  To prove that the defendant acted with that specific intent, the government must show that he knew of the proposed crime. To be culpable, the defendant need not know all of the details of the crime if the evidence shows

(continued...)

27, there must have been proof that Yassin Aref had the specific intent to provide material support to JEM."). The Court finds that the evidence was sufficient to support the convictions on Counts 20, 26, and 27.

Aref was brought into the matter on December 10, 2003 to serve as witness to the various financial transactions between Hossain and the CW. Although Aref's role was similar to that of a notary and a guarantor, a person who performs an otherwise legal act may be guilty of conspiracy (or the substantive crime) if he acts with knowledge of and intending to further the illegal venture. See United States v. Flaharty, 295 F.3d 182, 200 (2d Cir. 2002) ("Even a supplier of legal goods to a conspiracy may be found guilty of conspiracy if he supplied those goods 'kn[owing] of and intend[ing] to further the illegal venture . . . encourag[ing] the illegal use of the goods or ha[ving] a stake in such use.'")(quoting United States v. Zambrano, 776 F.2d 1091, 1095 (2d Cir. 1985)); see also United States v. Ross, 190 F.3d 446, 450-51 (6th Cir. 1999)(lawyer's involvement in real estate transactions and posting of bond with knowledge that funds were drug proceeds sufficient to establish participation in both money laundering and drug distribution conspiracies). Information supporting Aref's knowledge of the underlying purpose of the monetary transactions was imparted to him as soon as he met with the CW on December 10, 2003. On this date, Aref was told by the CW that he was importing "ammunitions" from China to sell to the CW's "brother Mujahideen" and that the CW did not pay taxes on the money. The nature of the financial transaction between the CW and Hossain was

_____

[17](...continued)
that he joined the venture, shared in it, and that his efforts contributed towards its success.

219 F.3d at 199-200 (citations omitted).

also explained to Aref, including the agreement that Hossain would keep $5,000 of the $50,000 that the CW would provide.

Later transactions provided further evidence that Aref was aware of, and understood, the criminal purpose behind the monetary transactions that he witnessed.  On January 2, 2004, the CW gave Aref $5,000.00 as the first payment toward the $50,000.00.  While doing so, the CW showed the trigger mechanism for the SAM, and told Hossain, in Aref's presence, "this is the part of the missile that I showed you."  The jurors saw the video tape of this transaction and were able to determine for themselves whether Aref looked up and saw the trigger mechanism while he counted the money. On the same date, Aref witnessed a check tendered from Hossain made payable to the CW's business in the amount of $2,000.00.   Later the same day, CW told Aref that the financial transactions were structured as they were because the CW needed to "legalize the money" that came from the black market.  Similar financial transactions occurred on several dates thereafter.

While Aref now argues that the he did not understand what it meant to "legalize the money" and that he believed he was merely witnessing a legitimate loan, it was well within reason for the jury to conclude otherwise given the nature of the financial transactions that occurred. See Best, 219 F.3d at 200 ("The jury is entitled to infer from circumstantial evidence that a party had knowledge of a particular fact despite the party's trial testimony denying such knowledge.").  Indeed, these transactions often resulted in payments of cash in the amounts of five and ten thousand dollars from the CW to Hossain, followed immediately or shortly thereafter by a check in the amount of between two and six thousand dollars from Hossain to the CW's business.  The jury could have reasonably

47

concluded that someone with even the most rudimentary business knowledge would have understood that the exchanges between the CW and Hossain were illegitimate and not in the regular course of business.  The jury could also have reasonably concluded from the context of the discussions and the nature of the transactions that Aref knew what the CW meant when he said the money came from the "black market."  In addition, the jury could have reasonably concluded that Aref understood that the term "to legalize the money" meant that the CW was attempting to make it appear that the money paid from Hossain to Hay's Distributors was for legitimate business purchases by Hossain when, if fact, it was not.

Further, the evidence supported the conclusion that Aref knew by July 1, 2004 that the money the CW provided to Hossain was derived from the CW's sale of a missile provided to JEM, and that JEM was a foreign terrorist organization.  On December 10, 2003, the CW told Aref that he was importing "ammunitions" from China to sell to the CW's "brother Mujahideen."  Gov. Ex. 2 I-T, 3:25-5:11.  On January 14, 2004, the CW met with Aref alone and told Aref: "I help my, my brother Mujahideen with ammunition and stuff like that to fight the wars, Holy Wars." Govt. Ex. 2L-T 14:16-18.  The two had a discussion about the struggles of Muslims in Pakistan and Kashmir and the CW told Aref that he was working with JEM and that "the missile" was sent to New York City to teach the President of Pakistan a lesson.  Id. 15:1-17; 19:8-20:6.  Aref indicated that he recognized JEM as a designated terrorist organization ("they . . . classificate that organization with the group which is called terrorist group," id. 17:11-13) and warned the CW about any link with the group, including giving them money, because, he cautioned, if the government learns that someone does this "they take them to the jail and they say they support . . . the terrorism."

48

Id. Ex. 2L-T, 17:14-22.  Given the context of these conversations, the jury could reasonably have concluded that Aref fully understood what the CW meant when he referenced both a missile and ammunitions during his explanation of how he helped his "brother Mujahideen" "to fight the wars, Holy Wars."

In addition, the words missile, ammunitions, and chaudry were used in several other conversations with Aref such to provide the jury with a reasonable basis to conclude that Aref fully understood what these words meant.  For instance, on February 12, 2004 the CW discussed the missile attack in New York City in front of Kassim Shaar, and Aref responded by telling Shaar that the statement was a joke.  "[O]ne interpretation [of this response] is that Yassin did believe [the CW] had some kind of knowledge about an attack in New York City, but he wanted Kassim to think it was a joke so that [the CW] would not get in trouble." Aref. Mem. L. p. 18.  Certainly, the jury could have reasonably concluded that if Aref did not know what a missile was, he would not have responded to the CW's statement as he did.  The fact that he did respond, and responded in the nature that he did, provided a basis for the jury to conclude that Aref understood the substance of the CW's warning.  Further, on March 2, 2004 Aref and the CW talked about the dangers of discussing the New York City missile attack in front of a third party, and Aref gave the story of the secrecy that cloaks the actions of a suicide bomber.  See Govt. Ex. 2 P-T, 9:4-12:24.  The jury could reasonably have concluded that Aref would not have shared the story unless he understood what the CW had been talking about when he mentioned the missile attack in New York City.

Still further, on June 10, 2004 the CW told Aref that he earns $50,000 by "selling ammunitions, you know?  Chaudrys . . . I import them, and they give me money."  Govt.

Ex. 2 S-T 29:1-10.  He then told Aref that when the Chaudry is "used" "on 142," as they had been planning, the CW will have a problem because the FBI will be looking for him and he will have to "hide" by leaving the country for two months.  Id. at 34:12-35-15. Again, from the context and content of this and previous discussions, the jury could have reasonably concluded that Aref understood that (a) the CW sold missiles to JEM; (b) that JEM was intending to use the missile in New York City; (c) that the money the CW had been periodically giving to Aref for Hossain derived from the proceeds of this sale; and (d) once the missile was used, a situation would arise which would cause the FBI to begin searching for the CW, including coming to Aref with questions about his involvement with the CW.  Even Aref's response to the CW's warning that the FBI might come to Aref once the "chaudry" was "used" provides some indication that Aref was aware of the full context of the proposed plan.  See id.  In this regard, the jury could have reasonably concluded that when Aref stated that "I am doing nothing, I am just eating and drinking and talking about nothing more.  So I have not a problem," id. 35:11-13, he was assuring the CW that the secret that they had been discussing for months was safe with him.

Aref's argument that his statements on January 14, 2004 negate intent is without merit.  While Aref's statements on January 14, 2004 indicate that he did not know of and adopt all of the objectives of JEM, Section 2339B "requires only that the defendant 'knowingly provide material support or resources to a foreign terrorist organization' and makes no mention of an intent to further the organization's goals." Strauss v. Credit Lyonnais, S.A., 2006 WL 2862704, at *13 (E.D.N.Y. Oct. 5, 2006)(quoting 18 U.S.C. § 2339B); see also United States v. Paracha, 2006 WL 12768, at *24-*30  (S.D.N.Y. 2006)("In sum, this Court agrees with the weight of existing judicial authority that requiring

the government to prove defendant acted with the intent to further the unlawful activities of the foreign terrorist organization is not necessary to avoid constitutional questions and would contravene the plain text of section 2339B."); United States v. Marzook, 383 F. Supp. 2d 1056, 1070 (N.D.Il. 2005) ("Section 2339B requires proof that Defendant provided material support knowing either that the recipient was a designated FTO or had engaged in terrorist activity."). Thus, whether Aref agreed with the goals of the CW or JEM is not the issue, but instead whether he knowingly and intentionally provided material support or resources to a group he knew was a foreign terrorist organization. For reasons discussed herein, the Court finds that the evidence was sufficient to support the jury's conclusion that he did.

Further, Aref's January 14, 2004 statements do not indicate that he disavowed all future intent to aid JEM. Rather, the January 14, 2004 conversation, as a whole, could reasonably be interpreted as Aref giving his approval for the CW's activities as long as the CW believed that JEM was working for Muslim interests against Muslim oppressors and as long as the CW operated very secretively. See Govt. Ex. 2L-T at 17:25-18:7 ("But with that, with that you should be very, very careful about this point. I don't say don't help, and I don't say stop your help. I say it is Allah, was duty for every Muslim anywhere he can help any Muslim, especially they are needy for help, especial if their situation like Palestine and Kashmir it is danger."); at 19:8-20:6;[18] at 21:11-22:25 (implying that any help

---

[18]YA:   So point for me, because that organization I don't know, I don't say stop your job, your help for them. I believe if you know them, you trust them and you believe they are doing right, and you believe they are fearing Allah, and you believe they are working for Allah, I believe it is wise for you to help if you can. If you don't can, like me, you are yourself. But if you help, especial that group, because now they have in the list, eh, you should be very, very careful, hundred percent. If not, they are going to one day if they know ...

(continued...)

to an organization that helps Muslim interests is justified because it helps Muslim people, including women and children); at 27:13-28:5.[19] The jury might well have concluded that although Aref did not know of JEM's objectives on January 14, 2004, he later decided for himself that he would support them as "part of the faith." Id.

More importantly, Aref's actions after January 14, 2004 speak of his intent to support the organization that he knew was classified as a foreign terrorist organization and that he knew was purportedly intending to commit an act of terrorism. The evidence supported the conclusion that, as of February 12, 2004, Aref believed that the missile would be used in New York City against the Ambassador of Pakistan and that JEM would be the group that would carry out the attack. Aref participated in several transaction thereafter that the jury could have reasonably concluded were structured to disguise the

---

[18](...continued)

CW:      I, I

YA:      If they know

CW:      I send the missile to ...

YA:      If they found anything.  If they find any proof they are going to tell you, you support the terrorism, and that's enough for them, even they made the law during, again, they, uh, the people in the Congress, they accept the law, they have the right to put the person in the jail without court without nothing, without any (unintelligible).

[19]YA:  If I know them huh, hundred percent they do corrected, I say, yes, help them and be careful, don't make problem for yourself.  But if I don't know them I cannot say.  But I say in general, and this I repeat, I say in general, I believe helping the Muslim, it is part of the faith, especial if that Muslim he is needy.

CW:      What do you think, I mean, uh, the thing is that, fighting any war, uh, for Islam is good . . .

YA:      If it is for Islam.

CW:      . . . as long as it is for Islam.

YA:      As long as it is for Islam, that is part of the faith.  Allah command the people to defend the faith.  Allah command the Muslim to carry out this faith.

source of the funds so as to allow the illegal importation of the SAM to go unnoticed by authorities and, thereby, provide support to the organization that received the weapon from the CW.  Aref's awareness of the illegality of the scheme is buttressed by his repeated warnings to the CW of the need for secrecy, including his March 2, 2004 warning in which he tells of the secrecy surrounding suicide bombing missions.  This evidence provided a sufficient basis for the jury to conclude that Aref "acted with knowledge of the facts that constitute the offense."  Paracha, 2006 WL 12768, at * 30.

Further, on June 9 and 10, 2004, Aref and the CW engaged in a series of discussions which provided sufficient proof that Aref gained a stake in the criminal venture such that the jury could reasonably have concluded that Aref formed the requisite intent to commit the underlying crime.  See Best, 219 F.3d at 199-299 ("To be culpable [as an aider and abetter], the defendant need not know all of the details of the crime if the evidence shows that he joined the venture, shared in it, and that his efforts contributed towards its success."); Aref. Mem. L. p. 6.[20]  On June 9, Aref sought money from the CW in order to purchase Hossain's pizza business.  On June 10, the CW agreed to provide the money but advised Aref that it would come from the same source as the money provided to Hossain - the illegal importation of "ammunitions" like the "chaudry." Govt. Ex. 2S-T 28:24-29:10.  At that time, the "chaudry" was still purportedly going to be used in an

_____

[20]Aref argues:

> To establish the requirement of intent, 'there must be something more than "mere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy." United States v. Cianchetti, 315 F.2d 584, 588 (2d Cir. 1963). The defendant must "in some way promote the venture himself, make it his own, [or] have a stake in its outcome." United States v. Falcone, 109 F.2d 579, 581 (2d Cir. 1940), aff'd 311 US 205 (1940).

Aref. Mem. L. p. 6 (quoting United States v. Lopac, , 411 F. Supp.2d 350, 361  (S.D.N.Y. 2006)).

attack in New York City.  Id. at 34:12–17.  The jury could have reasonably concluded that, at that point in time, Aref gained a personal interest in the covert continuation of the CW's scheme so that Aref could received money from the CW's future importations of SAMs for JEM.  Put another way, the jury could reasonably have concluded that, at that point in time, Aref formed the requisite intent to aid the scheme so that authorities would not discover the CW's dealings thereby allowing the CW to sell additional SAMs in the future. The jury could also have reasonably concluded that Aref's participation in the scheme as a witness was a necessary part of the continuation of the scheme.

Thus, there was sufficient evidence from which the jury could reasonably have concluded that, as of July 1, 2003: (a) by virtue of his direct participation in the unorthodox monetary transactions, Aref knew of the illegal money laundering scheme; (b) by virtue of his discussions with the CW in which it was explained that Hossain would earn $5,000 for his participation in the scheme that Aref would witness, Aref knew that Hossain was benefitting from the scheme; (c) by virtue of his participation, Aref knew that he was a necessary part of the continuation of the monetary transactions;  (d) by virtue of his conversations with the CW, Aref knew that the funds being laundered were the proceeds of the illegal importation of the missile; (e) by virtue of his conversations with the CW including his repeated warnings of the need for secrecy, Aref knew that the missile was sold to and would be used by JEM, an organization that Aref already recognized as a designated terrorist organization, in a terrorist attack in New York City; (f) by virtue of his repeated warnings to the CW to keep secret any aid the CW gave to JEM (including monetary aid), Aref knew that it was illegal to provide assistance to JEM; and (g) by virtue of his decision to continue with his participation in the money laundering scheme after all

of this became known to him and after he gained a personal interest in the CW's successful continuation of his smuggling business for JEM, Aref intended to provide support to JEM through his participation in the money laundering scheme.

Accordingly, the Court finds sufficient evidence that Aref positively or tacitly came to an understanding with Hossain to provide material support to a known foreign terrorist organization through a scheme to hide from authorities the proceeds of the sale of a SAM to JEM.  Although Aref's goal may not have coincided with the CW's or Hossain's, any lack of congruence in their goals does not diminish Aref's criminal responsibility for his agreement to knowingly and willfully provide material support to a foreign terrorist organization. See United States v. Acosta, 17 F.3d 538, 544 (2d Cir. 1994)("It is well established that two or more defendants may be guilty of participating in a single conspiracy where they agreed on the essential nature of the plan, even though their goals may not have been congruent."); see also United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1192-93 (2d Cir. 1989) (participants' goals need not be congruent for a single conspiracy to exist, so long as their goals are not at "cross purposes").   Further, the evidence was sufficient for the jury to conclude that by July 1, 2004, Aref intended to commit the underlying crimes, or knowingly and deliberately associated himself in some way with Hossain's commission of these crimes and participated in them with the intent to bring them about.  Thus, the Court also finds that the evidence was sufficient to support the convictions on Counts 26 and 27.

The jury's acquittals on Counts 21 through 25, alleging conduct occurring after January 14, 2004 but before July 1, 2004 (the date of the conduct underlying Count 26), are of no moment.  "[S]ufficiency of the evidence is reviewed independently for each

count, ignoring the jury's determination that evidence on another count  was insufficient."
United States v. Jespersen, 65 F.3d 993, 998 (2d Cir. 1995)(interior quotation marks and
citation omitted); see also United States v, Acosta, 17 F.3d 538, 545 (2d Cir. 1994) ("The
review of the legal sufficiency of the evidence with respect to one count should be
independent of the jury's determination that the evidence on another count was
insufficient to meet the government's burden of persuasion.").   For the reasons stated
above, the jury could have reasonably concluded that by July 1, 2004, the date of the first
substantive Section 2339B offense of which Aref was convicted, Aref formed the requisite
intent to provide support to JEM and that, thereafter, he knowingly participated in
monetary transactions that accomplished this goal and agreed with Hossain for the same
purpose.  Such a finding is not inconsistent with the acquittals on the earlier counts.  See
United States v. Gaind, 31 F.3d 73, 79 (2d Cir. 1994).  Accordingly, Aref's Rule 29 motion
directed at Counts 20, 26, and 27 is denied.

        Further, looking at the evidence objectively and in totality, the Courts finds no basis
to upset the verdict under Rule 33.  The evidence presented in this case, including Aref's
testimony and his handwritten note that said "rocet = missile" on one side and that
contained the Arabic word for missile on the other, see Trial Tr. at 1667-68, 1775, 1780,
supports the conclusion that Aref fully understood the terms used and the nature, goal,
and objective of  the money laundering scheme.  There was sufficient evidence for the
jury to conclude, beyond a reasonable doubt, that Aref acted with the requisite intent to
provide material support to a foreign terrorist organization when he continued with and
aided the money laundering scheme on July 1, 2004 and August 3, 2004.  Therefore,
Aref's Rule 33 motion in this regard is also denied.

**2. Counts 12, 18,  and 19 - Section 2339A Offenses**

Next, Aref argues that Counts 12, 18, and 19 must be vacated because there was

insufficient evidence that he knew what "a missile" was or that a weapon of mass

destruction would be used within the United States; that he did not know what a "chaudry"

was; that he did not know that the financial transactions he was witnessing were money

laundering transactions intended to conceal the source of the money obtained from

importing the SAM; and that his acquittals on Counts 13 though 17 mandate a judgment of

acquittal on Counts 12, 18, and 19.  The Court disagrees.

Count 12 charged Aref with a conspiracy to provide material support to the use of a

weapon of mass destruction on a person or property within the United States, in violation

of 18 U.S.C. § 2339A.  Counts 18 and 19 charged Aref with attempting, or aiding and

abetting the attempt, to provided material support to the use of a weapon of mass

destruction on a person or property within the United States on July 1 and August 3, 2003

in violation of 18 U.S.C. §§ 2339A & 2.  For the reasons discussed above, the Courts finds

sufficient evidence for the jury to reasonably conclude that by July 1, 2004, Aref: (a)

understood that the CW had imported a weapon of mass destruction - a missile; (b)

understood that the missile would be used in an attack in New York City; (c) understood

that by witnessing the loan he was helping to launder money and thereby conceal the

source of the money obtained from importing the missile; (d) agreed with Hossain to

participate in the money laundering scheme; and (e) acted with the requisite intent to carry

out the crimes charged.  Accordingly, the Rule 29 motion in this regard is denied.  Also for

reasons discussed above, the Court finds no basis to grant the Rule 33 motion on these

counts.  Therefore, that motion directed to these counts is also denied.

## 2.  Counts 1, 10,  and 11 - Money Laundering Offenses

Finally, for essentially the same reasons as he attacks the other counts, Aref contends that the evidence was insufficient to convict him of a conspiracy to engage in money laundering in violation of 18 U.S.C. § 1956(a)(3)(B) & (h) (Count 1) and the two substantive acts of money laundering on July 1 and August 3, 2004, or aiding and abetting such acts, in violation of  18 U.S.C. § 1956(a)(3)(B) and 18 U.S.C. § 2  (Counts 10 and 11).  The Court disagrees.

The money laundering "sting" provision, 18 U.S.C. § 1956(a)(3)(B), is violated when a person

> with the intent . . . to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity . . . conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity . . . .

18 U.S.C. § 1956(a)(3)(B).  Section § 1956(h) prohibits conspiring to violate any of the substantive provisions of § 1956.  18 U.S.C. § 1956(h).  As the jury was charged, in order to establish that Aref unlawfully conspired in violation of  Section § 1956(h),  the government had to prove that he:

> (1) knowingly and willfully agreed with his co-defendant to conduct a financial transaction affecting commerce;
>
> (2) with what was represented to be, and which the defendant believed to be, the proceeds of unlawful activity;
>
> (3) specifically intending to conceal or disguise the nature, location, source, ownership, or control of such proceeds of unlawful activity.

See United States v. LaSpina, 299 F.3d at 182; United States v. Castellini, 392 F.3d 35, 45 (1st Cir. 2004).

For the reasons discussed above, the Court finds that the evidence was sufficient to establish each of these elements.  First, the proof was sufficient to support the conclusion that Aref knowingly and willfully agreed with Hossain to conduct financial transactions affecting interstate commerce - that is, exchanging the cash proceeds from the sale of the illegal importation of the SAM for checks written from Hossain to the CW's business. See United States v. Gotti, 459 F.3d at 335 - 336;[21] United States v. Leslie, 103 F.3d 1093, 1101-02 (2d Cir. 1997)("[W]here the government agents got the check, and the defendant had the cash, there was a transaction for purposes of the [money laundering] statute."); United States v. Wydermyer, 51 F.3d 319, 325 (2d Cir. 1995).[22]  Second, the

---

[21] As the Second Circuit explained in Gotti:

> The statutory text, however, indicates the mere receipt of funds *does* constitute the conducting of a transaction pursuant to 18 U.S.C. § 1956(c)(2)-(3), under which (1) the term "conducts" includes participating in the conclusion of a transaction and (2) the term "transaction" includes transfers and deliveries.   In other words, when a person accepts a transfer or delivery of funds, he has participated in the conclusion of that transfer or delivery, and has therefore conducted a transaction.

459 F.3d at 335 (emphasis in original).

[22] Although neither defendant has challenged on these motions the requirement that the government prove that the financial transactions in question affected interstate commerce, it is worth noting that the evidence in this case was sufficient to support this element.  First, the Second Circuit has held that "[p]roof that a savings institution's accounts are federally insured is certainly sufficient to prove that the transaction involved a financial institution the activities of which affect interstate commerce under 18 U.S.C. § 1956(c)(4)(B)." United States v. Leslie, 103 F.3d 1093, 1101-02 (2d Cir. 1997).  The evidence indicated that the checks from Hossain were drawn on a federally insured bank.

Second, the interstate commerce connection can arise from the underlying criminal transaction.  As the Second Circuit stated in Gotti:

> We similarly reject the defendants-appellants' second argument: that the transactions in question were not "financial" because they did not affect interstate or foreign commerce. . . The moneys in question were alleged to be the proceeds of the Hobbs Act extortions and other illegal activities [].  The alleged extortion victims were businesses and unions that engaged in interstate commerce, and the gambling operations (in which the defendants allegedly operated the New York branch of a Costa Rican bookmaking enterprise) were international in scope.  As such, these criminal activities affected interstate and foreign commerce, and the laundering of their proceeds also affected interstate commerce by

(continued...)

evidence was sufficient to establish that the CW represented the cash to be proceeds from this unlawful activity, and that Aref believed the cash to be the proceeds from this unlawful activity. And third, the evidence was sufficient for the jury to conclude that Aref participated in the money laundering scheme specifically intending to conceal or disguise the nature, location, or source of the money paid in cash to Hossain by participating in the agreement to repay the money by checks drafted to the CW's business in order to disguise the source of the cash. See Gotti 459 F.3d at 337. Thus the evidence was sufficient to support the conviction on Count 1.

Further, and also for the reasons discussed above, the Court finds that the evidence was sufficient to support the convictions on Counts 10 and 11. In order to convict Aref of the substantive money laundering counts, the government was require prove that he:

> (1) conducted, attempted to conduct, or aided and abetted in conducting a financial transaction affecting commerce;
>
> (2) with what was represented to be, and which the defendant believed to be, the proceeds of unlawful activity;
>
> (3) specifically intending to conceal or disguise the nature, location, source, ownership, or control of such proceeds.

See United States v. Patel, 1999 WL 615196 at *5 (N.D.N.Y. 1999), aff'd. sub nom. United

---

[22](...continued)
promoting the activities that gave rise to them.

Gotti, 459 F.3d at 336. In the instant case, the evidence supported the conclusion that the underlying criminal transaction involved the illegal importation of a SAM from China that was purportedly going to be used by a foreign terrorist organization in an attack in New York City. This provided the interstate and international nexus necessary to support this requirement. See, United States v. Wydermyer, 51 F.3d 319, 325 (2d Cir. 1995)("The indictment specifically alleged that the financial transaction involved property represented to be the proceeds of criminal violations of the Arms Export Control Act. Since a transaction involving illegal international arms sales necessarily affects interstate or foreign commerce, the indictment gave adequate notice of that element.").

States v. Bala, 236 F.3d 87 (2d Cir. 2000); see also United States v. Puche, 350 F.3d 1137, 1142-43 (11th Cir. 2003); United States v. Leslie, 103 F.3d at 1101 (effect on interstate commerce is element of offense).

The evidence was sufficient to support the conclusion that on July 1, 2004 and again on August 3, 2004, Aref aided and abetted Hossain's attempt (a) to conduct a financial transaction affecting commerce, (2) with what was represented to be, and which Aref believed to be, the proceeds of unlawful activity, (3) specifically intending to conceal or disguise the nature, location, source, ownership, or control of such proceeds.

Accordingly, Aref's Rule 29 motion directed at Counts 1, 10, and 11 is denied. Further, the Court does not find that the evidence, when viewed objectively, leads to the conclusion that Aref was wrongfully convicted on these counts. Therefore, Aref's Rule 33 motion in this regard is also denied.

## V. CONCLUSION

For the reasons discussed above, Defendants' post-trial motions seeking a judgment of acquittal pursuant to Fed. R. Crim. P. 29, or a new trial pursuant to Fed. R. Crim. P. 33, are DENIED.

**IT IS SO ORDERED.**

Dated:   February 22, 2007

Thomas J. McAvoy
Senior, U.S. District Judge

61