1                   (Court reconvened at 1:47 PM.)

 2                   (Jury present.)

 3                   THE COURT:  All right, Mr. Kindlon.

 4                   MR. KINDLON:  No questions, your Honor.

 5     Thank you very much.

 6                   THE COURT:  Mr. Luibrand.

 7                   MR. LUIBRAND:  Yes, your Honor, I have a few

 8     questions.

 9                   THE COURT:  Sure.

10                   MR. LUIBRAND:  Thank you.

11     CROSS-EXAMINATION

12     BY MR. LUIBRAND:

13          Q.   Good afternoon, Mr. Ratledge.

14          A.   Good afternoon.

15          Q.   When were you first contacted by Agent Coll?

16          A.   I don't remember the exact date.  It's been

17     approaching two years, I think, but I do not remember the

18     exact date, sir.

19          Q.   Can you give a month and year?

20          A.   That's not my strong point.  Not really.

21          Q.   Did you keep any kind of records as to when he

22     contacted you?

23          A.   I do have records at home, yes.

24          Q.   And those records would indicate when Agent Coll

25     contacted you?

1        A.   Yes.

2        Q.   And what was the representation that Agent Coll

3   made to you when he contacted you?

4        A.   Can you explain?

5        Q.   What did he say to ya?

6        A.   They were looking for a piece of hardware that

7   would be used or could be used as a surface-to-air missile

8   weapon, like what we work with, and he was asking for a

9   round that was inert; that was functional, but, obviously,

10  was not dangerous.

11       Q.   Did Agent Coll give you a reason that he wanted

12  this type of equipment?

13       A.   Not specifically.

14       Q.   Did he give you a general reason as to why he

15  wanted it?

16       A.   He did indicate that there was some suspects

17  that -- a case that they were working on, but no specifics.

18       Q.   Now, what's the age of that SAM that was shown to

19  you by Miss Coombe?

20       A.   The age?

21       Q.   The age.  How old is it?

22       A.   Because the serial numbers have been taken off,

23  the date, serial number, combination, I cannot say with any

24  certainty.  It's probably a 1980ish, I would say early

25  eighty vintage.

1      Q.   And what's the shelf life for a SAM of that

2   variety?

3      A.   Typically, they were rated for 12 years to

4   15 years, by the country that produces 'em or the

5   manufacturer that's producing them.  Our experience has

6   been that these weapons are still functional after 20 to

7   25 years.

8      Q.   Is there anything about looking at the device that

9   tells you what country it comes from?

10      A.   Looking at it now, I cannot tell you.  I can if I

11   had the -- when you say "country," it came from the -- you

12   mean the production country?

13      Q.   Correct, the country that produced it.

14      A.   If the serial numbers were still on there, there

15   would be sufficient coding to tell me that.

16      Q.   Apart from the serial numbers, is there any

17   markings that have a nationality attached to it?

18      A.   Not on that particular piece.

19      Q.   Now, SAM is actually an acronym, meaning an

20   abbreviation, for surface-to-air missile?

21      A.   Yes.

22      Q.   And there are, at least by my count, 37 varieties

23   of SAM missiles?

24      A.   That's a good assessment, yes.

25      Q.   And it's -- for the United States, it's about a

1    two billion dollar a year business?

2         A.   Let me back up to your other statement.

3         Q.   Okay.

4         A.   You said 37 SAMs.  There are about 37 SAMs of the

5    man port variety.  There are considerably more

6    surface-to-air missile systems that have much greater range

7    than this.

8         Q.   Would they also be called SAMs?

9         A.   Yes.

10        Q.   So the variety that you have been shown today,

11   there is about 37 of that general type, correct?

12        A.   The specific designators, about 37 unique

13   designators, yes.

14        Q.   And if we go back to my follow-up question, it's

15   about a two billion dollar a year business for United States

16   companies?

17        A.   I am not exactly sure how much, but it is big.

18        Q.   Rathion is the biggest manufacturer of these,

19   correct?

20        A.   Yes.

21        Q.   And it's got manufacturing plants in eight states

22   in the United States?

23        A.   I could not confirm that, but Rathion is in

24   Arizona, the primary headquarters.  Exactly where they

25   produce all the parts, I really am not familiar with that.

Ratledge - Cross - Luibrand                              92

1        Q.   Rathion produces the parts that might make up

2   these SAMs, this variety of SAMs, in a number of different

3   states in the United States, correct?

4        A.   I think that's correct.

5        Q.   And there is about 20 countries that actually

6   manufacture -- 20 countries or businesses within countries

7   that manufacture these type devices?

8        A.   Yes.

9        Q.   And there's about a hundred countries that have

10  them within their borders legally, right?

11       A.   Yes, sir.

12       Q.   And of the United States roughly two billion

13  dollar a year business, about 1.1 billion of that is for

14  export to other countries?

15       A.   I cannot conform those numbers.  It's really not

16  my business, but they sound reasonable.

17       Q.   Okay.  Thank you.

18            MR. LUIBRAND:  That's it, your Honor.  Thank

19  you.

20            THE COURT:  All right.  Any redirect?

21            MS. COOMBE:  One moment, your Honor, please?

22            THE COURT:  Okay.

23            (Pause in proceedings.)

24                    - - - - -

25

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Ratledge - Redirect - Coombe                                93

1   REDIRECT-EXAMINATION

2   BY MS. COOMBE:

3       Q.   Mr. Ratledge, you testified earlier, I believe,

4   that Exhibit 1-A was a Russian SA-7, is that correct?  Would

5   you like me to show it to you again?

6       A.   No.  Yes, I think that's correct.

7       Q.   Does -- are any of those made in the United

8   States?

9       A.   No.  No.

10              MS. COOMBE:  I have nothing further, your

11  Honor.

12              THE COURT:  Anything further from defense

13  counsel?

14              MR. LUIBRAND:  Nothing, your Honor, thank

15  you.

16              THE COURT:  All right.  Thank you,

17  Mr. Ratledge.  You may step down, sir.

18              THE WITNESS:  All right, thank you.

19              (Witness was excused.)

20              MR. PERICAK:  Your Honor, at this point, with

21  the Court's permission, we would like to play the videotape

22  testimony of Mr. Hoover.

23              THE COURT:  There might be an objection, am I

24  correct, Mr. Luibrand?

25              MR. LUIBRAND:  Not this one.

USA v. Aref & Hossain                                    94

1                    THE COURT:  Not this one?

2                    MR. LUIBRAND:  No.

3                    THE COURT:  What's the designation on the

4     tape, numeric designation?  What's the Exhibit Number?

5                    MR. PERICAK:  This would be Government

6     Exhibit 24.

7                    THE COURT:  Government 24?

8                    MR. PERICAK:  Yes.

9                    THE COURT:  Do you offer that into evidence?

10                   MR. PERICAK:  I would like to offer it into

11    evidence, your Honor.

12                   MR. KINDLON:  We will stipulate, Judge.

13                   THE COURT:  No objection?

14                   MR. LUIBRAND:  No objection.

15                   THE COURT:  We will receive 24 in evidence

16    and you may exhibit it to the jury.

17                   MR. PERICAK:  Just direct the jurors'

18    attention to the screen.

19                   (Government Exhibit 24 received.)

20                   (Pause in proceedings.)

21                   MR. PERICAK:  Your Honor, in order to solve

22    this problem, why don't we call our next witness and let our

23    tech guy solve this in the interim.

24                   THE COURT:  Fine with me, if it's okay with

25    everybody else.

1                    MS. COOMBE:  Your Honor, the United States

2    calls Abul Kashem to the stand.

3                    THE COURT:  Okay.

4                    (Pause in proceedings.)

5                    THE CLERK:  Mr. Kashem, please come forward

6    to be sworn, sir.  Would you state your name for the record?

7                    THE WITNESS:  My name is Abul Kashem.

8                         - - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       A B U L    K A S H E M,

2   having been called as a witness, being duly sworn,

3   testified as follows:

4   DIRECT EXAMINATION

5   BY MR. KASHEM:

6        Q.   Good afternoon, Mr. Kashem.

7        A.   Yes.   Good afternoon.

8        Q.   Could you please state your name?

9        A.   My name is Abul Kashem.

10        Q.   Do you own a restaurant?

11        A.   Yes.

12        Q.   What is the name of your restaurant?

13        A.   My restaurant name is Ghandi Indian Restaurant.

14        Q.   Where is your restaurant located?

15        A.   Located One Central Avenue, corner of Lark and

16   Central.

17        Q.   When -- approximately when did you open your

18   restaurant?

19        A.   1998, last time.

20        Q.   Do you know Mohammed Mosharref Hossain?

21        A.   Yes.

22        Q.   Do you see him in the courtroom today?

23        A.   Yes.

24        Q.   Could you please identify him by pointing out a

25   piece of clothing that he has on?

1       A.   Yes.  He's Mosharref (indicating).

2                 MS. COOMBE:  Could the record reflect the

3    identification of Mr. Hossain?

4                 THE COURT:  Record will so reflect.

5    BY MS. COOMBE:

6       Q.   Does Mr. Hossain have a restaurant?

7       A.   Yes.  He has a pizza shop.

8       Q.   Where is Mr. Hossain's pizza shop located?

9       A.   My nextdoor.  My one is One Central Avenue, he's

10   my nextdoor, same, door-to-door.

11      Q.   When did you meet Mr. Hossain?

12      A.   '98, when I come from New York, he has his

13   restaurant at that time.

14      Q.   Do you know a Pakistani man who's name is Malik?

15      A.   Yes.

16      Q.   How did you meet him?

17      A.   Last time I open the restaurant, he's comes to my

18   restaurant as my customer.  Sometime they take order,

19   sometime he come and eat from in.

20      Q.   Did you ever take Malik to go talk to Mr. Hossain?

21      A.   Yes.

22      Q.   Why did you tell Malik to go talk to Mr. Hossain?

23      A.   What?

24      Q.   Why did you tell Malik to go talk to Mr. Hossain?

25      A.   Yes.  Malik asked me do you know Mosharref Hossain

1  sell restaurant?  I say I don't know, you go ask him.

2      Q.   During early 2004, did you have a conversation

3  with Malik and Mr. Hossain?

4      A.   Yes.

5      Q.   Did the FBI tape record that conversation?

6      A.   Yes.

7      Q.   Have you listened to that tape recording?

8      A.   Yes.

9      Q.   Did you talk about Bin Laden during that

10 conversation, Osama Bin Laden?

11     A.   Yes.

12     Q.   What did you say?

13     A.   I say Bin Laden is arrest.

14     Q.   What did Mr. Hossain say?

15     A.   Hossain say maybe lie.  I say maybe.  Hossain say

16 anybody who work for Allah, Allah save him, Allah save him.

17 Allah save him, all world can do nothing.  Same as Bin

18 Laden.

19          MS. COOMBE:  I have nothing further, your

20 Honor.

21          THE COURT:  Mr. Kindlon?

22          MR. KINDLON:  Very briefly, your Honor.

23          THE COURT:  Okay.

24                    - - - - -

25

1    CROSS-EXAMINATION

2    BY MR. KINDLON:

3         Q.   Good afternoon, Mr. Kashem.

4         A.   Good afternoon.

5         Q.   You have a wonderful restaurant.  Sir, how long --

6    withdrawn.

7                   What country are you from?

8         A.   I from Bangladesh.

9         Q.   From Bangladesh?

10        A.   Yes.

11        Q.   And how long, sir, have you been in the United

12   States?

13        A.   Almost 22 years, I think.

14        Q.   Twenty-two years?

15        A.   Yeah.

16        Q.   And did you speak English when you came to the

17   United States, sir?

18        A.   Before?

19        Q.   Yes.

20        A.   Little bit, little bit.

21        Q.   And your native language, is it Urdu?

22        A.   No, Bangali.

23        Q.   What is it, sir?

24        A.   Bangali.

25        Q.   Bangali?

1       A.   Yes, Bangali.

2       Q.   And in addition to Bangali and English, do you

3   speak any other language?

4       A.   Yes.  I understand some Pakistani language.  I

5   understand some English, too.

6            MR. KINDLON:  Thank you very much.  I have no

7   further questions.

8            THE COURT:  Mr. Luibrand.

9            MR. LUIBRAND:  Thank you, your Honor.

10  CROSS-EXAMINATION

11  BY MR. LUIBRAND:

12      Q.   Good afternoon, Mr. Kashem.

13      A.   Good afternoon.

14      Q.   How are you?

15      A.   Fine.

16      Q.   I want to be clear on a few things.  You have an

17  Indian restaurant, right?

18      A.   Yes.

19      Q.   And -- but you're Bangladeshi, correct?

20      A.   Yes.

21      Q.   And Mr. Hossain has an Italian restaurant, right?

22      A.   Yes.

23      Q.   And he's also Bangladeshi?

24      A.   Yes.

25      Q.   And this section of Albany where you and he have

1    your restaurants, there's a number of restaurants of

2    different ethnic backgrounds, right, in that section?

3         A.   Yes.

4         Q.   Okay.  Is there a Pakistani, as well?

5         A.   Pakistani?

6         Q.   Right, Pakistani restaurant.

7         A.   No.  This is an Indian restaurant.

8         Q.   Did you meet Mr. Hossain because your businesses

9    were next to one another?

10        A.   Yes.

11        Q.   And did you get to know Mr. Hossain?

12        A.   Before I don't know.  When I come Albany, take my

13   restaurant, that time I see him, and that time, too, I know

14   him.

15        Q.   Okay.  You didn't know him until you actually

16   moved into your restaurant?

17        A.   Yes.

18        Q.   Okay.  And then would you and Mr. Hossain see each

19   other almost every day?

20        A.   Yes.  Sometime every day, sometime two, three days

21   we don't see.

22        Q.   All right.

23        A.   Sometime more time, because we are very narrow,

24   near.

25        Q.   And you are very busy with your restaurant, are

1   you not?

2        A.   Yes.

3        Q.   And Mr. Hossain was very busy with his restaurant,

4   right?

5        A.   Yes.

6        Q.   Okay.  And when we say "restaurants," it's --

7   they're very small, correct?  Your space is very small,

8   right?

9        A.   Yes.

10       Q.   Okay.  And Mr. Hossain's space is very small?

11       A.   Yes.

12       Q.   And there would be times when you could go from

13   your restaurant, you would walk nextdoor and go into his

14   restaurant, right?

15       A.   Yes.  One I come -- once I do, sometime go

16   outside, that time sometime see him.

17       Q.   Okay.  Now, this Malik that came to you --

18       A.   Yes.

19       Q.   -- did you know Malik?

20       A.   Yes.

21       Q.   Malik was -- presented himself as some kind of a

22   businessman?

23       A.   Before he -- he owned a gas station.

24       Q.   Okay.  He used to own a gas station?

25       A.   Yeah.

1        Q.    That was down the road away from where you were,

2   right?

3        A.    No.  No.  Malik is gas station up near Motor

4   Vehicle.

5        Q.    Down by Motor Vehicle, right?

6        A.    Yeah.

7        Q.    Which would be a long way from your business,

8   right?

9        A.    Yeah.

10       Q.    It's not right near your business, correct?

11       A.    Not near my business.

12       Q.    And Malik would come into your restaurant and he

13   would buy food from you?

14       A.    Yes.

15       Q.    And Malik had a -- what, did he drive a BMW or

16   Mercedes?

17       A.    I don't know.  I don't know.

18       Q.    Okay.  Now, do you know if there was any reason

19   that Malik selected you to go and make an introduction to

20   Mohammed?

21       A.    No.  Malik asked me do you know Mohammed sell his

22   restaurant?  I say I don't know.

23       Q.    So he expressed an interest in purchasing the

24   restaurant, is that what he was saying?

25       A.    I don't know.  He asked me.

1        Q.    Okay.  He asked you if Mohammed was selling his

2    restaurant, right?

3        A.    Yeah, selling.  I say I don't know, you go and ask

4    him.

5        Q.    Okay.  And Mohammed, he lived above his

6    restaurant, right?

7        A.    Mosharref?

8        Q.    Mohammed Hossain, he lived in the area above his

9    restaurant?

10       A.    Yeah, he live on top, downstairs is the

11   restaurant.

12       Q.    Okay.  And he lived in there with his wife, right?

13       A.    Yes.

14       Q.    And he had a number of children, right?

15       A.    Yes.

16       Q.    And then he lived -- he had a brother there,

17   right?

18       A.    Yes.

19       Q.    And his brother is mentally disabled in some way?

20       A.    Yes.  He's disabled, mentally problem.

21       Q.    And then I think Mohammed had his father there at

22   one point in time and then his wife's mother there at one

23   point in time, correct?

24       A.    Yeah.  His father died a long time before.

25       Q.    Okay.

1        A.   His father died.  And his mother-in-law live with

2    him.

3        Q.   Okay.  And they all lived above the pizza shop,

4    right?

5        A.   Yes.

6        Q.   Now, when you would speak with Mohammed --

7    withdraw that.

8             Mohammed was -- his business involved serving

9    primarily people in downtown Albany?  Do you understand my

10   question?  Mohammed's pizza business was to serve pizzas and

11   food to people working in downtown Albany?

12       A.   Yes.

13       Q.   And that would be like State workers, right?

14       A.   State worker, I don't know.  His customer is so

15   many customers.

16       Q.   All kinds, college students?

17       A.   Maybe I don't know which customer is coming, who

18   college student or who worker.

19       Q.   Okay.  Was his restaurant busy?

20       A.   Yeah, sometime busy, sometime no busy.  Restaurant

21   business is all the same thing.

22       Q.   And would you see Mohammed, from time to time,

23   going off in his car to do deliveries?

24       A.   Yes.

25       Q.   All right.

 1        A.   He -- sometime he work his restaurant inside and

 2   sometime delivery.

 3        Q.   Now, the Government played for you an audiotape of

 4   some kind that they had made when there was a meeting that

 5   you were present at in Mohammed's business, correct?

 6        A.   Yes.

 7        Q.   And they did that before today, right?  They

 8   didn't do that today, did they?

 9        A.   Today?

10        Q.   Did the Government, today, play for you an

11   audiotape?

12        A.   Yes.

13        Q.   Okay.  And they played it for you a number of

14   other times?

15        A.   Yes.

16        Q.   All right.  And did they show you a transcript of

17   what that tape said?

18        A.   Yes.

19        Q.   All right.  And what had happened is you had

20   learned from -- this is in February of 2004, correct?

21        A.   Yes.

22        Q.   And there was a lot of rumors that Osama Bin Laden

23   had been captured, right?

24        A.   Yes.

25        Q.   And you heard that information from somebody,

1    right?

2         A.   Yes.  I don't know how can I hear, but I told

3    that, that Osama Bin Laden captured.

4         Q.   Okay.  Could have been on television or some other

5    source, right?

6         A.   I forget it.

7         Q.   Okay.  And then you went into Mohammed, Mohammed

8    was in his business at that time?

9         A.   Yes.

10        Q.   And Malik was in there, right?

11        A.   Yes.

12        Q.   And you told Malik and Mohammed that you had heard

13   that Bin Laden had been captured, correct?

14        A.   Yes.

15        Q.   And you said somebody might have told me a lie,

16   right?

17        A.   Yes.

18        Q.   And Mohammed agreed with you, right, he said

19   somebody might have told a lie, right?

20        A.   Yeah, Mohammed say maybe lie.

21        Q.   Okay.  And then you began a -- or strike that.

22             And then there is -- you're Islami, correct?

23        A.   Yes.

24        Q.   And in Islam, you believe that someone's fate is

25   up to God, right?

Kashem - Cross - Luibrand                                      108

1       A.   Yes.

2       Q.   And Mohammed Hossain said to you, in words or

3   substance, that it would be up to God when or if Osama Bin

4   Laden is caught, correct?

5       A.   Right after Mohammed say anybody who work for

6   Allah, Allah save him.

7       Q.   He said if I am with you and the entire world is

8   against you, no one can harm you, correct?

9       A.   If Allah save him, all cannot do nothing.

10       Q.   Right.  And the way the saying was written -- it's

11   a saying from the Qu'ran, correct?  It comes from the

12   Qu'ran?

13       A.   Yeah, first one have Qu'ran.

14       Q.   Okay.  And it says God says, or Allah says, if the

15   entire world wants to save you, but I don't, then no one can

16   save you, correct?

17       A.   What Allah say?

18       Q.   It's a two-part quote, right?  The first part is

19   Allah says, if the entire world wants to save you, but I

20   don't, then no one can save you, right?

21       A.   Again.  Again.

22       Q.   You want me to read it again?

23       A.   Yeah.

24       Q.   Okay.  There's two parts to it.  I am just gonna

25   read the first half, okay?

Kashem - Cross - Luibrand                                         109

1        A.   Yeah.

2        Q.   It's God, or Allah -- Allah is another name for

3   God in the Islamic faith, right?

4        A.   Yes.

5        Q.   I will use Allah.  Allah says, if the entire world

6   wants to save you, but I don't, then no one can save you,

7   right?

8        A.   Yes.

9        Q.   That's the first half.  And then the other half is

10  if I am with you and the entire world is against you, no one

11  can harm you, right?

12       A.   Yes.

13       Q.   And the message is it's up to God, right?

14       A.   Yes.  Allah save him, whole world cannot do

15  nothing.  Same thing.

16       Q.   Okay.  And there was a conversation -- the

17  conversation included, then, the topic of politics,

18  right?

19       A.   Say again.

20       Q.   The conversation, the talk --

21       A.   Yes.

22       Q.   -- included politics, right?  Do you know

23  politics?

24       A.   Yeah.  I don't know this is politics or not.  But

25  I hear two minute or three minute, I go back my restaurant.

                    THERESA J. CASAL, RPR, CRR
                 UNITED STATES COURT REPORTER - NDNY

1       Q.   Okay.  The Presidential election was a topic of

2    conversation, correct?

3       A.   President election?

4       Q.   The Presidential election was a topic of

5    conversation, correct?

6       A.   That time, we don't talk Presidential election for

7    anything.

8       Q.   Okay.  Did Malik say that Bush, referring to

9    President Bush, is a wicked person?  Did Malik say that?

10      A.   I don't have remember.

11      Q.   Okay.  I am going to approach you, with the

12   Court's permission, I want to show you a portion -- ask you

13   if you've seen this particular transcript before.

14              MS. COOMBE:  Objection, your Honor.

15              THE COURT:  Basis?

16              MS. COOMBE:  Your Honor, this isn't in

17   evidence.  I don't have a copy of it.  The tape is the best

18   evidence.  We should play the tape for him if there's some

19   question.

20              THE COURT:  I think, here, we got a different

21   situation from an evidentiary standpoint.  The witness has

22   indicated -- at least I thought I heard him say -- that he

23   didn't remember a discussion about President Bush or whether

24   he was or wasn't, whatever he was.  So, he has a document

25   here and I think he wants to present it to the witness to

1   see if that refreshes his recollection.  He can't read from

2   it, but he can show it to him and see if it refreshes his

3   recollection.

4               MS. COOMBE:  But the witness hasn't seen this

5   particular document, your Honor.

6               THE COURT:  How do I know that?  He is gonna

7   show him the document -- is that what you want to do?

8               MR. LUIBRAND:  Yes, your Honor.

9               THE COURT:  You're not going to ask him

10  what's on it, right?

11              MR. LUIBRAND:  No.

12              THE COURT:  You're just going to ask him if

13  it refreshes his recollection?

14              MR. LUIBRAND:  Yes.

15              THE COURT:  Go ahead.

16              MR. LUIBRAND:  Thank you.

17  BY MR. LUIBRAND:

18     Q.   Before I do, Mr. Kashem, I am gonna show you two

19  pages, but I am gonna turn to the second page for you, okay?

20     A.   Yes.

21     Q.   Just ask if you've seen this before.

22     A.   (Pause.)  I need my lawyer.

23              MR. PERICAK:  Mr. Stewart represents him.

24              THE COURT:  Do you want to speak to

25  Mr. Stewart a minute?

1                    THE WITNESS:  Yeah, Mr. Stewart.

2                    THE COURT:  That's an unusual procedure, but

3    I guess it's okay.  Do you want to come up here,

4    Mr. Stewart?

5                    MR. STEWART:  Sure, Judge.

6                    THE COURT:  Can we have some music?

7                    (Laughter.)

8                    (Pause in proceedings.)

9                    THE COURT:  All set, Mr. Stewart?

10                   MR. STEWART:  Thank you, Judge.

11   BY MR. LUIBRAND:

12       Q.   Mr. Kashem, have you had sufficient chance to

13   speak with Mr. Stewart?

14       A.   Yeah.  I talk Mr. Stewart.  I think this time I am

15   not present here.

16       Q.   Okay.  Do you see the QA?

17       A.   Yeah.

18       Q.   Do you know if that's intended to be you, the

19   abbreviation QA?

20       A.   Yeah.

21                   THE COURT:  You can't cross-examine him on

22   the document.

23                   MR. LUIBRAND:  Okay, your Honor.

24                   THE COURT:  Just ask him if it refreshes his

25   recollection as to what he forgot.  If it did, fine; if it

1   didn't, fine, too.

2   BY MR. LUIBRAND:

3       Q.   Does having looked at this help refresh your

4   memory as to the conversation?

5       A.   What?

6       Q.   Does having looked at this, what I showed you,

7   does it help you recall, remember the conversation?

8       A.   Yeah.

9       Q.   Okay.  And Malik had said that --

10                  MS. COOMBE:  Objection, your Honor, hearsay.

11                  MR. LUIBRAND:  Not being offered for the

12  truth, your Honor.

13                  THE COURT:  What's it being offered for?

14                  MR. LUIBRAND:  For did the conversation take

15  place and the topic of the conversation, that it was a

16  political conversation, that's all.

17                  THE COURT:  All right.

18                  MS. COOMBE:  Your Honor, Mr. Luibrand is also

19  reading from a document that's not in evidence.

20                  THE COURT:  I'm sorry?

21                  MS. COOMBE:  He is reading from a document

22  that's not in evidence, your Honor.  That's the other basis

23  for my objection.

24                  THE COURT:  Yeah, he can't read from the

25  document, but he can ask if it refreshes his recollection of

1    what the conversation was about with Malik.

2                    MR. LUIBRAND:  Correct, yes.

3                    THE COURT:  Okay.

4    BY MR. LUIBRAND:

5        Q.   Malik had said that Bush was a wicked person, is

6    that correct?  Not you, Malik.

7        A.   Exactly, I don't not remember this, because this

8    is long time, I don't know this talking, when I come here.

9        Q.   And did Mohammed say that he liked Hillary Clinton

10   at that point in time?

11       A.   He like?

12       Q.   That he liked Hillary Clinton?  Did Mohammed

13   Hossain say, "I like Hillary Clinton"?

14       A.   I forget this.

15       Q.   Okay.

16       A.   I say anything here?  I asked you Malik said

17   something and Mosharref say something, but have I statement

18   there?

19       Q.   No.  This is something different from your

20   statement.

21       A.   I thinking that time I am not present there.

22                    MR. LUIBRAND:  If I could just have a moment,

23   your Honor, I may be done.

24                    THE COURT:  Sure.

25                    (Pause in proceedings.)

Kashem - Cross - Luibrand                                    115

1                          MR. LUIBRAND:  I am, your Honor.  Thank you.

2                          MS. COOMBE:  I have nothing further, your

3       Honor.

4                          THE COURT:  Okay, Mr. Kindlon, anything?

5                          MR. KINDLON:  Thank you, no, Judge.

6                          THE COURT:  All right.  Thank you,

7       Mr. Kashem.  You may step down, sir.  All done.  Thank you.

8                          THE WITNESS:  Thank you.

9                          (Witness was excused.)

10                         (Pause in proceedings.)

11                         MR. PERICAK:  Your Honor, apparently it plays

12      all right here, but apparently it's not coming through the

13      speaker.

14                         THE COURT:  Is there any other way to get the

15      audio part out --

16                         (Pause in proceedings.)

17                         MR. PERICAK:  Your Honor, I would request a

18      brief recess so we can cure our technical problems.

19                         THE COURT:  Yeah, I think that's a good

20      suggestion.  If we need anybody out here to tell us about

21      the buttons, we will come get you.

22                         (Laughter.)

23                         (Jury excused at 2:29 PM.)

24                         (Jury present at 2:40 PM.)

25                         THE COURT:  Okay, we got the tape all ready

Kashem - Cross - Luibrand                                    116

1    to go?

2                    MR. PERICAK:  We believe we're ready to

3    launch.

4                    THE COURT:  All right.

5                    (Government Exhibit 24, videotaped deposition

6                     of Gary Hoover, played for the jury.)

7                    MR. PERICAK:  Your Honor, pursuant to the

8    Court's relation and agreement, we are gonna fast forward to

9    the next portion.

10                    (Videotape continued.)

11                    MR. PERICAK:  Thank you, your Honor.

12                    THE COURT:  That concludes that matter?

13                    MR. PERICAK:  It does.

14                    THE COURT:  Okay.

15                    MR. PERICAK:  The Government next calls

16    Saeda, our Urdu interpreter.

17                    THE CLERK:  Saeda, you do affirm under the

18    pains and penalties of perjury that the testimony you offer

19    here today will be the truth, the whole truth, and nothing

20    but the truth?

21                    THE WITNESS:  I do.

22                    THE CLERK:  Government witness Saeda.

23                    MR. PERICAK:  Your Honor, prior to my

24    questioning this witness, I would like to offer Government

25    Exhibits 2-A through 2-T, which would be a CD containing the

1   excerpted conversations that are listed on the Government's

2   exhibit list, just the audio and video, no transcripts, and

3   I understand that all counsel are in agreement that can be

4   received.

5                    MR. SPROTBERY:  That's correct, your Honor.

6                    MR. LUIBRAND:  Yes, your Honor.

7                    THE COURT:  All right.  The Court receives

8   Government 2-A through and including 2-T in evidence.

9                    MR. PERICAK:  Thank you, your Honor.

10                   (Government Exhibits 2-A through 2-T

11                    received.)

12                            - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      S A E D A,

2    having been called as a witness, duly affirmed and

3    testified as follows:

4    DIRECT EXAMINATION

5    BY MR. PERICAK:

6         Q.   Good afternoon, Saeda.

7         A.   Good afternoon.

8         Q.   Could you please tell me how you are employed?

9         A.   I am employed with the FBI as a

10   translator/interpreter.

11        Q.   When did you join the FBI?

12        A.   In March 2000.

13        Q.   Where were you born?

14        A.   I was born in Pakistan.

15        Q.   And would you briefly describe for the jury your

16   educational background?

17        A.   Well, basically, my entire education was in

18   Pakistan, including from elementary through middle through

19   high school and university.

20        Q.   What was the language of instruction in the

21   schools you attended?

22        A.   In schools I attended, the language of instruction

23   was English.

24        Q.   What was the language of conversation in those

25   schools?

1        A.    Basically, Urdu and English, because Urdu was the

2    language of the country and spoken around me.

3        Q.    Now, what was your degree in, college degree?

4        A.    My college degree was in English, Urdu and British

5    history; we have three majors usually, a bachelor's degree.

6        Q.    So, a degree in Urdu, what does that involve?

7        A.    It could be a complete study of what we both call

8    complete language and literature, including literary Urdu

9    and Urdu used in utilitarian documents, for example.  But it

10   means a level of spoken and written Urdu, fairly high.

11       Q.    After college, what, if any, experience did you

12   have in translation or interpretation?

13       A.    Well, because of the jobs that my husband held, I

14   worked for the U.S. Government as an interpreter for Urdu

15   for about twenty -- I would say, part time, over a period of

16   about 23 years.

17       Q.    And that's all prior to your joining the FBI?

18       A.    Yes.

19       Q.    And when you applied to the FBI, I believe you

20   said that was March of 2000?

21       A.    Correct.

22       Q.    When you applied to the FBI for the translator

23   job, did you have to take some kind of certification

24   examination?

25       A.    Yes.  I'm sorry, I didn't apply in March 2000.

Saeda - Direct - Pericak                                    120

 1    That's when I started working with them.  But when I did
 2    apply, which was a year prior to that, I did have to take a
 3    language certification exam.
 4         Q.   What score did you receive on that examination?
 5         A.   On a scale of zero to five, with five being that
 6    of a native speaker, I scored a five.
 7         Q.   And since joining the FBI, have you received any
 8    promotions?
 9         A.   Yes.  I have been promoted to the position of
10    senior or master linguist, as we call it.
11         Q.   And what does that entail, that promotion?
12         A.   Of course, I do detailed work on Urdu translating,
13    written as well as spoken.  I prepare verbatim transcripts
14    for court.  I do protocol interpretation for senior FBI
15    officials with foreign -- with Urdu speaking Government
16    officials.  I do quality control reviews of other linguists'
17    work, also test other linguists prior to employment with the
18    FBI.
19         Q.   I don't want to go into as much detail as you did
20    in gettin' your degree, but could you just describe,
21    generally speaking, any particular differences between
22    English and Urdu, sentence structure, grammar, syntax, that
23    kind of thing?
24         A.   Yes.  There are some major differences.  For
25    example, Urdu word order or sentence construction or syntax

 1  differs markedly from English, the primary feature being the

 2  verb appears at the end of the sentence.  There are other

 3  striking differences in that in Urdu, all nouns are gender,

 4  which is unlike English, and, therefore, in Urdu sentences

 5  verbs and the adjectives modify to coordinate with the

 6  gender of the noun in any given sentence.  These are perhaps

 7  the main ones.

 8       Q.   Now, what's the root language from which Urdu is

 9  derived?

10       A.   Well, it's originally derived -- perhaps you might

11  say the tissue or the texture of the language is originally

12  derived from a language which used to be called Hindustani,

13  which was the ordinary language of people in what used to be

14  India, before it became India, Pakistan, Bangladesh, so on.

15  And then I would say the verbs, adjectives, and nouns are

16  from Persian and Arabic, because Urdu first developed among

17  the foot soldiers of the Great Mogul Muslim rulers of India

18  and they were brought from Central Asia, Turkey, Persia, all

19  these countries which had Islamic background.  That's the

20  origin of Urdu.

21       Q.   How old a language is Urdu?

22       A.   Well, again, portions of it are very old, being

23  based upon Hindustani, which is based upon Sandscript, which

24  is an Indian language.  Portions are based on, as I said,

25  Persian and Arabic.  But written Urdu, with a written

Saeda - Direct - Pericak                                        122

1   literature as its own and used as a definitive functioning

2   language, probably about 300 to 400 years ago, with the more

3   active parts of it about a little over 200 years ago.

4        Q.   Now, you indicated that words have been taken in

5   from other languages.  Has English found its way into Urdu?

6        A.   Yes.  There is a lot of English in Urdu.  In fact,

7   in modern Urdu, if you were to monitor any TV broadcasts or

8   radio broadcasts, I would say up to 15 percent modern Urdu

9   is now English.  They are English words written in Urdu and

10  pronounced in an Urdu speaker's manner, but they are

11  undoubtedly English words.

12       Q.   Now, in connection with this particular criminal

13  case, were you asked to review and translate some material?

14       A.   Yes, I was asked to review and translate a great

15  deal.

16       Q.   And how did you go about preparing translations in

17  connection with this case?

18       A.   Well, basically, you listen to the audio, which is

19  provided, and on equipment which our Bureau provides us.

20  You then render them into English translations, but it is

21  entirely based upon audio that is given to us.

22       Q.   And is that something, as you described it, that

23  went very quickly?  Is that a quick process?

24       A.   No, actually it's not very quick, because

25  especially if it's verbatim, you have to be very, very

Saeda - Direct - Pericak                                      123

1    careful and you have to include literally every sound made

2    by the speakers.  And, in fact, we have worked out a sort of

3    measure which is that about 15 minutes of audio material

4    comes out to eight hours of work for the translator when

5    you're trying to both change from one language to the other

6    and try to make it as exact as possible, a reflection of the

7    original language.

8         Q.   Now, the particular conversations that you were

9    asked to translate in this case, can you tell us what

10   languages were spoken during those conversations?

11        A.   Primarily Urdu and English, but there was also

12   religious, Arabic and there was a little bit of what I

13   understand is the Bangali or Bangladeshi language.

14        Q.   Now, when you say religious Arabic, is that it's

15   own separate language or is it somehow part of Urdu?

16        A.   It is mostly Arabic, but persons worldwide use

17   concepts which are from the original Arabic since the

18   language of the Muslim's holy book, the Qu'ran, is written

19   in Arabic.  So, they are originally Arabic words, but

20   understood by Muslims everywhere, much like Catholics

21   worldwide would understand Latin concepts, religious

22   concepts.

23        Q.   Way back when we were altar boys and such?

24        A.   Yes.

25        Q.   How about -- does it happen, from time to time,

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Saeda - Direct - Pericak                                    124

1   when you're listening to a tape, that you can't make out

2   what a word or sound is?

3        A.   Yes, it certainly does happen.

4        Q.   Is there a convention to deal with that?

5        A.   Yes.  There is a mechanism.  We are taught to

6   never represent a word which we cannot clearly make out.

7   So, instead, we put the capital initials "UI," which means

8   unintelligible, to substitute for the unintelligible word or

9   phrase.

10       Q.   Now, does that mean that -- withdrawn.

11            Prior to coming in here, did you have an

12  opportunity to review portions of some translations that you

13  had made in connection with this case?

14       A.   Yes, I did.

15            MR. PERICAK:  And your Honor, I'll be

16  referring to exhibits with a T after them to correspond to

17  the audio or video exhibits.  So, for example, 2-A, the

18  transcript will be 2-A-T, et cetera.  And with respect to

19  Exhibits 2-A -- I will leave off the T 'til I get to the

20  end -- 2-A, B, C, D, E, F, G, M, N and T, dash T.

21       Q.   Can you certify to us that you actually did make

22  those translations?

23       A.   Yes, I did make them.

24       Q.   And are these translations that you made fair and

25  accurate to the best of your ability?

Saeda - Direct - Pericak                                      125

1        A.    Yes, as far as I could make them fair and

2    accurate, they are.

3        Q.    You used the term "verbatim" before.  What does

4    verbatim mean?

5        A.    Verbatim is a way we have of describing this kind

6    of translation, as opposed to summaries.  In summaries, you

7    write the main point and, you know, that are made by the --

8    main points that are made by the speakers.  But in verbatim

9    translations, you must reflect exactly what the speaker

10   said, as closely as possible, from the original language

11   into English.  You do not leave out anything as unnecessary

12   because you may have mentioned it before and so on.

13       Q.    And is it your experience, in -- as an FBI

14   translator and as the supervisor or senior linguist in that

15   unit, that when the tapes first come in, typically, a

16   summary is made of a tape, as opposed to a verbatim?

17       A.    Yes.  Often a summary will be made, unless we know

18   that something is going to be used for court, in which case

19   then the master linguist or the senior linguist has to work

20   on it to make sure that it is verbatim.

21       Q.    And in those cases when a summary was initially

22   prepared and then you were later told this has to be

23   completed for court, what's the procedure, at least with

24   respect to using the summary?

25       A.    Well, we don't really use the summary then.  We

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Saeda - Direct - Pericak                                    126

 1   have that as the raw material, if you will, but we must

 2   listen, once again, right from the beginning, to every

 3   detail of the audio in order to render a verbatim

 4   translation.

 5                  MR. PERICAK:  Your Honor, at this time, I

 6   would offer the exhibits I previously just mentioned, 2-A,

 7   B, C, D, E, F, G, M, N and T, all dash T, being the

 8   translations prepared by this witness for certain Urdu

 9   conversations.

10                  THE COURT:  Any objections?

11                  MR. KINDLON:  No, we have any objection, your

12   Honor.

13                  THE COURT:  All right.  Mr. Luibrand?

14                  MR. LUIBRAND:  Yes, Judge, brief voir dire?

15                  THE COURT:  Sure.

16   VOIR DIRE EXAMINATION

17   BY MR. LUIBRAND:

18       Q.   Good afternoon, ma'am.  My name is Kevin Luibrand,

19   I represent Mr. Hossain.  We have never met, right?

20       A.   I don't think so.

21       Q.   The transcripts, have you looked at the

22   transcripts that are on the tape that's being submitted into

23   evidence?

24       A.   Do you mean the transcripts that Mr. Pericak just

25   mentioned?

Saeda - Direct - Pericak                                        127

1        Q.   Correct.

2        A.   Yes, I have.

3        Q.   And were there draft transcripts that you had of

4   those before they went to the final version?

5        A.   I don't understand what you mean by draft before

6   going to final.

7        Q.   Sure.  The transcripts that are in evidence are

8   your final version of those transcripts?

9        A.   Yes.

10       Q.   And were there draft transcripts that existed

11  before those went to final?

12       A.   I don't really know.  I mean, there were draft

13  transcripts, in the sense that when I first make my

14  translation, that's what I call the draft, and then I go

15  back and go over them and finalize them.

16       Q.   Were the draft transcripts that you just referred

17  to, were those draft transcripts that you had created?

18       A.   I created all the original transcripts for these

19  conversations which are going to be used.

20       Q.   I just want to keep the language correct in that I

21  am not asking for the original.  Did you create all the

22  draft transcripts that you referred to in order to create a

23  final transcript?

24       A.   Okay.  Let me be clear here, because I can only

25  address what I did.  I cannot speak to what else may be

Saeda - Direct - Pericak                                   128

1    around.  I made translations from the original material,

2    which I would call drafts.  I reviewed those, finalized

3    them.  As far as I know, portions of those will be played

4    today, and I did look at those portions and review those

5    portions again.

6         Q.   Did you review draft transcripts that were

7    prepared by anyone other than you?

8         A.   No.

9         Q.   And did you have any conversations with any of the

10   people whose voices were collected on the tapes that you

11   created?

12        A.   You mean the people whose conversations I wrote

13   out there?

14        Q.   Correct.

15        A.   I don't know the subject, if that's what you mean.

16        Q.   I didn't say if you know the subject.  I just

17   want --

18        A.   I mean, I have not even had a conversation with

19   the subject ever.

20        Q.   Okay.  And by "subject," you mean anyone whose

21   voice is caught on the tape?  You haven't spoken to anyone

22   whose voice is caught on the tape, captured?

23        A.   I have not spoken to Mr. Hossain, who I understand

24   is the person whose conversation was being recorded.

25        Q.   How about the other person?

1        A.   I have met the other person.

2        Q.   That would be Malik?

3        A.   Yes.

4        Q.   And when you say you met Malik, did you speak with

5   Malik?

6        A.   Well, certainly we exchanged words about how are

7   you and so on.  And we wanted to make sure that I heard

8   everything correctly, and, apparently, I had.

9        Q.   Okay.  Had he reviewed those transcripts with you?

10        A.   No, he didn't go over them with me.

11        Q.   Did he speak to you about any of the content of

12   any of the transcripts?

13        A.   I can't remember specifically.  I think there may

14   have been one or two place names, for example, in Albany,

15   which we discussed, because, of course, I did not know the

16   place names myself, since I don't know, you know, Albany

17   itself.  In general, there were one or two words that I

18   couldn't understand for which I had put UIs, and he said

19   they were this or that.  But since I still could not hear

20   them as that, I left them as UIs.

21        Q.   Earlier, you spoke about the concept of the Urdu

22   translation, verbs coming at the end rather than in the

23   active section of a sentence, correct?

24        A.   In general, that is true.  In general.

25        Q.   When you would transcribe these audiotapes, would

1   you carry the verb at the end of the sentence, where it was

2   heard, or would you put it in some --

3        A.   No, I would put it so it would make sense in

4   English, which is how we are trained.

5        Q.   So, you would take the verb --

6        A.   Because we do not say, "We at the end of the

7   sentence verb put."  This would not make sense in English.

8        Q.   You would take the verb you heard at the end of

9   the sentence and put it earlier in the sentence, correct?

10        A.   Well, I would not specifically focus on the verb

11   and move it to the end of the sentence.  What I would do is

12   listen to a sentence and then put it into English, as

13   English word order would make sense, which usually means you

14   don't put the verb at the end of the sentence.

15        Q.   So, as you would hear the sounds, you would not

16   verbatim place those sounds on paper --

17        A.   No, we don't put it --

18        Q.   Let me finish my question.

19        A.   Sorry.

20        Q.   Even if you know what I'm going to say.

21        A.   Please.

22        Q.   Thank you.  When you would hear the sounds, you

23   would not always put them in the order that you heard them

24   on the piece of paper, correct?

25        A.   No.

Saeda - Direct - Pericak                                    131

1        Q.    And Mr. Hossain, he spoke, on the tapes, Urdu,

2   with a strong Bangladeshi accent, correct?

3        A.    Well, he spoke it with a strong accent, which I

4   assume is Bangladeshi.

5        Q.    And Mr. Malik, he would not speak smoothly or

6   connectedly when he would speak, correct?

7        A.    No, I suppose he didn't speak very connectedly.

8   Most people who, when they're speaking spontaneously, do not

9   speak connectedly.

10        Q.    And in fact, his words on the tape would be

11   mumbled and he would speak haphazardly, correct?

12        A.    Some of them, yes.  But when you listen to it

13   repeatedly, which is what you do for verbatim, you get most

14   of the words.

15        Q.    And he would switch words around at random,

16   wouldn't he?

17        A.    Correct.

18        Q.    And he would break off incomplete sentences and

19   start new ones, correct?

20        A.    As spontaneous speech is, yes, he would.

21        Q.    And when you produced the transcripts, did you

22   produce 'em as you heard his haphazard word construction and

23   sentence construction?

24        A.    I would try and reflect it as clearly as I could,

25   when going from one language to another.  For example, if he

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

1    stopped and repeated words or broke off in the middle of a

2    sentence and began another phrase, I would try and reflect

3    that in the English translation.  I would not render it as

4    if he had spoken smoothly with no breaks.

5        Q.    The words that were spoken would not be presented

6    in the form that were heard by the speakers at the time the

7    language was exchanged, is that a fair statement?

8        A.    I'm sorry, I don't understand the way you're

9    describing it.

10       Q.    The words that you wrote on the pieces of paper

11   that are now the transcripts do not represent the words that

12   were spoken between the two speakers?

13       A.    Well, they couldn't, because the original language

14   was in Urdu, which wouldn't make any sense to English

15   readers.

16       Q.    And --

17       A.    And Urdu is not like English.

18       Q.    Correct, it's not like English, is it?

19       A.    No.

20       Q.    And is there a word for word exchange between an

21   Urdu word and an English word?

22       A.    As far as possible, an equivalent, an exact

23   equivalent is given, which is always done in translations of

24   any kind.

25       Q.    So it's not always done?

Saeda - Direct - Pericak                                    133

1       A.   I said it is always done in translations of any

2   kind, as far as possible.  One is as exact as possible.  For

3   example, there are expressions in Urdu which would mean

4   nothing in English, so what we do is find exact equivalent

5   expression in English and then produce that in the

6   translation, since the original Urdu would not mean anything

7   in English.

8       Q.   So, it's not a translation of the words from Urdu,

9   in that circumstance, to English, correct?

10       A.   With regard --

11       Q.   Let me --

12       A.   With regard to certain idiomatic expressions which

13   would not make any sense in English, those would not be

14   translated as they are in Urdu.  For example, proverbs.  A

15   proverb in Urdu may mean nothing in English, but there may

16   be an exact equivalent proverb in English which would be

17   used instead.

18       Q.   And you would exercise your discretion in

19   converting whatever was said by way of proverbs, for

20   example, to English, correct?

21       A.   Not my discretion.  I have no discretion.  My

22   knowledge is what I would --

23       Q.   Your knowledge.  But you would not take the words

24   and put them in there word for word.  There would be a

25   conversion process for you and it would come out in what the

Saeda - Direct - Pericak                                    134

1    English idea would be?

2         A.   No, not idea.  Comprehensible English exact

3    equivalent of the original.  Not just the idea, but as close

4    an exact equivalence as possible.

5         Q.   And that would be even though the actual speaker,

6    Mr. Malik, would be speaking haphazardly and in broken off

7    sentences, correct?

8         A.   I would reflect that haphazard speech, I would

9    reflect breaks in the sentences, I would reflect repetition

10   of words and incomplete sentences from the original into

11   English.

12        Q.   Thank you.

13        A.   You're welcome.

14             MR. LUIBRAND:  Just have a moment, your

15   Honor?

16             THE COURT:  Okay.

17             MR. LUIBRAND:  Your Honor, I object on the

18   grounds of lack of foundation.

19             THE COURT:  Lack of foundation.  Well, what

20   is it by way of foundation that you think should be before

21   the Court and jury?  Or would you like to tell me at side

22   bar?

23             MR. LUIBRAND:  Sure.

24             (At side bar:)

25             MR. LUIBRAND:  Judge, the translation is

Saeda - Direct - Pericak                                          135

1    taking words that are heard, taking words that are spoken

2    and that are collected on a tape and hearing those words and

3    putting them into the other language.  It's not to take the

4    words that you hear and when you want to, whatever your

5    standard is, decide to take those words and convert 'em to

6    some -- to English, to make the point that you think the

7    person was trying to make, which is what she just testified

8    to.

9                    THE COURT:  No, she didn't testify to that.

10   If she did that, that would be a different kettle of fish.

11   What she said was she would search to find an exact

12   equivalent English phrase when the phrase -- or proverb, she

13   talked about as an example -- in Urdu didn't make sense in

14   English, couldn't be expressed in English.  She said,

15   through her knowledge, she would search for an exact

16   equivalent phrase in the English language that meant the

17   same thing.  Not the idea of what it meant, not the gist of

18   it, but what it was exactly to the best of her ability.

19                    MR. LUIBRAND:  But what it would be is what

20   words were spoken, not what she went in search for to try to

21   match it.

22                    THE COURT:  She couldn't produce the words in

23   English from Urdu in certain situations.  That's when she

24   went to get an exact English phrase.  And I think I

25   understand the nature of your objection.  What you're seein'

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Saeda - Direct - Pericak                                    136

1   written down on paper is not an exact word for word Urdu

2   train of speech.

3                  MR. LUIBRAND:  Correct.

4                  THE COURT:  I understand that.  But she can't

5   do that and she's represented to this Court that that can't

6   be done.  It has to be done in the way she did it, and the

7   jury has heard that explanation of how she did it.  So, as

8   they -- if they do hear these tapes, if they do read these

9   tapes -- on the screen?  If they do read these tapes, they

10  will have to consider, in reading them, that this is the way

11  the translation was made by this lady.  And then you can

12  argue anything you want from that.  But I think the

13  foundation has been laid.  Do you understand my ruling?

14                 MR. LUIBRAND:  I understand.

15                 THE COURT:  You can have an exception to

16  that.

17                 MR. SPROTBERY:  Your Honor, just so the

18  record is clear, we join in the objection and have one other

19  issue, on the issue of lack of foundation.  I believe she

20  testified that she spoke with Malik and he provided her with

21  additional information that she used then as a basis for her

22  translation.

23                 THE COURT:  No.

24                 MR. SPROTBERY:  I believe what she said is I

25  had to speak with him so he could identify local places and

                   THERESA J. CASAL, RPR, CRR
                UNITED STATES COURT REPORTER - NDNY

Saeda - Direct - Pericak                                         137

1    things she wasn't familiar with.

2                    THE COURT:  I think she talked about some

3    names.  I didn't understand that.

4                    MR. PERICAK:  Places.  Gateway Diner, Latham.

5                    THE COURT:  I'm sorry, I didn't understand

6    that.

7                    MR. SPROTBERY:  My point at this time is we

8    have not heard from all the translators and interpreters who

9    took part in this, Malik being one of those.  Lack of

10   foundation.

11                   THE COURT:  I think the only time she

12   directly addressed the issue of what Malik told her, in

13   terms of what she couldn't understand, where she put UI,

14   that even after Malik attempted to tell her what that meant,

15   she did not translate that because she still couldn't hear

16   it, even though Malik told her what it was.

17                   The fact that there may have been

18   identification of certain places, geographically located

19   places in Albany that might have been an aid to her in

20   understanding, I don't think that taints the translation in

21   any sufficient manner.  But we've got it on the record and

22   you can make that argument.  All right?

23                   MR. PERICAK:  Thank you, your Honor.

24                   (In open court:)

25                   THE COURT:  All right, the Court will

Saeda - Direct - Pericak                                          138

1  overrule the objection and admit the exhibits.  Now, do I
2  understand, just so I understand correctly, these exhibits
3  are 2-D-T, E-T, et cetera?  You put the T at the end?  You
4  ran them off in a string and said they're all T exhibits,
5  right?
6                    MR. PERICAK:  Yes.  2-A-T, 2-B-T, 2-C-T --
7                    THE COURT:  I started 'em wrong, I got slash.
8  I started in the middle.  So, the Court will admit 2-A-T,
9  2-B-T, 2-C-T, 2-D-T, 2-E-T, 2-F-T, 2-G-T, 2-M-T, 2-N-T,
10  2-T-T.  Right?
11                    MR. PERICAK:  You got it.
12                    (Government Exhibits 2-A-T through 2-G-T
13                     2-M-T, 2-N-T and 2-T-T received.)
14                    THE COURT:  Worse than Urdu.
15                    (Laughter.)
16                    THE COURT:  Okay.
17                    MR. PERICAK:  Your Honor, at this point, we
18  will play the tapes, with the transcripts as prepared by
19  this witness, and we will ask her questions with respect to
20  those.
21                    THE COURT:  Yes, sir, Mr. Luibrand.
22                    MR. LUIBRAND:  Your Honor, I don't know if
23  this is the sanctions version or --
24                    MR. PERICAK:  No, this is sanctions with the
25  scrolling transcript.


                         THERESA J. CASAL, RPR, CRR
                    UNITED STATES COURT REPORTER - NDNY

Saeda - Direct - Pericak                                    139

1                     MR. LUIBRAND:  Judge, I have an issue.

2                     THE COURT:  An issue we should address at

3     side bar?

4                     MR. LUIBRAND:  Yes.

5                     THE COURT:  We get to hear more music?

6                     MR. LUIBRAND:  Yes, your Honor.

7                     (At side bar:)

8                     THE COURT:  What's your objection?

9                     MR. LUIBRAND:  Judge, I object with respect

10    to audio only tapes in which the voice has been collected

11    but no video, and then taking those and displaying them as

12    videotapes, which is what this sanction is, it's a videotape

13    of an audio conversation, it's like a movie, and what

14    they've done is said this is the speaker and you see

15    question, answer, speaker, speaker, and it gives the false

16    impression that this is just a conversation when, in fact,

17    at least on two of these, my guy is working and it gives the

18    sense that he's paying attention because here's his picture

19    and here's the conversation and you don't -- and you're --

20    the impression given to the jury is this is just a regular

21    conversation and it takes away the -- what actually was

22    happening by showing the photograph.  And I believe that

23    that's not proper.  It's a video -- it's making this into a

24    movie and it's putting improper evidence in front of the

25    jury by putting pictures there.

Saeda - Direct - Pericak                                    140

1              THE COURT:  Well, in a movie, there is a

2    sequence of pictures strung together that portray action of

3    the person portrayed.  Here, I understand it's only gonna be

4    the picture of each speaker once, shown once, but

5    illuminated back and forth as the speakers change.  So, it's

6    not the same, in my view, as a movie or what's called, I

7    guess, video.

8              I think the jury should be instructed that

9    this, in no way, depicts what the speakers were doing during

10   the conversation.  We don't know what they were doing,

11   because there isn't any video.  But the fact that they're

12   shown in still in opposition to one another does not mean

13   and the Government doesn't represent it to mean, as I

14   understand it, that that's the way they were during the

15   course of this conversation, and you can't take that as

16   such.  All you can do is listen to the conversation and base

17   whatever understanding you get on what you hear through the

18   transcript or see through the transcript.

19             So, basically, that's an overruled, but I

20   think you made your record.

21             MR. LUIBRAND:  Okay.

22             MR. PERICAK:  Thank you.

23             MR. LUIBRAND:  One last thing is I have my

24   translator here for those complete sections that we have to

25   complete as they come up.

1                THE COURT:  Okay.  So he's in the courtroom?

2                MR. LUIBRAND:  He's in the hallway.

3                THE COURT:  Bring him in the courtroom.

4                MR. LUIBRAND:  Okay.

5                THE COURT:  All right.

6                (In open court:)

7                THE COURT:  Ladies and gentlemen, we are

8    gonna see displayed upon the screen the transcripts of the

9    tapes that were just mentioned in the evidence and as a way

10   to allow you to know which person is speaking as the

11   transcript unfolds before you, the Government has chosen to,

12   in their words, subtly -- I don't know what that means --

13   but, somehow, they light up the face of the person who

14   allegedly is making these statements.  And what I want to be

15   clear with you is that as the people were speaking and, of

16   course, speaking together, they were in no way sittin' there

17   lookin' at each other at a table face-to-face, they were

18   doin' whatever they were doin', we don't know, there is no

19   video.

20                But I don't think you can take it because the

21   Government has chosen to present it to you in this posture

22   to aid your understanding of who the speaker is that you can

23   infer, in any way, shape or form, that they were actually

24   sitting in the way you see them opposite -- one on one side

25   and one on the other.  There may be testimony later on about

1   what they were doin', there may not be.  But there certainly

2   isn't any video representation of what they were doin' as

3   this conversation unfolded.  I just wanted to make that

4   clear to you.  That's what we do at side bar.  Remember I

5   said we didn't talk about the sports scores?  We talk about

6   things like that.

7                   MR. PERICAK:  And your Honor, if I may just

8   correct one thing.  A lot of these tapes are videotapes.

9                   THE COURT:  Well, I'm talkin' about the ones

10  that aren't.

11                  MR. PERICAK:  Just want to make 'em clear.  I

12  don't want them to think the videotapes aren't videotapes.

13                  THE COURT:  All right.  I guess that's an

14  illuminating point, Mr. Pericak.

15                  (Laughter.)

16                  MR. PERICAK:  All right.  I will have our

17  technician play the videotape and the corresponding

18  transcript, transcript for Exhibit 2-A and 2-A-T, August 7,

19  2003, after which, Saeda, I will ask you some questions

20  about this particular tape.

21                  (Tape played.)

22                  THE COURT:  Okay, we are gonna take a recess

23  before you ask the witness some questions.

24                  MR. PERICAK:  Okay, fine.

25                  (Short recess taken at 3:44 PM.)

Saeda - Direct - Pericak                                        143

1              (Counsel, Judge and stenographer in jury

2               assembly room at 4:00 PM.)

3         THE COURT:  The jurors have reported to the

4    clerk that they had extreme difficulty in following the

5    tape, the reading part or the visual part, and that it was

6    goin' too fast and they couldn't keep up with it.  And

7    actually, I think it would have been probably beneficial if

8    somebody said CW was Malik, the confidential witness.

9         MR. PERICAK:  I was gonna ask her that, that

10   was one of my questions.

11        THE COURT:  Okay.  I think what we gotta do,

12   if nobody has an objection, maybe even if somebody does, is

13   we got to play that over again so they can see that, because

14   the Court couldn't follow it and I understand there are

15   other people in chambers who couldn't follow it either.  Is

16   there a way to slow it down?

17        MS. COOMBE:  Yes, your Honor.

18        MR. PERICAK:  We can ask them to slow it

19   down, is that possible?

20        MS. COOMBE:  We can.  There's normal, slower

21   or faster.  But I can't do any gradations between slower and

22   normal.

23        THE COURT:  Another problem I think people

24   had, although the jurors didn't report that to me, although

25   others did, that when you're tryin' to concentrate to follow

Saeda - Direct - Pericak                                    144

1   the language on the written part, the yellow line that

2   highlights that moves up, and when we read, we go from up to

3   down, most of it, one line to another, when we go down, and

4   then when you do concentrate on that, you can't lift your

5   eyes at the same time to watch what the characters on the

6   screen are doin' 'cause you can't just split your

7   concentration.

8            MR. PERICAK:  There are several alternatives.

9            MR. KINDLON:  I tell you the sanctions I saw

10  before, there was no line, you just got to read along with

11  it.  The line is distracting as can be.  Is there any way to

12  eliminate that line?

13           MR. PERICAK:  Well, you could eliminate the

14  line, but then you don't know where they are -- I mean --

15           MR. KINDLON:  But you got a thin slice of

16  transcript.  I mean, you know, I just went through this with

17  my last trial and it was a lot easier to follow without the

18  line.

19           MR. PERICAK:  The other thing we can do is

20  make copies of the transcripts so they could have 'em in

21  their laps and refer to them as --

22           THE COURT:  Then you're lookin' at three

23  things, the transcript on the lap, the thing on the screen

24  and the characters.

25           MR. PERICAK:  Let's just try it again slow.

1                MR. LUIBRAND:  But Judge, it's just another

2     piece of evidence, so however quick or slow, they'll have it

3     at the end of the case and can look at it --

4                THE COURT:  They can't take that in the jury

5     room.

6                MR. LUIBRAND:  They will have the

7     transcripts.

8                THE COURT:  I am not sure they will.  I guess

9     they will have the transcripts of the nonEnglish speaking,

10    because that, I suppose, is the evidence, and the

11    transcripts are only an aid of what you're hearing --

12                MR. PERICAK:  I think, under U.S. versus

13    Carson, you have the discretion on the English language

14    transcripts to decide whether or not to admit them as

15    evidence or only as demonstrative aids, but, clearly, the

16    foreign language, the transcript is the evidence.

17                THE COURT:  Yeah, that's right 'cause there

18    isn't anything else.  Well, let's play it once more, slow it

19    down.  Can you have your tech guy slow it down?

20                MS. COOMBE:  It will just take him a minute

21    to recreate the clip.

22                THE COURT:  Get workin' on it.

23                MR. LUIBRAND:  I have the expert comin' in

24    pretty soon, I think.  When do you want to put him on?

25                MR. PERICAK:  He goes after November 20th.

Saeda - Direct - Pericak                                    146

1    From the time --

2                   THE COURT:  You are not gonna get to

3    November 20th?

4                   MR. PERICAK:  No.  September 30, October 20,

5    then November 20, so that's the fourth clip we are gonna

6    play, and that's a long clip.

7                   MR. LUIBRAND:  Judge, his transcript is for

8    October 20, they're playing part of October 20th, he can

9    go -- should be able to go just after that instead of

10   waiting until November 30th, or whatever date it is, which

11   is a long transcript.  I got him up from New York just for

12   this and then goin' home.  I don't want to keep him

13   overnight.  I don't think I should have to.

14                  MR. PERICAK:  But the problem is the rule of

15   completeness, he is completing something that occurred on

16   the 20th, and then, under the rule, you play the 20th and

17   then he completes it.

18                  THE COURT:  Yeah, that's what the rule is,

19   but there are rules that work in tandem with rules like that

20   and one is if you got a witness who is here out of town and

21   he has to go back...

22                  MR. PERICAK:  Okay.

23                  THE COURT:  We can let 'em go out of order

24   and tell the jury.  All right.

25                  (Recess in jury assembly room at 4:06 PM.)

1                    (In open court at 4:08 PM.)

2                    (Jury present.)

3                    THE COURT:  All right, ladies and gentlemen,

4        I understand there were some complaints from the listeners

5        and the viewers about the speed at which the last

6        presentation was made to you.  And I think I can understand

7        that because I was havin' trouble following it.  So, we've

8        discussed it among all the folks involved and we are gonna

9        try it again and we are gonna slow it down a little bit.

10       But if we slow it down too much, it may sound like somethin'

11       that we haven't heard before.  We are gonna try it and see

12       how it works and we can, I guess, speed it up a little more

13       or slow it down a little more, just so we can all follow it.

14       So, are you set -- by the way, there were letters on the

15       screens to the left of the lines of the language, and I

16       suppose you all figured it out now, but I will tell you

17       anyway, CW is Malik, the confidential witness; MH is the

18       defendant Mohammed Hossain, just so you know that.  I guess

19       you did anyway.

20                    All right.

21                    (Tape replayed.)

22                    THE COURT:  All right, ladies and gentlemen,

23       was that better?  Very good.  What's next, Mr. Pericak.

24       BY MR. PERICAK:

25           Q.   Saeda, I would like to direct your attention to

Saeda - Direct - Pericak                                    148

1  page 26, line 16, where the words "kill or (sic) be killed"

2  are spoken.  Do you see that?

3       A.   Yes.  "Kill and be killed."

4       Q.   "Kill and be killed."  In what language was that

5  in the original?

6       A.   It was religious Arabic.

7       Q.   And as indicated, when you prepared the

8  transcript, you indicated MH and CW, and who were they?

9       A.   MH is the subject, Mr. Mosharref Hossain, and CW

10  means, in FBI jargon, cooperating witness.

11       Q.   And who said, "Bin Laden killed 3,000 people"?

12       A.   In this case, the CW said it, the cooperating

13  witness.

14       Q.   And who said "kill or (sic) be killed"?

15       A.   Mr. Mosharref Hossain said it.

16            MR. PERICAK:  Can we now go to

17  September 30th, please.

18            (Tape played.)

19            MR. PERICAK:  With the Court's permission,

20  can we do that one more time to make sure -- do you think

21  everybody caught it?

22            THE COURT:  Yeah, I think we should.

23            (Tape replayed.)

24  BY MR. PERICAK:

25       Q.   And of course, we saw the word "Jihad" in there a

1    number of times.  Can you tell us the definition, what is

2    the meaning of the word Jihad?

3                    MR. LUIBRAND:  Judge, I object.

4                    THE COURT:  I'm sorry?

5                    MR. LUIBRAND:  I object.  This is a

6    translater, not an expert witness on Jihad.

7                    THE COURT:  Yes, I think I will sustain that.

8                    MR. PERICAK:  Well, your Honor, I am just

9    asking her what the word means, if the word Jihad is a word

10   in the language, and she is just gonna say what it means.

11                   THE COURT:  Well, I think you can ask a lot

12   of people what the word means and you will get a lot of

13   different answers.  But I think this is a translator, she

14   has been called upon to translate certain conversations and

15   she has not been called upon, as I understand it, to be an

16   expert in terms of what the meaning of a certain term is

17   from anything but a translation standpoint.

18                   MR. PERICAK:  That's all I'm asking her.

19                   THE COURT:  Just from a translation --

20                   MR. PERICAK:  Just from a translation

21   standpoint what Jihad means.

22                   MR. LUIBRAND:  I still object.  They are

23   defining what Jihad is.  Not a translator.  Translator gives

24   me words.

25                   THE COURT:  Let me ask the witness:  Is Jihad

Saeda - Direct - Pericak                                          150

1   a word that is from Urdu?  Is that an Urdu word?

2                   THE WITNESS:  It's originally religious

3   Arabic, but it has become part of the Urdu language, just as

4   it's become part of all Muslim languages.

5                   THE COURT:  Is there an English translation?

6                   THE WITNESS:  The simplest translation is

7   "holy war," but, obviously, there are complex connotations

8   beyond that.

9                   THE COURT:  Okay.

10                  MR. PERICAK:  Thank you.  Let's go to

11  October 20th, please.

12                  (Tape played.)

13  BY MR. PERICAK:

14      Q.   In your translation, you see the word "problem"

15  appears twice?

16      A.   Yes.

17      Q.   And what was the spoken word in that conversation

18  that you put down as "problem"?

19      A.   It was problem, because it was said as the English

20  word "problem."

21      Q.   Now, can you explain to us -- you said 15 percent

22  of Urdu is English.  Can you explain to us how that works?

23      A.   It means that for many words, English words, are

24  used instead of the original Urdu word, just in the course

25  of speaking the Urdu.


                    THERESA J. CASAL, RPR, CRR
                 UNITED STATES COURT REPORTER - NDNY

1        Q.   For example, if an English speaker, only English

2   speaker went to Pakistan and turned on the television and

3   listened, would they hear English words?

4        A.   Yes, they would hear English words in the middle

5   of the spoken Urdu.  For example, in talk shows,

6   advertisements, educational discussions.  Or they would hear

7   English words in the middle of it, obviously pronounced the

8   way Urdu speakers would.

9        Q.   And are there any particular context or -- can I

10  use the phrase "borrowed" or "adapted"?

11       A.   Yes.  Words like "problem" are used frequently.

12  "Job," for example, is used frequently.  The word

13  "professor," for example, is used frequently.  The actual

14  English word in the middle of Urdu.  "Dollars" would be said

15  as dollars.  "Rent" would usually be said as rent, though

16  there are perfectly good --

17       Q.   And in this particular conversation, it refers to

18  "that day you said you had a problem with money"?

19       A.   Right.

20       Q.   I am not gonna ask you, if it's a Urdu word, to

21  say it because the court reporter might have my head, but

22  was that spoken as an English word or Urdu word?

23       A.   No, in this case, it was the Urdu word.

24       Q.   And how about where it got to "I'll need two,

25  four, maybe $5,000."  The numbers two, four, five, were

1  they --

2        A.    They were in Urdu.

3        Q.    Thank you very much.

4              MR. PERICAK:  Your Honor, at this time, I

5  understand that Mr. Luibrand would like to put on a witness

6  to testify to certain other parts of this particular tape or

7  transcript.

8              THE COURT:  Do have you that witness here?

9              MR. LUIBRAND:  I do, your Honor.

10             THE COURT:  All right, ladies and gentlemen,

11 what's happening now is that the Government has elected to

12 play a certain portion of what happened that day, and under

13 the rules, the defense is able to play the remaining part,

14 the part they say should be heard, so you can understand

15 everything together.  And here, in this instance, this tape

16 was from November 20th?

17             MR. PERICAK:  October 20th.

18             THE COURT:  October 20th.  But as I

19 understand it, Mr. Luibrand, your expert is going to be

20 testifying as to what else was done on October 20th and then

21 offer also something on November --

22             MR. LUIBRAND:  No, we fixed that one.

23             THE COURT:  You fixed it.

24             MR. LUIBRAND:  The Government agreed to play

25 that, and they did.

Saeda - Direct - Pericak                                    153

1                    THE COURT:  Okay.  That's fine.

2                    (Witness excused temporarily.)

3                    THE CLERK:  Will the witness come forward to

4     be sworn, please?  Would you state your name for the record?

5                    MR. PERICAK:  Your Honor, Mr. Luibrand has

6     transcripts for us, but we don't have copies.  Can we

7     just --

8                    THE COURT:  Make quick copies?

9                    MR. PERICAK:  Yeah.

10                   THE COURT:  Hold on until we swear the

11    witness first.

12                   (Witness duly sworn.)

13                   THE CLERK:  Alyas Bhatti.

14                   (Pause in proceedings.)

15                        - - - - -

16

17

18

19

20

21

22

23

24

25

                    THERESA J. CASAL, RPR, CRR
                UNITED STATES COURT REPORTER - NDNY

Bhatti - Direct - Luibrand                                   154

1                    A L Y A S    B H A T T I,

2      having been called as a witness, being duly sworn,

3      testified as follows:

4      DIRECT EXAMINATION

5      BY MR. LUIBRAND:

6           Q.    Good afternoon, Mr. Bhatti, how are you?

7           A.    I'm fine.

8           Q.    Would you state your name for the jury, please?

9           A.    My name is Alyas Bhatti, A-L-Y-A-S, B-H-A-T-T-I.

10          Q.    Where do you live, Mr. Bhatti?

11          A.    I live in New York.

12          Q.    And are you -- do you have employment?  Do you

13     have a job that you work day to day?

14          A.    Well, I'm working for Eastern District of New

15     York, that's U.S. District Court, and Southern District, and

16     I work as a per diem with them.

17          Q.    And if I could give some meaning to that, you

18     work, when needed, at the federal court in New York City?

19          A.    Yes, sir.

20          Q.    All right.  And that's called the Eastern District

21     of New York, is that correct?

22          A.    Eastern District and -- both.  The other one is

23     the Southern District of New York.

24          Q.    Okay.  So the two courts?

25          A.    Two courts.

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Bhatti - Direct - Luibrand                                      155

1          Q.   Southern District and Eastern District?

2          A.   Yeah, Eastern and Southern.

3          Q.   Why don't you go through your education first?

4          A.   Well, I did my Bachelor's in Arts in '67.  I did

5     my law, Bachelor of Law in 1970.  I did my Master of Arts in

6     political science in '87.  I did my Master in Law in 1990.

7          Q.   Where are you from originally?

8          A.   I'm from Punjab area, which is West Punjab, now is

9     a part of Pakistan.  And there is a town named Jalem

10    (phonetic), it's well-known historical place.  I belong -- I

11    come from that place.

12         Q.   And have you done -- from time to time, over the

13    years, have you been a translator or interpreter in

14    different court proceedings?

15         A.   I been working with the New York State Unified

16    Court System from '85 until '95, and I'm working with the

17    U.S. District Court, both Eastern and Southern District,

18    since 1985.

19         Q.   And when you say you work with them, are you

20    called by the judges to come in and do interpretations?

21         A.   No.  It's like, you know, criminal court.  In

22    New York City, there are, you know, five boroughs, and New

23    York City controls the whole area, like criminal courts are

24    controlled by them.

25              Then there's the Family Court, then civil

Bhatti - Direct - Luibrand                                    156

1   court.  So, over there, I also was a per diem, and whenever

2   they needed me, I used to work with them.

3        Q.   Have you done work with the District Attorney's

4   office in New York City?

5        A.   No, I don't.

6        Q.   And how about the Department of -- and I don't

7   mean right now.  I mean at any point in time.  Did you ever

8   do any work with the District Attorney's office in New York

9   City?

10        A.   I did work for the New York City, but I did work

11   for the U.S. Attorney's office, both for Southern and

12   Eastern Districts.

13        Q.   The U.S. Attorney's office would be the federal

14   prosecutor's office in New York City?

15        A.   Yes, sir.

16        Q.   And what kind of services did you provide to them?

17        A.   I provided them as a translator, as an

18   interpreter, as an expert witness.

19        Q.   Have you sought to achieve any certifications of

20   any kind in language?

21        A.   Well, I have honors in Urdu language, which I did

22   in 1964, and that was an extra, you know... So I have this

23   specialization.

24        Q.   How often do you provide any type of assistance in

25   translation and interpretation of foreign languages?

Bhatti - Direct - Luibrand                                    157

1       A.   Like twice in a week, and sometime, if there's a

2    trial, then I do the whole trial, like end up two, three

3    weeks.

4       Q.   Are there particular languages that you have

5    experience with translating?

6       A.   Well, I speak Hindi, and then I speak Urdu, and

7    then Punjabi, which is my basic language, which I was born.

8    Then there are dialects, because Punjabi language, if you

9    start from East Punjab, which is part of India, and going up

10   to the western part, which is Pakistan, so there are lot of

11   dialects, like Boutuhari (phonetic), then Hinco (phonetic),

12   then Suraki (phonetic).  So, I understand that and I do

13   that.

14      Q.   You made a reference to India and Pakistan.  They

15   are Urdu speaking countries?

16      A.   No.  Actually, before partition, before 1947,

17   after English, Urdu was a second language for official, you

18   know -- in northern part of India.  Southern part, they have

19   their own languages.  But after partition, Punjab was

20   divided into two sections.  One is East Punjab, India.  West

21   Punjab became part of Pakistan.

22      Q.   So, over the course of the past, must be a year

23   now, I've given you tapes, from time to time, to translate,

24   have I not?

25      A.   Yes.

1       Q.   And you have done your translations at your office

2  and home in New York City?

3       A.   Yes, sir.

4       Q.   And could you describe to the jury how you go

5  about translating a tape from Urdu, or a foreign language,

6  into English that a jury or people speaking English could

7  understand?

8       A.   My way of doing the translation is this:  That for

9  this tape, I have a special equipment, which I control with

10  my foot, you know, it's a pedal.  So what I do is I listen

11  the -- listen to the tape conversation, then I write -- if

12  it's in Urdu, I write in Urdu word by word.  And after I

13  finish that, I -- like transcribe.  Then I translate it

14  after I finish it.

15      Q.   When you say listen to the tape and then go word

16  by word, do you -- every word that you hear on the tape, do

17  you collect that in your mind and write it on the piece of

18  paper?

19      A.   Yes, sir.

20      Q.   Do you vary from that practice at all?

21      A.   Yes.  I been doin' since long and that's the way I

22  do.

23      Q.   Do you do any modifications of the words as they

24  come out when you put 'em on the paper?

25      A.   According to my personal experience, and as I have

Bhatti - Direct - Luibrand                                    159

1   done it lot of translations, it should be verbatim, whether

2   it means or not.  So I go with that.  As it is said, I try

3   to follow that guidelines and then translate it.  I don't

4   modify, because that's not my job.  I don't give opinions

5   about anything, because that's not -- my job is just to

6   translate as it is.

7       Q.   And what if the final product that you produce

8   really doesn't make much sense, what do you do?

9       A.   I don't do anything.  I just give it to the

10  attorneys.  And -- because there are lot of words which can

11  be -- in essence, they mean something else.  But what I see,

12  I listen to the person, what he is saying, I go by that.

13      Q.   Okay.  Now, I know in the past, you have done

14  translations of a conversation that was October 20, 2003.

15  You've done that for me, right?

16      A.   Yes, sir.

17      Q.   And I also asked you to do another one recently,

18  but we're not -- we don't need that one today, okay?  I am

19  just going to focus on October 20, 2003, okay?

20      A.   Yes, sir.

21                (Pause in proceedings.)

22                THE CLERK:  Defendant Hossain Exhibit 1

23  marked for identification.

24                MR. LUIBRAND:  May I approach, your Honor?

25                THE COURT:  Yes.

Bhatti - Direct - Luibrand                                    160

1   BY MR. LUIBRAND:

2       Q.   Mr. Bhatti, I am gonna show you a cassette that's

3   been marked as Defendant's Exhibit Number 1?

4               THE COURT:  Hossain's 1.

5               MR. LUIBRAND:  Hossain 1?

6               THE COURT:  Right.

7               MR. LUIBRAND:  Thank you, your Honor.

8               THE COURT:  That's what the clerk said.

9   BY MR. LUIBRAND:

10      Q.   I am just going to ask you if that's the tape

11  recording you listened to with respect to October 20, 2003?

12      A.   Yes, sir.

13      Q.   And it has certain identification writing on it?

14      A.   Yes, sir.  Which I also mention -- my translation,

15  when I start, I always mention exhibit number, like I said

16  315NID-ID7.  That's what I mention.

17      Q.   And that's certain information that you understood

18  had been placed on there from somebody with the Government?

19      A.   Sure.

20      Q.   And then that's the tape that you actually played

21  and listened to --

22      A.   Yes.

23      Q.   -- to determine what was said?

24      A.   Yeah, that was it.

25      Q.   Describe what your process is to get from that

Bhatti - Direct - Luibrand                                161

1   plastic container to your final version.  With respect to

2   that particular tape, what did you do?

3        A.   Well, I took it out, put it in my cassette player,

4   which is actually, you know, so I can listen, I can lower

5   the speed, and go back and forth, because sometime the

6   conversation is so fast and inaudible, or there's some kind

7   of disturbances, so I have to go back and forth, you know.

8   Maybe 30 seconds conversation, may take ten minutes to catch

9   up.  So that's the way I go, and I just do that way.

10       Q.   Did you make notes at the time you created that

11  tape recording -- or that transcript of the tape recording?

12       A.   Yes, sir.

13       Q.   And did you bring those notes with you here?

14       A.   Yes, I have in front of me.

15       Q.   Okay.  Can I just take a look at those, please?

16       A.   This is starting from here (indicating).

17       Q.   Okay.

18            (Pause in proceedings.)

19            MR. LUIBRAND:  I will give this back to you.

20            THE WITNESS:  Oh, sure.

21            MR. LUIBRAND:  Can you mark this?

22            THE CLERK:  Defendant Hossain Exhibit 2

23  marked for identification.

24  BY MR. LUIBRAND:

25       Q.   Mr. Bhatti, I am gonna show you Defendant's

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Bhatti - Direct - Luibrand                                      162

1    Exhibit 2 and just describe what that is for the jury, just

2    what the document is.  I am not asking you to read it or

3    anything, but just what it is.

4          A.   Are we going from page 6 or page 7?  Look like you

5    are puttin' on page 7.  Page 6 is up, you know (indicating).

6               THE CLERK:  Defendant Hossain Exhibit 3

7    marked for identification.

8          Q.   I am gonna show you four pages of typing and ask

9    if you know what that is.

10         A.   Yes, I do.

11         Q.   Okay.  What is Hossain Exhibit 3?

12         A.   Exhibit Number 3 concerns to the portion which I

13   have translated on my page number 6.  And it's from the

14   middle, from Mosharref Hossain's, you know, conversation,

15   starts --

16              MR. PERICAK:  Objection, your Honor.

17         A.   -- from there.

18         Q.   Then you have another conversation, which was

19   translated from the same tape, which would be the third page

20   of that transcript I just gave you, correct?

21         A.   Yes, sir.

22         Q.   Now, Exhibit 3, which is the typed transcript,

23   does that contain your signature at the end?

24         A.   Yes.  I certify that.

25         Q.   Okay.  What does it mean to "certify" it?

Bhatti - Direct - Luibrand                                    163

1      A.   Certify that I stand by what I've done, so this is

2   the way I always give at the end, this is true and accurate

3   translation.

4      Q.   And is that the true and accurate translation of a

5   portion of the October 20, 2003, conversation?

6      A.   Yes, sir.

7      Q.   And it's sections of that conversation, not the

8   entire conversation, correct?

9      A.   Yeah, it's a section of that, which is taken from

10  the middle of the conversation of this October 20, 2003.

11     Q.   And you reviewed that on several occasions and you

12  are confident that it accurately represents what you hear

13  being said in those conversations?

14     A.   Yes, I do.

15          MR. LUIBRAND:  Judge, I am gonna ask that

16  Exhibit 3 be received, and Exhibit 2 as well.

17          MR. PERICAK:  Can the Government voir dire?

18          THE COURT:  Sure.

19  VOIR DIRE EXAMINATION

20  BY MR. PERICAK:

21     Q.   Mr. Bhatti, when did you start working on the two

22  particular translations that you have before you?

23     A.   Okay, I can tell you the date I started and when I

24  finished.

25     Q.   Yes.

Bhatti - Direct - Luibrand                                    164

1        A.   Okay.  I think I started on August 24th of 2006.

2        Q.   So a couple weeks ago?

3        A.   Yes, sir.

4        Q.   And how much time did you actually spend preparing

5   these transcripts, approximately?

6        A.   Well, I have -- I didn't bring that.  Let me tell

7   you exactly.  I have already --

8        Q.   Sure.

9        A.   I started on 25th actually, 25th was the start of

10  the tape I was listening.  The timings -- you need the time

11  from what time to what time?

12       Q.   I need approximately the total amount of time you

13  spent.

14       A.   Hours, you mean?

15       Q.   Yes, hours.

16       A.   For transcribing, I have different hours, and

17  translating is different one.  So, first of all... (pause.)

18  Almost 13 hours.

19       Q.   Thirteen hours?

20       A.   Yes, sir.

21       Q.   Now, sir, I counted, on the first transcript, 33

22  ellipses, right?  You know what ellipses is, the "..." you

23  have right there?

24       A.   Yes.

25       Q.   What does that indicate, the ellipses?

Bhatti - Direct - Luibrand                                    165

1       A.   That's the conversation is continued, but

2   sometime, you know, they stop or -- and just to

3   differentiate the portion of that conversation.

4       Q.   Doesn't that connote there was something that was

5   said you couldn't hear?

6       A.   No.  No.  That's a continuation.  But you know,

7   it's not like in English, whether a comma or like that.

8   Just to denote that it's a -- that's what was said and then

9   it continued.  Because sometime it with a gap, sometimes

10  it's with a, you know -- the person who's speaking is just

11  thinking or you know...

12      Q.   So you were able to account for every single word

13  in each of these translations?

14      A.   Sure.

15      Q.   Sure?  Okay.  And if I understand you correctly,

16  if an English speaker -- I want to do English to Urdu so we

17  can all understand it.  If an English speaker says, "Here

18  come the fuzz," which every English speaker would recognize

19  as "here comes the police," you think the proper translation

20  would be, "here comes a thin hair"?  You said you translate

21  word for word and you don't translate the concepts of what's

22  said.  And my question to you is -- I'm trying to do it the

23  reverse so we all understand what you're saying.  If an

24  English speaker said, "Here come the fuzz," which every

25  English speaker, at least of my age, maybe younger wouldn't

Bhatti - Direct - Luibrand                          166

 1   understand that, would understand to mean "here come the
 2   police," you understand a proper translation would be what
 3   the dictionary says fuzz is, a thin hair, right?
 4        A.   In English, it's much easier than the other
 5   language, because you're the person who is speaking.  He's
 6   not, you know, well educated or he's not following the
 7   principals of that language, how it is written, how it is
 8   spoken.  If a layman speaks Urdu which is not born with, you
 9   know, like we have different areas in India and Pakistan,
10   Punjabi, a person born with the Punjabi language, if he
11   speaks Urdu, only he can understand if he has gone to school
12   and got the education.  Without education, he cannot
13   understand because simple -- because national language they
14   say Urdu.
15        Q.   I am sorry, Mr. Bhatti, I think you lost track of
16   my question.  Can I --
17        A.   So what I'm saying, you say the police is coming,
18   in Urdu I can translate that.
19        Q.   Right.  But if it was "here come the fuzz," as I
20   understood what you're saying, you don't look at what the
21   sentence says it would mean to the ordinary Urdu speaker,
22   you translate word for word what the words say, is that
23   right?
24        A.   Yeah.
25        Q.   So, reversing that, if an English speaker said

1    "here come the fuzz," you could say the proper translation

2    is "here comes a thin hair," am I correct, because that's

3    the dictionary definition of fuzz?

4         A.   No.  But I say in Urdu, you know.  If I'm to

5    translate from English to English, you're asking about?

6         Q.   If you were going from English to Urdu.

7         A.   So then I say --

8         Q.   Would you use the Urdu word for fuzz or the Urdu

9    word for police in that example, in my example?

10        A.   Police is -- in Urdu language, is mesh of

11   different languages.

12        Q.   I understand, sir.

13        A.   And you may not understand the word "Urdu" is from

14   Turkish language, which means "army."

15        Q.   I actually was told that, sir.

16        A.   So Urdu word shows that -- Urdu has adaptability

17   of, you know, adjusting to other languages, because Urdu

18   itself is no language, it is based on different, you know --

19   from Hindi, Sandscript, Persian, some part of the Arabic

20   words, and the same way they have taken over some English

21   words also.

22        Q.   I'm sorry, sir, I think you're missing the point

23   of my question.  I'm asking you about your literal

24   translations.  If there is a sentence spoken in Urdu that

25   you understand to mean something, but as I understand what

1    you're telling us, that even though every Urdu speaker would

2    understand that, you think a proper translation would be

3    word for word --

4                    MR. SPROTBERY:  I object to the form of the

5    question.

6         Q.   -- what the Urdu words mean, correct?

7                    THE COURT:  Hold on.

8                    MR. SPROTBERY:  Form of the question.  Keep

9    saying what every person knows.  Mr. Pericak said some

10   people may not follow his analogy of the fuzz and the

11   police.  He is trying to say an exact fit and I think we are

12   already running into the difficulties of language.

13                   THE COURT:  If he changes that to say "assume

14   that in the English language the word fuzz means police to

15   everyone," would you take your objection away?

16                   MR. SPROTBERY:  If the Court wants me to.

17                   (Laughter.)

18                   THE COURT:  No, I want to get the question

19   answered, that's all.

20                   MR. PERICAK:  I'll rephrase it.

21   BY MR. PERICAK:

22        Q.   Sir, assume the word "fuzz" means "police" to

23   everyone.

24        A.   Police.

25        Q.   But that's not what the dictionary says it means.

Bhatti - Direct - Luibrand                                    169

1      A.   There is a word for police in -- let me tell you
2  about the same you are saying fuzz.  When a person in Punjab
3  says a policeman, he says glhadi (phonetic) and glhadi is a
4  little animal which goes on the trees, you know.  So you'll
5  call that translation, right.  People say like that, too.
6      Q.   That's perfect.  I don't know how to say the word
7  you just said, but if you were translating that word as you
8  just said, literally, do you -- would you put police or
9  would you put a little animal that climbs a tree?
10     A.   No, I say the glhadi.  He said glhadi.  But I will
11  say the glhadi, he may mean police.
12     Q.   But your translation, if you don't explain it, you
13  would put the little animal going up the tree?
14     A.   That's not my job.  My job is to translate.
15     Q.   And I am asking what word would you use for
16  glhadi?
17     A.   Glhadi, I use the glhadi word.
18     Q.   What English word would you use?
19     A.   They call it squirrel, you know.  Sorry.
20          MR. PERICAK:  Thank you very much.
21          MR. LUIBRAND:  I think I've offered the
22  document.  The Government voir dired the document.
23          THE COURT:  Well, you were offering Defendant
24  Hossain Exhibit 3, which is a typewritten --
25          MR. LUIBRAND:  Correct.

1               THE COURT:  -- version?

2               MR. LUIBRAND:  Yeah.  I am gonna offer 3, 2

3    and a photocopy of his book.  I don't want to have his whole

4    book, but the photocopy of that page.

5               THE COURT:  Is that marked something?

6               MR. LUIBRAND:  Yes, 1, 2 and 3.

7               MR. PERICAK:  Do we have that?  I don't have

8    a book.

9               MR. LUIBRAND:  No, he has it, his original

10   book, which is in Urdu.

11              MR. PERICAK:  I see.

12              THE WITNESS:  Yeah, I have my notes.

13              MR. PERICAK:  I certainly don't mind them

14   being marked for identification, but you're not offering

15   them in evidence?

16              THE COURT:  That's what he's doing.

17              MR. LUIBRAND:  If I can get the transcript in

18   without 'em, I wouldn't offer it.

19              MR. PERICAK:  You don't have to put in the --

20              THE COURT:  The Government is waiving any

21   foundational objection that might include the notes, which

22   are 1, 2 and 3, as a basis for the foundation of offering

23   the tapes in evidence, transcription to the tape.

24              MR. LUIBRAND:  Transcript.  I offer the

25   transcript at this point.

Bhatti - Direct - Luibrand                                        171

1                    THE COURT:  And they're marked what?  Nothing

2      yet.

3                    MR. LUIBRAND:  They are.  3.

4                    THE COURT:  3.  How about it, Mr. Pericak?

5                    MR. PERICAK:  No objection, your Honor.

6                    THE COURT:  All right.  We will receive

7      Defendant Hossain's Exhibit 3 in evidence.

8                    (Defendant Hossain Exhibit 3 received.)

9                    THE COURT:  No objection?

10                    MR. SPROTBERY:  No objection.

11                    THE COURT:  All right.

12                    MR. LUIBRAND:  At this point in time, I do

13     not have this type of technology.  I would like to read

14     those.  I do not need the assistance of Mr. Bhatti to read

15     them.

16                    THE COURT:  I think you can have Mr. Bhatti

17     read them, but if you would prefer to read them to the jury

18     now that they are in evidence --

19                    MR. LUIBRAND:  I would do that.  He would

20     then be finished.

21                    THE COURT:  Maybe somebody would want to

22     cross-examine those.  Did you ever think about that?

23                    MR. LUIBRAND:  They could.  I have nothing

24     else to offer with respect to them.

25                    THE COURT:  Okay.

Bhatti - Direct - Luibrand                                          172

1                    MR. LUIBRAND:  At this point in time, I am

2      going to read Exhibit 3.  Thank you, your Honor.

3                    THE COURT:  Yes, sir, Mr. Luibrand.

4                    MR. LUIBRAND:  October 20, 2003 conversation.

5      And I will state the names as I go through 'em.

6                    Mr. Hossain, and he's speaking only with

7      Mr. Malik, or the person we know as Malik, who is CW on the

8      Government's Exhibits.

9                    (Defendant's Exhibit 3 published.)

10                   MR. PERICAK:  Judge, can he stop at the

11     pauses the witness indicated are in there?

12                   THE COURT:  Kind of slow down.

13                   MR. LUIBRAND:  Sure, your Honor.

14                   (Defendant's Exhibit 3 continued.)

15                   THE COURT:  Okay.  So, Mr. Pericak, did you

16     want to cross-examine?

17                   MR. PERICAK:  No more questions, your Honor.

18                   THE COURT:  All right.  Anything from

19     Mr. Sprotbery?

20                   MR. SPROTBERY:  No, your Honor, thank you.

21                   THE COURT:  You may step down, Mr. Bhatti.

22                   THE WITNESS:  Thank you, sir.

23                   THE COURT:  Thank you very much.

24                   THE WITNESS:  You're welcome.

25                   (Witness was excused.)


                        THERESA J. CASAL, RPR, CRR
                     UNITED STATES COURT REPORTER - NDNY

Bhatti - Direct - Luibrand                                173

1                THE COURT:  I guess that brings us to the

2      close of the day.  It's 5 o'clock.

3                Ladies and gentlemen, we will adjourn until

4      tomorrow.  Let me remind you not to discuss the case among

5      yourselves, with anyone else or permit anyone to discuss it

6      with you and we will see you back and begin tomorrow morning

7      at 10 o'clock, hopefully on time, if something else doesn't

8      break.  So have a nice evening.  Court stands adjourned.

9                (Jury excused at 5:03 PM.)

10               THE COURT:  Any home work to do in chambers?

11               MR. PERICAK:  I think we do, your Honor, but

12     we can't remember what it is right now.  I will be back in

13     five minutes.

14               THE COURT:  I will give you five minutes to

15     remember.  If you can't remember it will have to wait until

16     tomorrow.

17               MR. PERICAK:  Oh, yes.

18               (At side bar:)

19               MR. PERICAK:  During the opening statements,

20     I wrote down the seven reasons are in because Mr. Sprotbery

21     opened and talked about choosing, the Government chose.  Now

22     I understand he told me that --

23               MR. SPROTBERY:  Chose Malik, not Aref as a

24     target.

25               MR. PERICAK:  I will say Miss Coombe took it


THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

Bhatti - Direct - Luibrand                                  174

1  the way Mr. Sprotbery intended but --

2              THE COURT:  Do we kneed a transcript?

3              MR. PERICAK:  Right.

4              THE COURT:  That was Bonnie?

5              MR. PERICAK:  We may not need it because

6  Kevin opened and made a big deal that his guy was not the

7  target, so I think that that meets the criteria that we

8  discussed on opening the door for the seven reasons.

9              THE COURT:  Well, I must be under a terrible

10  misapprehension here, misunderstanding.  I thought that if

11  Agent Coll were to be called to the stand, which he will be,

12  there can be certain questions asked of him as to why either

13  of these gentlemen or defendants were targeted by the FBI

14  for this investigation.

15              MR. PERICAK:  That's right.

16              THE COURT:  And we had all discussed this

17  before and there were seven reasons that were articulated

18  that were reasons that could be properly asked and answered

19  and put before the jury.  But you couldn't go beyond that

20  and say to Special Agent Coll, "And was there anything

21  else?"

22              MR. PERICAK:  Right.

23              THE COURT:  Now tell me what's happened, if

24  anything, to change that?

25              MR. PERICAK:  Well, that's on

                  THERESA J. CASAL, RPR, CRR
                UNITED STATES COURT REPORTER - NDNY

1   cross-examination, and very simply, I believe that instead

2   of waiting for cross-examination, because the defense

3   already opened on that, especially Kevin saying that his guy

4   was not the target, that that invites the jury to think

5   about, well, you know, who was the target and why, so I just

6   wanted to -- I didn't just want to blurt it out, I wanted to

7   get out here and have everybody discuss whether it would be

8   appropriate for the Government to ask Agent Coll those

9   questions, about who was the target, he would say Aref.

10                  THE COURT:  Oh, I see.

11                  MR. PERICAK:  And what were the reasons.

12                  THE COURT:  Well, how do you do it if

13  Mr. Luibrand opens the door and now the door is slamming on

14  the other defendant, Mr. Aref, when they didn't do that on

15  their opening?

16                  MR. PERICAK:  Well, it invites the jury to --

17                  THE COURT:  I know it does.

18                  MR. PERICAK:  -- question that.  And I don't

19  know what impression the jury got from his -- from what

20  Mr. Sprotbery said, and I completely understand that

21  different jurors understand things differently, but they

22  could have understood it the way I understood it.

23                  THE COURT:  So you think he opened the door

24  also?

25                  MR. PERICAK:  I think he did, yes.

Bhatti - Direct - Luibrand                                    176

1                    THE COURT:  Let's assume he didn't, now what

2        do you tell me?

3                    MR. PERICAK:  I think Mr. Luibrand's opening

4        does open it up because it's now placed into the jury's

5        mind, placed into the case, they didn't target him, who did

6        they target, why?

7                    MR. LUIBRAND:  Judge, when we sat down in

8        Binghamton, the Government said here is what we are gonna

9        ask Agent Coll.  Your target was not Mohammed Hossain, it

10       was Aref, correct?  Bill read the question.  Here's what he

11       said.  Said, "It wasn't Hossain, it was Aref?"  "Yes."  And

12       what couldn't follow from that is there is no reason to go

13       after Aref and all I repeated, I parroted what he said he

14       was gonna ask, "Hossain was not the target, Aref was."  I

15       copied that.

16                   MR. PERICAK:  But the ruling was I could not

17       ask that and could not get into the reasons unless the

18       defense opened the door.

19                   THE COURT:  Well, I have got the transcript

20       in there, we can go look at it, the transcript from the

21       Binghamton hearing.

22                   MR. PERICAK:  Right.  Right.

23                   THE COURT:  Do you want to look at that?

24                   MR. PERICAK:  Sure.

25                   MR. LUIBRAND:  Sure.

1              MR. PERICAK:  But I remember the ruling, I am

2      not gonna go there unless they open the door.

3              MR. LUIBRAND:  It's gonna be what it is, but

4      my understanding was they were gonna ask that question and

5      we couldn't stand up and cross and target the reason that

6      they selected Aref, because if they did, the door was open.

7              THE COURT:  Yeah, I think that's what I

8      understood, too.  But we better look at the transcript.

9              MR. LUIBRAND:  Sure.

10              MR. PERICAK:  And the question is by his

11      bringing it up on the opening does it open the door.

12              THE COURT:  Yeah, it probably does.

13              MR. SPROTBERY:  Then we have a bigger issue.

14      If we didn't open the door --

15              THE COURT:  I brought that up, but I was

16      playin' devil's advocate.  I think it's an unfortunate

17      circumstance, but I don't think it's of a constitutional

18      proportion that would damage your client the way it's gonna

19      come in.  It's gonna come in with Mr. Pericak now doing it,

20      before we get on cross-examination, on direct.

21              MR. SPROTBERY:  I thing a number of

22      transcripts, first being the transcript of Binghamton,

23      secondarily, Mr. Luibrand's opening, because I concur with

24      the way he opened, we obviously had this very discussion, we

25      are aware of the sensitivity in trying to create our

Bhatti - Direct - Luibrand                                      178

1    opening, so we wouldn't be having this discussion.  I concur

2    with his assessment.  I think he and I both deliberately

3    side-stepped the issue, so I don't believe the door was

4    opened either by myself certainly or Mr. Luibrand's

5    argument.

6                    THE COURT:  If you want to listen to what

7    Mr. Luibrand said, I thought I heard him say that when they

8    were going to Mr. Hossain, they weren't going to Mr. Hossain

9    to be the target of the investigation.  They were going to

10   him so he would introduce them to Aref down the road.

11                   MR. PERICAK:  He didn't mention Aref, but

12   that's -- clear as night follows day, that's what everybody

13   understood.

14                   MR. SPROTBERY:  How does that open it?

15                   MR. LUIBRAND:  Yeah, I don't --

16                   THE COURT:  He says the inference can now be

17   drawn that since they're definitely not goin' after

18   Mr. Hossain that it had to be that they were goin' after

19   Mr. Aref.

20                   MR. SPROTBERY:  And if I'm not standing up

21   and saying they had no reason to go after Mr. Aref, which I

22   have not --

23                   THE COURT:  No, you have not.

24                   MR. SPROTBERY:  -- then it's not in there.  I

25   haven't asserted he's not a target.  That's what opens the

Bhatti - Direct - Luibrand                                    179

1  door.

2              MR. PERICAK:  I think that's too narrow.

3  What opens the door is introducing the content.

4              THE COURT:  I don't think so.  I think he has

5  to do something affirmatively that would stick that notion

6  in there.  I am not so sure the door is open.

7              MR. PERICAK:  You used the word "slop" at the

8  conference and I think it's the same concept here.

9              THE COURT:  Do you want to look at the

10 transcripts and see what they say?

11             MR. PERICAK:  Yeah.

12             MR. LUIBRAND:  Judge, that was the classified

13 transcript.

14             THE COURT:  I am sorry?

15             MR. LUIBRAND:  It was the classified

16 transcript, just so you know.

17             THE COURT:  I have got both of them, I think.

18 Okay.

19             (Pause in proceedings.)

20             (Court reconvened in chambers at 5:18 PM.)

21             (Discussion held off the record.)

22             (Court adjourned at 5:30 PM.)

23                         - - - - -

24

25


                    THERESA J. CASAL, RPR, CRR
                UNITED STATES COURT REPORTER - NDNY

```
 1                    CERTIFICATION:

 2

 3

 4              WE, THERESA J. CASAL, RPR, CRR, and

 5   BONNIE J. BUCKLEY, RPR, Official Court Reporters in and for

 6   the United States District Court, Northern District of

 7   New York, do hereby certify that we attended at the time

 8   and place set forth in the heading hereof; that we

 9   did make a stenographic record of the proceedings held in

10   this matter and cause the same to be transcribed; that the

11   foregoing is a true and correct transcript of the same and

12   the whole thereof.

13

14

15                              _____

16                              THERESA J. CASAL, RPR, CRR

17

18

19

20                              _____

21                              BONNIE J. BUCKLEY, RPR

22                              Official Court Reporters

23

24   DATE:

25
```