1

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4   UNITED STATES OF AMERICA,

5

6       -versus-                        04-CR-402

7                                       (SENTENCING)

8   YASSIN MUHIDDIN AREF,

9

10                      Defendant.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

12

13

14

15          TRANSCRIPT OF PROCEEDINGS held in and for the

16  United States District Court, Northern District of New York,

17  at the James T. Foley United States Courthouse, 445 Broadway,

18  Albany, New York 12207, on THURSDAY, MARCH 8, 2007, before

19  the HON. THOMAS J. McAVOY, Senior United States District

20  Court Judge.

21

22

23

24

25

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

```
 1

 2    APPEARANCES:

 3

 4

 5    FOR THE GOVERNMENT:

 6    HON. GLENN T. SUDDABY, United States Attorney - NDNY

 7    BY:  WILLIAM C. PERICAK, Assistant U.S. Attorney

 8         -and-

 9         ELIZABETH C. COOMBE, Assistant U.S. Attorney

10

11

12    FOR THE DEFENDANT AREF:

13    KINDLON & SHANKS

14    BY:  TERENCE L. KINDLON, ESQ.

15

16

17    ALSO PRESENT:  EDWARD M. COX, U.S. Probation Officer

18

19

20

21

22

23

24

25
```

USA v. Aref - 04-CR-402                                              3

1                    (Court commenced at 9:31 AM.)

2                    THE CLERK:  United States of America versus

3        Yassin Muhiddin Aref, 04-CR-402.

4                    May I have the appearance for the Government?

5                    MR. PERICAK:  William Pericak, on behalf of

6        the United States.  Good morning, your Honor.  Elizabeth

7        Coombe with me.

8                    THE COURT:  Good morning.

9                    THE CLERK:  On behalf of the defendant,

10       please.

11                   MR. KINDLON:  Terence Kindlon, on behalf of

12       Mr. Aref, your Honor, sitting at counsel table with Kathy

13       Manley from my office.  Mr. Sprotbery, who was engaged in

14       trial, is in jury selection in County Court and can't be

15       here this morning.

16                   THE COURT:  All right.  Are you ready to

17       proceed with sentencing?

18                   MR. KINDLON:  Yes, sir.

19                   THE COURT:  Why don't you come up and stand

20       before the Court so I can dialogue with you.  Mr. Aref, if

21       you would come up, sir.  Good morning.

22                   THE DEFENDANT:  Good morning, sir.

23                   THE COURT:  All right.  Well, there is a lot

24       of information that's been presented to the Court in this

25       case, and some of it's been very helpful.  There has been a

USA v. Aref - 04-CR-402                                              4

1   lot of input from the public, I received petitions, I've

2   received many, many letters on behalf of your client,

3   some -- a couple of them not so complementary, but the vast

4   majority of them said a lot of nice things about him, and

5   the Court will certainly take that into consideration.

6   Of course, I have received and gone over the presentence

7   investigation report and the addendums and all the briefs

8   and submissions by counsel, which, again, have helped the

9   Court in reaching a sentence that it will pronounce this

10  morning.

11              So, to begin with, I know the answer to this

12  question, Mr. Kindlon, but for the record, you have had an

13  opportunity, have you not, to go over the contents of the

14  presentence report with your client, Mr. Aref?

15              MR. KINDLON:  Yes, sir.

16              THE COURT:  And Mr. Aref, has somebody gone

17  over in detail -- namely, Mr. Kindlon or Mr. Sprotbery or

18  somebody from the office -- gone over the entire contents of

19  the presentence report with you?

20              THE DEFENDANT:  Mrs. Kathy.

21              THE COURT:  All right.  My question goes to

22  do you understand what's in that report?

23              THE DEFENDANT:  Yeah.

24              THE COURT:  Okay.  I thought you might.  All

25  right.  Is there anything you wanted to tell me about the

USA v. Aref - 04-CR-402                                      5

1    report, Mr. Kindlon?

2              MR. KINDLON:  Anything that I have to say

3    about the report, your Honor, with the Court's permission, I

4    will incorporate into the remarks addressed to the subject

5    of sentencing.

6              THE COURT:  All right.  Would you take the

7    same stand, Mr. Aref?

8              (Discussion between defendant and counsel.)

9              MR. KINDLON:  I know that my client has a

10   statement that he's given a great deal of thought to that he

11   would like to address to the Court.  In response to your

12   question, "Do you take issue with anything in the report,"

13   what Mr. Aref has told me is that he takes issue, to use his

14   words, with everything in the report.  I have suggested to

15   him, and with the Court's leave would ask that he be

16   permitted, to incorporate any reservations he has about the

17   information contained in the report into his remarks that

18   I'm anticipating he is about to address to the Court.

19             THE COURT:  Well, yeah, that's all right, I

20   have no problem with that.  But I think everybody knows here

21   that whatever I do is gonna be appealed to the Second

22   Circuit, and that's fine, that's what they're there for.

23   And this is laying the groundwork for that.  So, to make it

24   easier for defense, I will give you an exception to every

25   word in the presentence report that was said about Mr. Aref.

USA v. Aref - 04-CR-402                                        6

1   Now there can be no doubt, when it gets to the Circuit, that

2   you've got the foundation and the groundwork to argue

3   anything you want about the contents of that report.

4                  MR. KINDLON:  Thank you, Judge.  I think

5   that's a perfect response to that.  Mr. Aref likes to make

6   detailed notes on each and every word.

7                  THE COURT:  Sure.  That's okay.

8                  (Discussion between defendant and counsel.)

9                  MR. KINDLON:  I think we're ready to proceed,

10  Judge.

11                 THE COURT:  All right.  What would you like

12  to say on behalf of your client before I sentence him?

13                 MR. KINDLON:  Mr. Aref has requested the

14  opportunity to speak himself and I have assured him that, in

15  due course, he will be given that opportunity.

16                 THE COURT:  Absolutely.  It is his right

17  under the law, and he will be given that opportunity.

18                 THE DEFENDANT:  Thank you.

19                 MR. KINDLON:  And the custom and tradition

20  and the law provides that counsel is permitted the

21  opportunity to speak first, so I have some things I will say

22  on your behalf and then you'll be able to speak on your own

23  behalf.

24                 THE DEFENDANT:  Thank you.

25                 MR. KINDLON:  Okay?

USA v. Aref - 04-CR-402                                      7

1              THE DEFENDANT:  Thank you.

2              MR. KINDLON:  Judge, I had hoped we would

3    never come to this day.  It was my fond hope my client would

4    be found not guilty of all 30 counts in the indictment.

5    But, unfortunately, we do find ourselves here today,

6    confronted by the stark reality of Mr. Aref's conviction on

7    10 out of the 30 counts that he went to trial with, and what

8    I'd like to do is put this in the context of 18 USC 3553(a)

9    and advise the Court concerning some of the factors I would

10   like to amplify that the Court should take into

11   consideration.

12             Now, as you know, the defense lawyers who

13   worked on this case, myself, Mr. Sprotbery, Kathy Manley,

14   Steve Downes, everybody, devoted a considerable amount of

15   time and effort to presenting as full and complete a picture

16   of Mr. Yassin Aref to this Court as we possibly could.  So,

17   I don't certainly want to repeat all of that stuff.  I think

18   the record is more than complete.

19             But I do want to just emphasize some things

20   about the nature and the circumstances of the offense and

21   the history and the characteristics of my client.  First of

22   all, the nature and circumstances of the offense.  When the

23   FBI came into Yassin's life, he was not in violation of any

24   law, he was going along, he was serving as an Imam, he was

25   the head of a family, he was, essentially, minding his own

USA v. Aref - 04-CR-402                                          8

1   business.  This was not a crime that was initiated by

2   Mr. Yassin or by his co-defendant.  It was a sting, a sting

3   that was based on a fantasy, and involved a crime that was

4   really the creation of the Government.  And unfortunately,

5   this occurred at a time when there was a climate of the

6   greatest fear in this country, fear that was, quite frankly,

7   and I say this with all due respect to the current

8   administration, fear that was flogged by the administration.

9   And this pretend plot was carried forward by the most

10  despicable snitch, undercover informant known as Malik, that

11  we found in an American courtroom.  It's really important to

12  remember that Yassin Aref was not a terrorist, not even a

13  radical and, in fact, he never posed any threat whatsoever

14  on national security.  I am not gonna reargue the motion to

15  set aside the verdict or reargue the motion to dismiss, but

16  I have to emphasize that the only thing that he was found

17  guilty of was witnessing two money laundering transactions

18  at the end of this long conspiracy that involved a grand

19  total of $4,000.  That's it.  That's all that there is to

20  this conviction.

21          The nature and the circumstances of the

22  offender are also required to be taken into account under

23  3553.  It's important to remember, and the Court listened to

24  my client's testimony over a couple of days, that he's had a

25  life that's as difficult as it is fascinating.  He lived

USA v. Aref - 04-CR-402                                    9

1    under Saddam Hussain for a period of time.  He lived in a

2    country where anarchy was the only rule for a period of

3    time.  He came to this country, ultimately, as a refugee.

4    He is a refugee, he is a man of God, he is a poet, he is a

5    scholar, and I submit to your Honor that the record is

6    replete with evidence of the fact that he had the greatest

7    respect for the law.  In fact, on at least one occasion when

8    we were listening to tapes, when my client ended up

9    lecturing Malik on the subject of morality, I had the sense

10   I was listening to the TV character "Church Lady."  He was

11   actually telling, actually instructing Malik on ethics,

12   honesty and concern for his fellow human.

13              Yassin Aref had a sterling reputation for

14   honesty and courage in his community.  He has been

15   described, over and over and over again, by people who know

16   him, by those who have submitted letters, as a loving,

17   caring, involved head of his family.  We know that his wife

18   has been profoundly depressed by this and he is the father,

19   loving father of four rambunctious and fully Americanized

20   children.

21              We have to stand in awe of his scholarship,

22   your Honor.  As the Court will recall from his testimony, it

23   was shown that when he was a young man, in order to secure

24   his college diploma, he had to travel through war-torn,

25   ungoverned country to attend classes, and it's only because

USA v. Aref - 04-CR-402                                        10

1    of this insatiable thirst for knowledge and the incredibly

2    hard work he was willing to put forth that he was able to

3    secure his Bachelor's degree and, by and by, move to Syria

4    and start his family.

5                    Your Honor, around here, a decade or so ago,

6    we used to listen to the stories of Governor Cuomo's family

7    and how hard his immigrant father worked at his little

8    grocery store in Brooklyn to get the family started.  And

9    when I learned the story of Yassin Aref, I thought "my God,

10   this is the same story, just being repeated again."

11                   When this man was evacuated to this country

12   by the United Nations as a refugee -- and it's important to

13   remember, he didn't come to this country to be a terrorist,

14   he was evacuated by the United Nations Commission on

15   Refugees -- he didn't pick the United States.  He could have

16   gone to South America, Great Britain.

17                   When he got here, he didn't speak the

18   language.  What did he do when he first arrived?  He went

19   out and got a job, and the only job he could get was

20   cleaning bathrooms at the Albany Medical Center Hospital.

21   That's how this educated poet, scholar and man of God began

22   his life in the United States, cleaning filthy bathrooms at

23   Albany Medical Center Hospital.  I said, "How many did you

24   clean every day?"  He said, "Twenty-eight.  And when I was

25   done, they sparkled," he said proudly.  Because of his hard

USA v. Aref - 04-CR-402                                    11

1    work and his dedication, he learned our language, he

2    established himself in the community, he, by and by, became

3    an Imam at a new mosque, and it was because of his fine

4    qualities that he was drawn into this sting.  It was because

5    he was known as such an ethical and honest individual that

6    he was turned to to witness the financial transactions which

7    were an integral part of the sting.

8                    Now, under 3553, the Court, and I quote from

9    the statute, "is required to impose a sentence that is

10   sufficient, but not greater than necessary."

11                   THE COURT:  That's right.

12                   MR. KINDLON:  And in order to calculate or to

13   determine what that sentence should be, it is required that

14   the Court take into account the seriousness of the offense

15   and recognize that purposes of sentencing are to establish

16   respect for law and to provide just punishment.

17                   Again, your Honor, I have to emphasize that

18   this offense was a fantasy created by the Government and

19   that my client was drawn into it, that he thought, at all

20   times, and I am not here to argue the question of guilt or

21   innocence, and I don't want to give you that impression,

22   your Honor, because that has been in the record of this case

23   already established, but it's my position that my client

24   firmly and sincerely believed at all times that he was doing

25   the right thing, he was honoring the command, he was

USA v. Aref - 04-CR-402                                     12

1    witnessing a financial transaction between two Muslim men.

2                  It is so important when imposing a sentence

3    that we promote respect for the law, and as this Court can

4    see from the outpouring of community support, that has

5    continued right up until this morning's Times Union, which I

6    don't know if you've seen it, but it contains a very

7    compelling editorial addressed to this Court that says, in

8    sum and substance, temper justice with mercy, that a lengthy

9    prison sentence will achieve nothing here.  And I think that

10   this Court can rightly, under the strict terms of 3553, can

11   rightly take into account what the public and the community

12   perception is about the sentence.

13                  Now, we do have to address the issue of the

14   Guidelines, and the fact is that because of the law under

15   which we're operating, this -- these offenses or this

16   offense carries a guideline sentence of 360 months to life.

17   But in this post-Booker era, any sentence is available to

18   the Court, we are not bound by the Guidelines.  And the

19   question remains:  What sentence is reasonable?  And I would

20   submit, your Honor, that a sentence that was well below the

21   guideline range is that which is reasonable here.  And I

22   would further submit that pursuant to 5K2.0, a downward

23   departure, based upon a combination of factors, is certainly

24   the most appropriate.

25                  We cited, in our extensive brief, we cited a

USA v. Aref - 04-CR-402                                    13

1    couple of significant examples, a case called Blake, from

2    the Second Circuit, where a 21-level downward departure was

3    appropriate; a case called Gamez, where a 10-level downward

4    departure was appropriate.  And we feel that under the

5    circumstances here, the combination of factors compels the

6    conclusion that a downward departure would be most

7    appropriate.

8                Some of those factors, and they're all set

9    forth at length, but some of the factors are the

10   extraordinary family responsibilities that my client has;

11   the fact that he is an Imam, a man of God; that he has -- he

12   began his time in this country with a history of low-paying

13   jobs; and that he has managed just the most incredibly

14   impressive array of achievements in his life up to this

15   tragic event.

16                Finally, your Honor, I have to emphasize one

17   last time that out of the 30 counts that were contained in

18   the indictment, my client was convicted of only 10 out of

19   the 30.  Or turn that around, he was acquitted of 20 out of

20   the 30.  And I looked through these papers and through the

21   petitions and through the letters for one thought that

22   captures the essence of what it is that -- what message I

23   would like to leave with this Court, and I found it in a

24   letter from Sarah Burn (phonetic), who is a retired lawyer,

25   who has been closely following this case from its inception.

USA v. Aref - 04-CR-402                                             14

1    And I quoted this in the papers, but I would like to repeat

2    these words of wisdom here in this courtroom and, again,

3    humbly request that this Court take these words to heart.

4    Sarah Burn writes, "The terrorists are weakened when our

5    system works the way it is supposed to.  Granting leniency

6    in sentencing the Imam is just and it is vital to show the

7    integrity of our system."

8                  Thank you, Judge.

9                  THE COURT:  Thank you, Mr. Kindlon.

10   Mr. Pericak, Miss Coombe?

11                 MR. PERICAK:  Yes, your Honor.  Your Honor, I

12   don't intend to repeat everything that's in the papers, but

13   I want to highlight a couple of important points.

14                 The charge which carries the most severe

15   guideline, 2339B, is providing material support to a Foreign

16   Terrorist Organization, and it is crystal clear from the

17   evidence, the operative facts show that Mr. Aref engaged in

18   conduct that was exactly the kind of conduct that Congress

19   and the Sentencing Commission contemplated when they enacted

20   the severe guideline.  And that conduct was when Mr. Aref

21   was told by the informant that he worked for

22   Jaish-e-Mohammad, Mr. Aref recognized them immediately as

23   being on the list as a terrorist organization.  And we've

24   quoted in our memo and quoted to the Court before and

25   Mr. Aref's conclusion with respect to this was two-fold:

                    THERESA J. CASAL, RPR, CRR
                  UNITED STATES COURT REPORTER - NDNY

USA v. Aref - 04-CR-402                                          15

1    One is, "Should I help them," that was the informant's
2    question.  And he said, "It is wise for you to help them if
3    you can."  That was his advice.  "Should I help this Foreign
4    Terrorist Organization?"  "It is wise for you to help them
5    if you can.  But be very careful, because if they find a
6    link, if they find a link, you're gonna go to jail."  That
7    was his advice, your Honor, and that's exactly the kind of
8    conduct in the context of which this guideline was enacted.
9              And we all know, and Mr. Kindlon readily
10   pointed out, it's a sting.  But a conspiracy, by definition,
11   usually is prosecuted before any harm is committed, before
12   the final act.  And so there's no question that conspiracies
13   are punished based on the intent and the belief of the
14   person engaged in it.  And in this case, it's very clear
15   that Mr. Aref knew exactly what this organization was and
16   what was involved.
17             And I do want to emphasize something else.
18   In the contacts that Mr. Aref had with the FBI, especially
19   Agent Hoover, the Court will recall he told him that he
20   would definitely bring any suspicious activities or
21   individuals to the FBI's attention if he -- if they came to
22   his attention.  Definitely.  He used that word "definitely."
23   And I submit to the Court that when he's told, "I work for
24   JEM," and he not only doesn't bring it to the FBI's
25   attention, but says, "Be very careful," and when he's later

USA v. Aref - 04-CR-402                                           16

1    told in February, February 12th, there's gonna be a missile

2    attack next week, and instead of bringing it to the

3    attention of the FBI, as he promised Agent Hoover he would,

4    he said, "Don't talk about that kind of thing," and told the

5    suicide bomber story.  "Even the suicide bomber doesn't tell

6    his own mother when he's about to engage in that conduct."

7    And this is the type of conduct that the Court should take

8    into consideration when deciding that this is a truly

9    appropriate guideline range.

10              Just to address the suggestion that Mr. Aref

11   was minding his own business, I just want to remind the

12   Court, and I'm sure the Court is aware, that the FBI had the

13   reasons for looking at Mr. Aref -- his name and phone number

14   found in those camps in Iraq, including one camp where 80

15   insurgents were killed, and we had the list of "missiles"

16   and things.

17              So, there is no question the FBI

18   appropriately, and it would have been utterly irresponsible

19   not to, involved Mr. Aref.  What did they do?  A very simple

20   thing.  "Let's talk to him, say some things and see how he

21   reacts.  Tell 'em you work for JEM, see how he reacts.  Tell

22   him about a missile attack in New York and see how he

23   reacts."

24              I submit to the Court, based on his own

25   conduct, based on how he reacted, based on what he did, it's

USA v. Aref - 04-CR-402                                          17

```
1   totally appropriate to sentence him within the guideline
2   range.
3                   Thank you, your Honor.
4                   THE COURT:  Thank you, Mr. Pericak.
5                   Mr. Aref.
6                   THE DEFENDANT:  Yes.
7                   THE COURT:  You may be heard, sir.
8                   THE DEFENDANT:  Thank you, your Honor.  Thank
9   you very much, Honor, for to me to speak.  And I like first
10  to thank this Court for all for the time I spend here and
11  whoever involve in this case in any way.  And I start with
12  marshal officer here, which brought me continuously one
13  month for the trial.  I did not see from them only respect
14  and only they deal with me not even as a criminal, as a
15  guest, and I'm very thankful for that and I believe they was
16  shocked by the verdict more than me.
17                  The same thing about the Rensselaer County
18  Jail, which is my home for last almost 18 months, and most
19  of them, the officers there, they are shocked and they tell
20  me it's no way for us in whatever to believe you are bad
21  man, you are danger, you are terrorist, you are -- they tell
22  me that they believe it is wrong and they don't understand
23  why I must to sleep in the cell alot.
24                  And I thank after that these people in the
25  back, which I believe they supported in many ways.  Without
```

USA v. Aref - 04-CR-402                                    18

1    their support, my children, now they used to be on the

2    street homeless because I was only the person I work and

3    taking care of them; my wife, she have the new baby, she

4    have three young children, she had health problem, she was

5    not able to work.  If not the support from these people

6    (indicating), my children now they used to be on the street.

7    For no any reason, for no any crime.  If it's coming to

8    commit the crime in this country, why I bring the sick wife

9    and three young children with me to suffer?  To be arrested

10   after my crime?  Why I bring them with me if I'm coming to

11   commit any crime?  I'm very thankful for these people in the

12   back and I believe they must to stand up and they must to

13   come in front and these people should to lead this country

14   and to stop these people from making story, from taking this

15   country toward the hell.  These are the same people, Honor,

16   they destroyed my country, Iraq, they killed seven hundred

17   thousands innocent because they say we have the map, we have

18   the video, we have the evidence, Iraq have the weapon of

19   mass destruction.  And they went to United Nation, they

20   showed to all the universe this is our evidence, this is our

21   map, this is our proof.  Where it is now?

22             The same they did for me.  I did not hear to

23   answer anything about my case because they told me don't do

24   it.  But prosecutor, Mr. Pericak, now he say we give him the

25   opportunity to do the crime.  I knew my crime -- I knew JEM,

USA v. Aref - 04-CR-402                                    19

1   it is the terrorist.  If anyone asks me, "Do you know Osama

2   Bin Laden?"  Yes, I hear about him in the TV, but that's

3   mean I am with Osama Bin Laden because I hear in the TV

4   about him?  That's all I say about JEM.  He ask me, "Do you

5   know that?"  I say, "I hear, I hear about them in the TV,"

6   because I cannot lie to say never I heard about them.  I'm

7   the person daily I listen to the news, because every week I

8   must to preach in the mosque.  How I can to preach every

9   week if I don't know what's going on in the universe?  So,

10  all my crime, I say I hear about that group on the TV.  He

11  say for helping them.  At least ten time in the same

12  meeting, continuously I say I don't know them, I don't know

13  anything about them, I don't know who's leading them, I

14  don't know who's (sic) their purpose, I don't know who's

15  (sic) their goal.  I cannot trust any politic organization.

16  More than ten time continuously he try to make me emotional

17  and say support them.

18            After he misguide me, he describe them not by

19  terrorist group, by freedom fighter, they are working for

20  their freedom.  If best of for information he gave to me I

21  say to support them, I must not to be criminal because he

22  told me they are freedom fighter.  For 40 years their land

23  has been occupied and they work for their freedom.  I am

24  Kurdish, I knew the mean of freedom.  Because Kurdish, they

25  are biggest nation in this universe, at least 14 million

1  Kurdish like me, we are homeless, we are stateless, we are

2  unoccupied territory, all for century.  I knew the mean for

3  freedom.  When they told me freedom fighter, to be honest

4  I'm not hiding anything, I'm not politician to lie.  In the

5  mosque, I preach same way; in the Court, I preach same way;

6  in the jail, I told same way.

7              Prosecutor and FBI, they interview me, I talk

8  same way.  I am saying the truth.  I support freedom for all

9  the nations, including Kashmil (phonetic), including

10  Kurdistan, including Palestine, I want them to be free.  But

11  never I supported any terrorist act, any bombing, any

12  innocent killing, any harming for children, any target or

13  targeting any civilian.  And they ask me every single thing

14  terrorist they believe, because they try to make me to say

15  something in the cassette.  They ask me about suicide bomb

16  in their cassette.  I say it is not allowed in Islam.  They

17  say why they do?  I say go ask them.  Does they do?  Does

18  they plan for them?  Does they give him the permission fatwa

19  to do them or they will be charged in front of God for what

20  they did?  They asked me about killing the innocent.  I say

21  no way in Islam to kill the innocent.  He ask me about do

22  something in this country.  I say we are not in Palestine to

23  fight.  We are in this country.  We came, we sign, we

24  promise to obey the law.  You want to make me like -- in my

25  culture, they say you want to be more Catholic than Pope,

USA v. Aref - 04-CR-402                                    21

1    you want to tell me this is not Islamic law, why we should
2    to respect it?  I say no, because Islam make it obligatory
3    for us to do because when we came to this country, we sign
4    we should to obey the law, we should to respect the law, and
5    Islam make it obligatory to respect the law.
6                   How I do crime because I knew JEM terrorist
7    group?  I knew it was terrorist group, but what I have to do
8    with JEM?  Ever in my life I say I no met anything from JEM,
9    nothing.  He say you told us there will be attack in New
10   York City.  How he say it?  Bring the cassette, tell me how
11   he say it.  What I did?  I say God bless you, I say I'm
12   coming to help you, I say who's doing it, why he doing it.
13   When I hear that I kick him out from my house, I am Imam,
14   not Muslim people allowed to disrespect their guest, doesn't
15   matter what is they say.  But as much I get I kick him out.
16   And because they don't bring the cassette, because it is
17   proof, I don't give any proof for what he say, because they
18   lie, they say in that day they explain for me the word of
19   Chaudhry, never they going to hear if they bring the
20   evidence, the cassette for that day, because they brought
21   the person, they scaring him, he testify, he say he used to
22   call FBI, but Yassin told him Malik joking, that's why he
23   did not call the FBI.
24                   I swear by God if you give me death penalty,
25   I am not going to swear by God falsely.  I swear by God

USA v. Aref - 04-CR-402                                              22

1    never I told him Malik he's joking.  Anyway, today I came

2    here and they told me don't say anything about the case.

3    I'm sorry, I did not came here -- and this is my

4    disagreement with my lawyer all the time.  I say I believe

5    in the court we should to talk about the evidence, not talk

6    about Yassin is so funny and Yassin children.  Because if

7    Yassin worry about his children, he should not commit the

8    crime.  If I commit the crime, it is my problem, the

9    children, not yours problem.

10              You should to be fair.  But I believe we have

11   clear proof they did nothing.  But my lawyer's philosophy,

12   he told me continuously, before and during the trial, it is

13   no way, no way this jury, that time jury was sitting there,

14   to make you guilty.  No way evidence to make you crime for

15   anything.  But now I'm criminal, now I'm terrorist, now I'm

16   guilty 10 charges which is still now I don't understand

17   them, I don't know what is they are.  I don't know.  If

18   somebody say he's going to -- he did not say he's -- if

19   going to be some attack in New York City, I kick him out.

20   What's my crime?  What's I did?  They told me oh, you are

21   crime because you did not call the FBI.  I say I did not

22   call FBI because he was liar.  Why you know he was liar?

23              Honor, if I do something like this or he knew

24   something like this, why he were going to mention it?

25   What's the reason for that guy to tell us next week it will

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

USA v. Aref - 04-CR-402                                          23

1    be some attack?  What's the reason?  He say the reason.  He

2    say we told him because we want Yassin to be save, not go to

3    New York City on that day.  This is true if every day I go

4    to New York City or every week.  I am six years in this

5    country, I did not went to New York City three time.  What I

6    do with New York City?  Why you tell me that?

7              Say, Honor, I give -- say Malik, he trusted

8    me, he told me.  I have the guest, never saw Malik in his

9    life.  How somebody can in front of the guest to say

10   something like this if it is true?  Does make me to have any

11   doubt it's not true and I did not call.  And I don't know

12   how I am crime.  I believe even if it is true, I will not be

13   crime because I did not show any signing for my approval for

14   that, for support for that idea.

15             Second, if I believe terrorist attack or

16   suicide attack against the principle of my faith and this is

17   the same FBI Agent Hoover, he testified here when he asked

18   me I say that, maybe somebody say, oh, he was FBI, why you

19   say that?  But where Malik he ask me, I don't know Malik,

20   he's FBI, I say it's the same thing, society, it's against

21   Islam.  And how am I gonna believe something against Islam?

22             I am going to stop to say about the case, but

23   any human being, Honor, any human being he see this

24   evidence, he cannot believe I am guilty.  And I believe many

25   people, they wrote for you the letter, they was sitting


                    THERESA J. CASAL, RPR, CRR
                  UNITED STATES COURT REPORTER - NDNY

USA v. Aref - 04-CR-402                                      24

1    there, and every single day they came to the trial.  It is
2    beyond any human being's mind to say jury came to the
3    conclusion based of the evidence.  I'm not accusing them
4    because we are human being, something maybe misguide us,
5    something maybe confuse us, something maybe mistake we do.
6    But, strongly, I believe it is this Court's duty to find
7    that error, to make sure that justice has been fair and the
8    fair decision has been made.
9              I told this lawyer first time I saw him in my
10   life, I say what's the evidence?  If you believe I'm guilty
11   in any charge, don't bring it to the trial, don't defend,
12   don't use your experience, your knowledge to bring out the
13   criminal person on the street to harm the people.  If I did
14   the crime, I will be happy to pay for it, to sleep in the
15   jail; it's my crime, I pay for it.  But if not, why I do?
16   Why my daughter Dinya (phonetic), she's 15 months now, she
17   don't know me, I was in jail when she born, she came to the
18   jail, maybe they say a lot here, she believing I'm danger, I
19   cannot carry her because she don't know me, she's scared
20   from me, my daughter.  Why?  If I did the crime, I will not
21   blame anyone.  But I did nothing.
22             And let me go back to what was in my mind to
23   say because to be honest, they give me wrong information.
24   Never they told me you have the right to argue any evidence.
25   And never my lawyer he argue their evidence, even now, all

USA v. Aref - 04-CR-402                                        25

 1    the time making the story, I say please, we are in court,
 2    leave the story, leave exaggerating Yassin he's this, he's
 3    this, he's peaceful man, Imam, brilliant, this and that.
 4    Yes, he suffered a lot in Iraq under Saddam and he has the
 5    family.  No, this is all my problem.  I suffered in Iraq, it
 6    is not your problem, Honor.  My children suffer and it is
 7    not their problem, Honor.  It is my problem.  If I am worry
 8    about them, why I commit the crime?  I say leave, don't beg
 9    them for mercy because my children's situation.  Because I
10    suffered alot under the Saddam.  Don't beg that.  Prove I
11    didn't.  And if I did something, I am in charge.
12              I am villager, Honor.  I am villager.  I born
13    in the village, I live in the village.  I have the parents;
14    my father is the farmer in the isolated village in the third
15    country.  But every single person in my village, they
16    believe human being they are in charge only for what they
17    did and what they said.  I'm not in charge what he say
18    (indicating), doesn't matter what he say, only if I show my
19    approval for it, only if I show the sign I am happy with
20    that.  But what he say what's my problem?  I must to be in
21    charge for what I did and what I say.  I came to United
22    State, I believe United State should be human being only in
23    charge for what they did because no crime for talking in
24    this country.  This is not Iraq.  I can talk, say something,
25    criticize President Bush, I can say this government have the

USA v. Aref - 04-CR-402                                          26

 1    wrong policy.  I can't say they destroyed my country, they
 2    did not build it.  They took the sectarian to the Iraq, not
 3    the democracy.  I can't say they took Iraq hundred years
 4    back, not hundred years forward.  I cannot say they did not
 5    change Iraq or Baghdad to become New York or London.  They
 6    changed it back to be Magdule (phonetic) or Kabul.  I cannot
 7    say that.  In Iraq, if I say that, they will hang me.  If I
 8    criticize the Government, I will be under the ground.
 9                   That's why we came here, to be free, to live
10    free, to have the dignity to live like the human being.
11    What happened in this country, not only they charge the
12    people for whatever they say or did, because if they charge
13    the people like the villager they do in the third country, I
14    will not be guilty.  Honor, you or any human being search
15    every single evidence, what is the act I do I am paying for?
16    Even what is the word I say I am paying for?  It's not
17    there.  It's not there.
18                   So what I am paying for?  In this country,
19    they have charge, this is different charge, never I hear in
20    my village anywhere.  They say he have intention, he will.
21    I am guilty for my intention.  But, Honor, I believe so, I
22    believe God, only God, he know what is in the heart of the
23    people.  And I believe God.  He did not gave the power to
24    anyone, doesn't matter how much technology they have, they
25    cannot go to my heart.

USA v. Aref - 04-CR-402                                          27

1              In jail, we say they can jail you, but not

2    jail your mind, not jail your heart.  You can be free in

3    your mind.  I believe my heart, God give it to us, every

4    individual.  Nobody can enter something or take out

5    something, only by your key.  This is not secret code in the

6    computer or e-mail somebody can open.  This, God gave to

7    every individual, never to go to the heart and check what is

8    there.  I'm guilty for my intention?  They must to show when

9    I show that intention.  If I say this is not allowed in my

10   faith, how I do it?  Where the intention?  And I believe if

11   I have intention to do something wrong, say I put it in my

12   mind and I did not, I must not be guilty.

13             But God, he knew my heart.  I swear by God I

14   have no any intention, I never had intention to harm anyone

15   in this country.  And I don't know why I'm guilty.  Sir,

16   what's happen, I came from that country, from the village,

17   which I believe I have no intention, I did nothing at all.

18   I say nothing at all to be the criminal.  And after that,

19   all my life, Honor, because I am Kurd, they accuse the Kurd

20   by being villager, by being danger, by being willed, by

21   being animal, by being ignorant.  This is description for

22   Kurd in Iraq, in Turkish, in Iran, in all the country they

23   have Kurdistan in.  All of our life we struggle.  We must to

24   prove we are human being, nothing else.  We are human being.

25   Like any human being, God created us.  Maybe we look a

USA v. Aref - 04-CR-402                                    28

1    little bit difference, but we are human being.  We have two

2    eyes, one mouth, two ear, we don't have tails, don't have

3    horn, we are normal human being.

4              All my life for century we must to do that.

5    I come to this country and I say that over.  Everybody human

6    being here, everybody in front of Honor and court, everybody

7    have the same right for freedom of speech.  In this country,

8    me and seven million Muslim live in this country, all has

9    been accused, they are willed, they are animal, they are

10   danger, they are terrorist, they are ignorant and they must

11   to prove now no, we are not, we are just human being.

12             And this lawyer, he told me, he told me

13   things, he say you don't have to argue anything about the

14   case because they prove something against you.  All I want

15   you to go there (indicating) and to speak so the jury they

16   knew you are just human being.  Why?  Why they should to

17   have the doubt I'm human being?  This is not help in this

18   country, your Honor.  These seven million people they came

19   to here as the Muslim, which is 95 percent of them citizen,

20   they belong to this country.  My children don't have

21   citizenship in Iraq, don't have citizenship in Syria, don't

22   speak even the Kurdish.  Just they know English.  Why they

23   should be criminal just because they are Muslim?  Why should

24   we to prove we are human being?  We have no horn, no tails

25   on our back.  Why?

USA v. Aref - 04-CR-402                                         29

1              And I believe this is wrong, I believe this

2    is not being any good for this country, for the system here,

3    for anything.  I one person.  But if you gave me death

4    penalty, I would take it proudly because -- I know you,

5    Honor, and every single person and everybody, FBI, they

6    check all my record, all my life, they interview thousands

7    of the people, they brought all my life in Iraq, too, they

8    knew never I did any violence, never I participate in any

9    fighting, never I support any terrorist group in any way.

10   They have everything, they knew that.  And I believe, Honor,

11   you have no doubt their evidence not prove anything.

12             But with that, if they will be proud by

13   putting me in the all my life in the jail and make my

14   children to suffer, I will tell you and give you right, make

15   them more proud and give me death penalty and I will take it

16   proudly, not because I'm arrogant or proud person, because

17   they knew and you knew and everybody knew I did nothing to

18   be one day in the jail for.  I did nothing to be one day in

19   the jail for.  And I did not came to this country to be in

20   the jail.  I came to be free.  I did not came to this

21   country to destroy this country.  I came to be my life.  I

22   did not came to threaten any human being in this country, to

23   terrorize any children.  I came for my children to be safe

24   from terrorist.

25             I am going to stop here and I am going to

USA v. Aref - 04-CR-402                                    30

1   don't finish.  I have many thing to say, but I will repeat,

2   I did nothing at all, even I say nothing at all.  And God,

3   he knew my heart I have no intention to harm anyone, and I

4   believe what's done for me it is unfair and I believe,

5   Honor, it is your duty to make sure that justice has been

6   served.  If not, give me death penalty.

7           Thank you very much for your time.

8           THE COURT:  All right.  Any reason I

9   shouldn't sentence your client now?

10          MR. KINDLON:  No, sir, there's none.

11          THE COURT:  Mr. Aref, do you know any legal

12   reason I shouldn't pass sentence on you?

13          THE DEFENDANT:  I don't know.  I'm villager,

14   I don't know anything about legal, Honor, please.

15          THE COURT:  Okay.

16          THE DEFENDANT:  Thank you very much.

17          THE COURT:  Well, sure, it's nice for you to

18   believe you're innocent, but, of course, you were convicted

19   here after proof was introduced before a jury, they heard

20   the proof, they made the decision.  The Court reviewed that

21   decision and decided that it was, in fact, correct, that you

22   did break the law, that you intended to help that group,

23   that you wanted to achieve those ends, even though you

24   weren't quite clear what they were.  But what you did do was

25   continue on and participated in a scheme that would launder

USA v. Aref - 04-CR-402                                      31

1   money, that would ultimately be used, so you were told by

2   Malik, for the purposes of helping your Mujaheddin brothers.

3   And my listening to the evidence made me believe that's

4   exactly what you wanted to happen.  And that's without

5   debating the issue, I am not gonna do that, because your

6   point of view is going to be aired thoroughly in the Second

7   Circuit Court of Appeals, and if this was done in error or

8   unjustly done, they're gonna tell us about it, they will

9   send it back for either a new trial or some other

10  disposition, and that's fine, that's what their job is.

11            But from this Court's perspective, being here

12  for the whole trial, my belief is that you were guilty of

13  the crimes that the jury found that you committed, by your

14  own free will, in a free country, not caring about your wife

15  or your children, but caring about your purposes.  And,

16  again, I don't want get into a political debate with you,

17  because this is not the forum for that.

18            Now, this is gonna take a little bit of time.

19  I want to apologize, in a fashion.  Not that I'm gonna do

20  anything that I consider to be improper, but what I am gonna

21  do is cite to a lot of sections in the Guidelines and a lot

22  of case law, so some of you may not understand what I'm

23  saying.  Of course, at the end of this recitation, you will

24  all understand what my sentence will be in this case without

25  question.  So, I am going to begin now, and hopefully, it

USA v. Aref - 04-CR-402                                    32

1    won't take too long.

2              The Court has, of course, reviewed and

3    considered all the pertinent information, including what was

4    said here today, presentence investigation report, and the

5    addendum, all the submissions by counsel, the petitions, the

6    letters, all the factors outlined in 18 U.S. Code Section

7    3553 and the Sentencing Guidelines.

8              Court adopts the factual information

9    contained in the presentence investigation report.

10             As to the United States Sentencing Guidelines

11   calculation, the Court will start by addressing the

12   guideline calculation for Mr. Aref's convictions on Counts

13   20, 26 and 27.  On these counts, Mr. Aref was convicted of

14   one count of conspiracy to provide material support to a

15   Designated Terrorist Organization, in violation of 18 U.S.

16   Code Section 2339B and two counts of attempting, or aiding

17   and abetting an attempt, to provide material support to a

18   Designated Terrorist Organization, in violation of 18 U.S.

19   Code, Sections 2339B and 2.  The Sentencing Guidelines

20   manual specifies that for violations of 18 U.S. Code

21   Section 2339B, the applicable guideline is United States

22   Sentencing Guidelines 2M5.3.  Under 2M5.3(a), the base

23   offense level is a 26.

24             Section 2M5.3(b)(1), specific offense

25   characteristics, provides that if the offense involved the

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

USA v. Aref - 04-CR-402                                          33

1   provision of funds or other material support or resources,

2   with the intent, knowledge or reason to believe they are

3   being used to commit or assist in the commission of a

4   violent act, increase by 2 levels.  The facts at trial

5   established that the material support in issue -- that is,

6   the laundering of funds from the confidential witness'

7   purported illegal importation of a surface-to-air missile --

8   was aided and abetted by Mr. Aref with the intent,

9   knowledge, and belief that the surface-to-air missile would

10  be used in an attack on the Pakistani Ambassador in New York

11  City.  Thus, the offenses clearly involved the provision of

12  material support with the intent, knowledge or reason to

13  believe that the material support would assist in the

14  commission of a violent act.  Accordingly, 2 points are

15  added.

16              Section 3A1.4, the terrorism enhancement,

17  provides at subsection (a) that if the offense is a felony

18  that involved, or was intended to promote, a federal crime

19  of terrorism, increase by 12 levels; but if the resulting

20  offense level is less than level 32, increase to level 32.

21  This enhancement also provides at subsection (b) that in

22  each such case, the defendant's criminal history category

23  from Chapter 4, criminal history and criminal livelihood,

24  shall be category 6.

25              Pursuant to application note 1, a federal

USA v. Aref - 04-CR-402                                      34

1   crime of terrorism has the meaning given that term in

2   18 U.S. Code Section 2332b(g)(5).  That provision contains a

3   two-part definition:  One, the crime must be an offense that

4   is calculated to influence or affect the conduct of

5   government by intimidation or coercion, or to retaliate

6   against government conduct; and the crime must be listed in

7   Section 2332b(g)(5)(B).

8            Both 2339A, which I will address in a moment,

9   and Section 2339B, are listed in Section 2332b(g)(5)(B).

10  Further, based on statements by the confidential witness

11  during the course of the criminal venture, the evidence

12  established that Mr. Aref committed the crimes believing

13  that Jaish-e-Mohammad, the group that purportedly received

14  the surface-to-air missile, was intending to deploy it

15  against the Pakistani Ambassador in order to teach the

16  President of Pakistan a lesson.  Thus, the evidence was

17  sufficient to establish that the Section 2339B offenses

18  involved a federal crime of terrorism that was calculated to

19  influence or affect the conduct of government by

20  intimidation or coercion, or to retaliate against the

21  government conduct.  See United States versus Arnaout,

22  431 F.3d 994 at 1001; United States versus Mandhai, 375 F.3d

23  1243 at 1247; United States versus Graham, 275 F.3d 490 at

24  516; see also United States versus Hale, 448 F.3d 971,

25  footnote 1; United States versus DeAmaris, 406 F.Supp.2d 748

1    at 750.  Therefore, 12 levels will be added under the

2    terrorism enhancement.

3              For the reasons set forth in the presentence

4    report at paragraphs 84, 85 and 87, the Court finds that no

5    other adjustments are warranted for offense level.

6              With regard to an obstruction of justice

7    enhancement pursuant to 3C1.1 of the guidelines, the Court

8    does not find that the enhancement applies simply because

9    Mr. Aref chose to testify in his own behalf at trial.  As

10   evidenced by the guilty verdicts on some, but not all, of

11   the counts, the jury evidently chose not to credit all of

12   his testimony.  However, this does not establish that he

13   gave false testimony concerning a material matter with the

14   willful intent to provide false testimony, rather than as a

15   result of confusion, mistake or faulty memory.  United

16   States versus Dunnigan, 507 US 87 at 94.  Accordingly, the

17   total offense level is 40 for the 2339B convictions.

18             Turning to criminal history, the application

19   of the terrorism enhancement results in a presumptive

20   criminal history category of 6 for Mr. Aref.  While the

21   Second Circuit has held that, quote, "Congress and the

22   Sentencing Commission had a rational basis for creating a

23   uniform criminal history category for all terrorists under

24   Section 3A1.4(b)," the Circuit also noted, in the same case,

25   that the District Court always has the discretion under

USA v. Aref - 04-CR-402                                        36

1    Section 4A1.3(b) to depart downward in sentencing.  United

2    States versus Meskini, 319 F.3d 88 at page 92.  Thus, even

3    where the terrorism enhancement applies, a horizontal

4    departure on criminal history is warranted under 4A1.3(b) if

5    the criminal history category of 6 substantially

6    overrepresents the seriousness of the defendant's criminal

7    history or the likelihood that the defendant will commit

8    other crimes.

9              The Court finds that a criminal history

10   category of 6 does substantially overrepresent the

11   seriousness of the defendant's criminal history.  As

12   indicated in the presentence investigative report at

13   paragraphs 91 through 94, Mr. Aref has no prior criminal

14   adjudications and received zero total criminal history

15   points, as scored by the United States Probation Department.

16   The credible and reliable evidence indicates that Mr. Aref

17   came to this country with his family, with a limited

18   understanding of the English language, and provided for his

19   family, until his arrest, through lawful employment in

20   various capacities.  The information available to the Court

21   indicates that he has been a good father and husband, and

22   there's no indication that he's engaged in any other

23   criminal activity in this country.  Further, as indicated in

24   the presentence report, Mr. Aref has been an Imam at the

25   local mosque, in which capacity he has been a spiritual

USA v. Aref - 04-CR-402                                              37

1    leader for many members of the community in Albany, New

2    York.  His positive impact on numerous members of the

3    community is evidenced by the letters and petitions

4    submitted on Mr. Aref's behalf.  Based upon Mr. Aref's lack

5    of prior criminal history and his personal characteristics

6    as set forth in -- that must be considered in the statute,

7    the Court finds his circumstances to be extraordinary and

8    that a downward departure is warranted to a criminal history

9    category of 1.

10                  Pursuant to United States Sentencing

11   Guideline Chapter 5, Part A, based on the total offense

12   level of 40, and a criminal history category of 1, the

13   guideline range for imprisonment is 292 to 365 months.

14   Pursuant to 18 U.S. Code Section 2339B, the statutory

15   maximum term of imprisonment for Counts 20, 26 and 27 is

16   180 months.  The Court will address the relationship of the

17   statutory maximum to the guideline range in a moment.

18                  I can see your eyes are all glazed over, and

19   I don't blame you one bit.

20                  The Court turns next to Count 12, upon which

21   Mr. Aref was convicted of conspiracy to conceal or disguise

22   the nature, location, source or ownership of material

23   support or resources in connection with an attack with a

24   weapon of mass destruction on a person or property within

25   the United States, in violation of 18 United States Code

USA v. Aref - 04-CR-402                                    38

1   Section 2339A; and Counts 18 and 19 upon which Mr. Aref was

2   convicted of two substantive counts of attempting, or aiding

3   and abetting an attempt, to conceal or disguise the nature,

4   location, source or ownership of material support or

5   resources in connection with an attack with a weapon of mass

6   destruction on a person or property within the United

7   States, in violation of 18 United States Code Section 2339A

8   and 2.

9            For a violation of 18 U.S. Code Section

10  2339A, the applicable guideline is Section 2X2.1 or

11  Section 2X3.1.  These provisions, in turn, direct that the

12  offense level is the same as that for the underlying

13  offense.  The underlying offense charged in these counts was

14  a violation of 18 U.S. Code Section 2332a, the unauthorized

15  use of a weapon of mass destruction on a person or property

16  within the United States.

17           A guideline sentence for a violation of

18  2332a is determined using either 2K1.4 or Section 2M6.1.

19  Section 2M6.1, which is the higher guideline, does not apply

20  because the definition of weapon of mass destruction in

21  application note 1 excludes the subsection of 2332a that is

22  charged in the superseding indictment.  Under United States

23  Sentencing Guidelines Section 2K1.4, the base offense level

24  is, therefore, 24.

25           For the reasons discussed a moment ago, the

USA v. Aref - 04-CR-402                                    39

1    terrorism enhancement of United States Sentencing Guideline

2    Section 3A1.4 applies to the 2339A convictions, resulting in

3    a 12-point increase to an offense level 36.  Also for the

4    reasons discussed a moment ago, the Court finds that no

5    adjustments apply and that a downward departure to criminal

6    history category 1 is warranted in this case.

7                    Pursuant to United States Sentencing

8    Guideline Chapter 5, part A, based on total offense level of

9    36, and a criminal history category of 1, the guideline

10   range for imprisonment for Counts 12, 18 and 19 is 188 to

11   235 months.  Pursuant to 18 U.S. Code Section 2339A, the

12   statutory maximum term of imprisonment for Counts 12, 18 and

13   19 is 180 months.

14                    Mr. Aref was also convicted of conspiracy and

15   two substantive offenses of money laundering in violation of

16   18 U.S. Code Section 1956.  See Counts 1, 10 and 11.  The

17   Sentencing Guidelines manual specifies that for violations

18   of 18 United States Code Section 1956, the applicable

19   guideline is United States Sentencing Guideline Section

20   2S1.1.

21                    Under Section 2S1.1(a)(2), the base offense

22   level for these convictions is 8 plus the number of levels

23   from the table in Section 2B1.1 corresponding to the value

24   of the laundered funds.  Because the value of the laundered

25   funds in this case was more than $30,000 and less than

USA v. Aref - 04-CR-402                                40

1    $70,000, 6 additional levels are added.

2              As to specific offense characteristics,

3    Section 2S1.1(b)(1) provides that if the defendant knew

4    or believed that any of the laundered funds were the

5    proceeds of or were intended to promote a crime of violence

6    or an offense involving firearms or explosives, increase by

7    6 levels.  The evidence established that Mr. Aref believed

8    that the laundered funds were the proceeds of the illegal

9    importation of a firearm or explosive and that he believed

10   that money laundering scheme was intended to promote a crime

11   of violence involving the use of a firearm or explosives.

12   Accordingly, 6 additional levels are added.

13             Next is the question of whether the terrorism

14   enhancement of Section 3A1.4 applies to the money laundering

15   conviction.  As the Court indicated previously, in order for

16   this enhancement to apply, the offense must be a felony that

17   involved or was intended to promote a federal crime of

18   terrorism.  Section 3A1.4(a), application note 1 provides

19   that a federal crime of terrorism has the meaning given that

20   term in 18 U.S. Code Section 2332b(g)(5).  Under Section

21   2332b(g)(5), the crime must be an offense that is calculated

22   to influence or affect the conduct of government by

23   intimidation or coercion, or to retaliate against government

24   conduct and as listed in Section 2332b(g)(5)(B).

25             Since 18 U.S. Code Section 1956 is not listed

USA v. Aref - 04-CR-402                                        41

1    in Section 2332b(g)(5)(B), this offense does not involve a

2    federal crime of terrorism.  Nonetheless, the terrorism

3    enhancement is properly applied to the money laundering

4    convictions under the "intended to promote" prong of the

5    enhancement's language if the purpose or intent of the

6    defendant's substantive offense of conviction or relevant

7    conduct was to promote a federal crime of terrorism.  United

8    States versus Arnaout, 481 F.3d 994 at 1000-1001; see also

9    United States versus Hale, 448 F.3d 971 at 988; United

10   States versus Mandhai, 375 F.3d 1243 at 1247; United States

11   versus Graham, 275 F.3d 490 at 517.

12              Here, the evidence established that Mr. Aref

13   believed that funds being laundered were the proceeds from

14   the sale of a surface-to-air missile that was to be used in

15   an attack on the Pakistani Ambassador by Jaish-e-Mohammad to

16   teach the President of Pakistan a lesson.  Thus, the

17   evidence was sufficient to establish that, through the money

18   laundering scheme, Mr. Aref intended to promote a federal

19   crime of terrorism that was calculated to influence and

20   affect the conduct of government by intimidation or

21   coercion, or to retaliate against government conduct.

22   Accordingly, the terrorism enhancement applies to the

23   Section 1956 convictions and 12 levels are added.  No

24   additional adjustments are warranted, bringing the total

25   offense level to 32.

1               Also, for reasons discussed a moment ago, the

2    Court finds that a downward departure to criminal history

3    category 1 is warranted.

4               Pursuant to United States Sentencing

5    Guidelines Chapter 5, part A, based on a total offense level

6    of 32, and a criminal history category of 1, the guideline

7    range for imprisonment for Counts 1, 10 and 11 is 121 to 151

8    months.  Pursuant to 18 United States Code, Section 1956,

9    the statutory maximum term of imprisonment for Counts 12, 18

10   and 19 is 240 months.

11              On Count 30, Mr. Aref was convicted of making

12   a false statement to the FBI, in violation of 18 United

13   States Code Section 1001.  Under guideline Section 2B1.1(a),

14   the base offense level for this crime is 6.  No specific

15   offense characteristics from 2B1.1(b) need to be applied.

16   Again, the Court applies a criminal history category of 1.

17              Pursuant to United States Sentencing

18   Guidelines, Chapter 5, part A, based on a total offense

19   level of 6 and a criminal history category of 1, the

20   guideline range for imprisonment on Count 30 is zero to

21   6 months.  Pursuant to 18 United States Code Section 1001,

22   the statutory maximum term of imprisonment for Count 30 is

23   96 months.

24              Now, United States Sentencing Guideline

25   Section 5G1.2(d) provides, if the sentence imposed on the

USA v. Aref - 04-CR-402                                    43

1   count carrying the highest statutory maximum is less than

2   the total punishment, then the sentence imposed on one or

3   more of the other counts shall run consecutively, but only

4   to the extent necessary to produce a combined sentence equal

5   to the total punishment.  In all other respects, sentences

6   on all counts shall run concurrently, except to the extent

7   otherwise required by law.

8            The counts carrying the highest statutory

9   maximum are the 1956 counts, which carry a 240-month

10  statutory maximum.  The guideline sentence for Section 1956

11  offenses is 121 to 151 months, which is less than the

12  240-month statutory maximum.  Referring to Section 5G1.2(d),

13  the Second Circuit recently held, quote, "where the

14  guidelines-recommended sentence exceeds the statutory

15  maximum on some counts, but not others, the Court should

16  impose no more than the statutory maximum on any one count,

17  but should impose a sentence consecutively to the extent

18  necessary to reach the recommended guideline range."

19  United States versus Reifler, 446 F.3d 65 at 113.

20           The Section 2339B convictions carry the

21  highest adjusted offense level.  Consequently, in accordance

22  with United States Sentencing Guideline Section 3D1.3(a),

23  these offenses are controlling for scoring purposes.  The

24  guideline range for these offenses, which can be grouped

25  with the other offenses of conviction under United States

USA v. Aref - 04-CR-402                                    44

1    Sentencing Guideline Section 3D1.3(b), constitutes the total

2    punishment for purposes of Section 5G1.2(d).  See

3    presentence report at paragraph 80, discussing grouping.

4    The guideline range for the Section 2339B offenses is 292 to

5    365 months.

6                   Thus, if the Court were to apply Section

7    5G1.2(d), Mr. Aref's sentence of imprisonment on the various

8    convictions would be imposed within their statutory maximums

9    but consecutively up to the point that the total punishment

10   sentence of imprisonment under the guidelines was reached.

11   In this regard, applying Section 5G1.2(d) would result in an

12   aggregate sentence of at least 292 months, which is the

13   lower end of the guideline range for the 2339B convictions.

14                   However, as a result of United States versus

15   Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621,

16   Section 5G1.2(d) of the sentencing guidelines is advisory.

17   United States versus Kurti, 427 F.3d 159 at 164.

18   Accordingly, this Court possesses discretion to determine,

19   after application of the 3553(a) factors, whether to impose

20   consecutive or concurrent sentences.  Now, the Court is

21   gonna state for the record, it's well aware of each and

22   every factor enumerated in that statute and I am not going

23   to reiterate it here, because there's pages and pages of

24   other Judge's stating those factors.  The Court's well aware

25   of them and knows how to apply them.

USA v. Aref - 04-CR-402                                    45

1              Considering the factors set forth in

2    Section 3553(a), the Court finds that an appropriate

3    sentence is reached without applying Section 5G1.2(d).  The

4    underlying terrorism crime around which the sting was

5    purportedly based is a serious offense, and those who

6    support these types of crimes deserve substantial punishment

7    to deter them and others like them from committing similar

8    crimes in the future.  But having said that, and having

9    considered that Congress determined that the statutory

10   maximum sentences for the Section 2339A and Section 2339B

11   offenses to be 180 months, the Court finds that a sentence

12   of 180 months is reasonable and sufficient to accomplish the

13   goals set forth in Section 3553(a).

14             While the underlying crime is serious, the

15   evidence does not support the proposition that Mr. Aref

16   actively sought out some way to aid a terrorist crime;

17   rather, the crimes were presented to him.  In addition,

18   27 of the 30 counts arose out of a sting operation and

19   Mr. Aref was convicted of only 9 of those 27.  By the jury's

20   determination, it can be fairly said Mr. Aref, while

21   possibly aware of the criminal transaction for some time,

22   did not knowingly, intentionally and criminally associate

23   himself with it until July 1, 2004, over six months after he

24   became involved in the transactions between the confidential

25   witness and the defendant Hossain.  While his delay in

USA v. Aref - 04-CR-402                                    46

1   entering into the scheme does not diminish his criminal

2   responsibility, it does play some role in consideration to

3   the appropriate sentence for this defendant.  The Court

4   finds that the need to punish this defendant and protect the

5   public from further crimes of Mr. Aref is adequately served

6   by a sentence of 180 months.

7           The Court has considered Mr. Aref's motion

8   for a further departure under 5K2.0 of the sentencing

9   guidelines based upon a combination of factors.  While the

10  Court is aware that it has the authority to depart under

11  Section 5K2.0 under appropriate circumstances, the Court

12  finds that those circumstances are not present here.  The

13  combination of factors argued by defendant does not remove

14  this case from the heartland of cases covered by the

15  guidelines.  Accordingly, the motion for a Section 5K2.0

16  downward departure is denied.

17          Therefore, Mr. Aref, upon your conviction at

18  trial of Counts 1, 10, 11, 12, 18, 19, 20, 26, 27 and 30 of

19  the superseding indictment, it is the judgment of this Court

20  that you are hereby committed to the custody of the Bureau

21  of Prisons to be imprisoned for a term of 151 months on each

22  of Counts 1, 10 and 11; 180 months on each of Counts 12, 18,

23  19, 20, 26, and 27; and 6 months on Count 30.  The sentences

24  on all counts are to run concurrently with one another.

25  Therefore, the aggregate term of imprisonment for all counts

USA v. Aref - 04-CR-402                                                47

1    is 180 months.

2                Upon your release from imprisonment, you

3    shall be placed on supervised release for a period of three

4    years on each of the 10 counts of conviction.  These terms

5    of supervised release are to run concurrently, pursuant to

6    18 U.S. Code Section 3624(e), for a total term of supervised

7    release of three years.  While on supervised release, you

8    shall not commit another federal, state or local crime and

9    shall comply with the standard conditions that have been

10   adopted by this Court and the following special conditions:

11               If you're deported or otherwise leave the

12   United States, you shall not enter or attempt to enter the

13   United States without the permission of the Secretary of the

14   Department of Homeland Security.  If you do re-enter the

15   United States, you shall report to the probation office in

16   the Northern District of New York within 72 hours.

17               You shall report to and remain in contact and

18   cooperate with the Bureau of Immigration and Customs

19   Enforcement, and you shall fulfill any requirements of U.S.

20   Immigration Law.

21               You shall provide the Probation Officer with

22   access to any requested financial information.

23               You shall commit your person, property,

24   vehicle, papers and effects to search at any time, with or

25   without a warrant, by any federal probation officer with

USA v. Aref - 04-CR-402                                              48

1    reasonable suspicion concerning a violation of the

2    conditions of supervised release or unlawful conduct by you.

3              The Court has reliable information which

4    indicates you pose a low risk of future substance abuse, so

5    the mandatory drug testing condition is suspended.

6              Pursuant to 18 United States Code Section

7    982(a)(1), 18 United States Code 981(a)(1)(C) and 28 United

8    States Code Section 2461, and as fully outlined in the

9    preliminary order of forfeiture, you shall forfeit to the

10   United States all right title and interest in $40,000 United

11   States currency, but shall receive credit for any funds

12   previously recovered.

13             Further ordered you pay a special assessment

14   to the Clerk of the Court of $100 on each count of

15   conviction, for a total of $1,000, which is due immediately.

16             The Court finds, based on your financial

17   resources, projected earnings and other income, as well as

18   your obligations, that you do not have the ability to pay a

19   fine.

20             Both you and the Government have the right to

21   appeal this sentence under certain limited circumstances and

22   you're advised to consult with your attorney to determine

23   whether or not an appeal is warranted.  Any appeal must be

24   filed within 10 days of the date of this sentence.

25             You are remanded to the custody of the

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

1   U.S. Marshal in accordance with the terms of this sentence.

2                   Court stands adjourned in this matter.

3                   MR. PERICAK:  Thank you, your Honor.

4                   MR. KINDLON:  Thank you, Judge.

5                   (This matter adjourned at 10:47 AM.)

6                           - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Aref - 04-CR-402                                              50

1                          CERTIFICATION:

2

3

4                 I, THERESA J. CASAL, RPR, CRR, Official Court

5    Reporter in and for the United States District Court, Northern

6    District of New York, do hereby certify that I attended at

7    the time and place set forth in the heading hereof; that I

8    did make a stenographic record of the proceedings held in

9    this matter and cause the same to be transcribed; that the

10   foregoing is a true and correct transcript of the same and

11   the whole thereof.

12

13

14

15                                      _____

16                                      THERESA J. CASAL, RPR, CRR

17                                      Official Court Reporter

18

19

20

21   DATE:

22

23

24

25


                          THERESA J. CASAL, RPR, CRR
                     UNITED STATES COURT REPORTER - NDNY